## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| DECURTIS HOLDINGS LLC, *et al.*,[1] | ) Case No. 23-10548 (JKS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| CARNIVAL CORPORATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Adv. Case No. 23-50413 (JKS) |
| | ) |
| DECURTIS HOLDINGS LLC, DECURTIS LLC | ) |
| | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |

## CARNIVAL CORPORATION'S COMBINED (A) OPPOSITION TO DEBTORS' OPENING BRIEF IN SUPPORT OF MOTION FOR ENTRY OF AN ORDER DECLARING DEBTORS OWN THE ASSETS THAT DEBTORS SEEK TO SELL AND THAT CARNIVAL HAS NO OWNERSHIP INTEREST IN THE ASSETS (D.E. 295), (B) OPENING BRIEF IN SUPPORT OF ITS REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF IN CARNIVAL'S ADVERSARY COMPLAINT (D.E. 292), AND (C) RESPONSE TO DEBTORS' REQUEST TO SELL PROPERTY FREE AND CLEAR UNDER SECTION 363(F)

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include: DeCurtis Holdings LLC (2384) and DeCurtis LLC (9241). The location of the Debtors' service address in these chapter 11 cases is 3208 East Colonial Drive, Suite C190, Orlando, FL 32803.

# TABLE OF CONTENTS

Page No.

INTRODUCTION.....................................................................................................1

FACTUAL BACKGROUND....................................................................................4

ARGUMENT.........................................................................................................10

I.      **CARNIVAL HAS OWNERSHIP RIGHTS PURSUANT TO THE EXPRESS TERMS OF THE PARTIES' CONTRACTS** ...........................................................10

    A.    The Carnival-DeCurtis MSA .............................................................10

    B.    Carnival-DeCurtis SOWs....................................................................12

II.    **CARNIVAL OWNS CARNIVAL INFORMATION POSSESSED BY DEBTORS AND CONTAINED WITHIN DXP** ...........................................13

    A.    DeCurtis Has Not Established a Prima Facie Case of Ownership.....................14

        1.    DeCurtis Relies Upon an Inapplicable "Presumption"...........................15

        2.    Carnival Admittedly Owns Prototypes and Other Information Still Possessed by DeCurtis, Negating Any Presumption of Ownership over the "DXP Assets."...........................................16

    B.    Carnival Owns Portions of the DXP & Modules Comprising Carnival Information .........................................................................19

        1.    DeCurtis's "Affirmative Use" of Carnival's PRDs, HLA, and Technical Framework to Create the DXP Assets ...........................20

        2.    DeCurtis's "Affirmative Use" of Carnival's Applications...................25

        3.    DeCurtis's "Affirmative Use" of Carnival's Location Engine.............30

        4.    DeCurtis's Alleged Work Prior to July 24, 2014 is Beside the Point...........................................................................................35

        5.    DeCurtis's Source Code Arguments Are All Red Herrings.................37

        6.    The Court Must Give Effect to the Florida Jury's Verdict...................40

C.    Initial Response to Debtors' Newfound "Schedule A" List of Sixty-Eight Software Modules ................................................................................. 45

IV.    **CARNIVAL IS ENTITLED TO AN INJUNCTION** ................................................. 47

A. Governing Legal Standards ......................................................................... 48

B. Carnival is Entitled to an Injunction ......................................................... 49

1. Carnival Has Suffered And Continues To Face Irreparable Injury .................... 49

2. Remedies At Law Are Inadequate .................................................................... 53

3. The Balance Of Hardships Favors Carnival ..................................................... 55

4. The Public Interest Will Be Served By A Permanent Injunction ........................................................................................................ 56

V.    **THE DXP ASSETS CANNOT BE SOLD "FREE AND CLEAR"** ...................... 56

**CONCLUSION** .......................................................................................................... 59

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Board of Trustees of Internal Imp. Fund*,
    37 Fla. 266 (1896)................................................................................................15

*All Leisure Holidays Ltd. v. Novello*,
    No. 12-62328-CIV, 2012 WL 5932364 (S.D. Fla. Nov. 27, 2012) .........................57

*Apple Inc. v. Samsung Elecs. Co.*,
    809 F.3d 633 (Fed. Cir. 2015)...............................................................................52

*Arlington Indus. v. Bridgeport Fittings, Inc.*,
    106 F. Supp. 3d 506 (M.D. Pa. 2015) ........................................................44, 45, 46

*Atlas Powder Co. v. Ireco Chems.*,
    773 F.2d 1230 (Fed. Cir. 1985)..............................................................................62

*Automated Mgmt. Sys. v. Rosenthal*,
    2022 U.S. Dist. LEXIS 61328 (S.D.N.Y. Mar. 31, 2022) ......................................40

*AutoNation, Inc. v. O'Brien*,
    347 F. Supp. 2d 1299 (S.D. Fla. 2004) ..................................................................59

*Bashlow Realty Co. v. Zakai*,
    2010 Bankr. LEXIS 1162 (Bankr. D.N.J. Apr. 14, 2010) .........................................8

*Belt v. United States*,
    868 F.2d 1208 (11th Cir. 1989) .................................................................25, 30, 36

*In re Ben Franklin Hotel Assoc.*,
    186 F.3d 301 (3d Cir. 1999).....................................................................................63

*Berckeley Inv. Grp., Ltd. v. Colkitt*,
    455 F.3d 195 (3d Cir. 2006)......................................................................................9

*Boggs Contracting, Inc. v. Freismuth*,
    2021 U.S. Dist. LEXIS 252335 (M.D. Fla. Dec. 27, 2021).........................51, 52, 59

*Carpenter v. United States*,
    484 U.S. 19, 108 S. Ct. 316 (1987)...........................................................25, 30, 36

*Chetu, Inc. v. Hickey*,
    2019 U.S. Dist. LEXIS 236148 (S.D. Fla. July 1, 2019).........................................58

*Chisholm v. Def. Logistics Agency*,
   656 F.2d 42 (3d Cir. 1981) (applying *Ashe v. Swenson*, 397 U.S. 436, 444
   (1970) to determine preclusive force of general verdict)............................................42, 46, 47

*In re Clark Entertainment Group, Inc.*,
   183 B.R. 73 (D. N.J. 1995) ...........................................................................................15, 16

*Classical Silk, Inc. v. Dolan Grp., Inc.*,
   2016 U.S. Dist. LEXIS 193774 (C.D. Cal. Mar. 21, 2016)......................................................42

*In re Cogswell*,
   622 B.R. 109 (Bankr. M.D. Fla. 2020) ....................................................................15, 16, 17

*Cohen v. De La Cruz*,
   523 U.S. 213 (1998)...............................................................................................................8

*CommScope, Inc. v. Rosenberger Tech. (Kunshan) Co.*,
   2021 U.S. Dist. LEXIS 76200 (D.N.J. Apr. 20, 2021) ....................................................25, 30

*Cordis Corp. v. Bos. Sci. Corp.*,
   635 F. Supp. 2d 361 (D. Del. 2009)......................................................................................62

*In re Delloso*,
   2022 Bankr. LEXIS 741 (Bankr. D. Del. Mar. 24, 2022)..........................................................8

*Dun & Bradstreet Software Servs. v. Grace Consulting, Inc.*,
   307 F.3d 197 (3d Cir. 2002)............................................................................. *passim*

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006)..........................................................51

*Envtl. Servs. v. Carter*,
   9 So. 3d 1258 (Fla. Dist. Ct. App. 2009) (Florida recognizes "legitimate
   business interest" in the protection of "confidential business information") .........................25

*Facebook, Inc. v. Brandtotal Ltd.*,
   499 F. Supp. 3d 720 (N.D. Cal. 2020) ..................................................................................54

*Ferrero v. Associated Materials Inc.*,
   923 F.2d 1441 (11th Cir. 1991) ............................................................................................54

*In re fFuture Graphics*,
   2010 WL 1965893 (Bankr. E.D. North Carolina May 17, 2010) ...........................................63

*Fla. Soc'y of Newspaper Editors, Inc. v. Fla. Pub. Serv. Com.*,
   543 So. 2d 1262 (Fla. Dist. Ct. App. 1989) ..........................................................................25

*FMC Corp. v. Control Sols., Inc.*,
    369 F. Supp. 2d 539 (E.D. Pa. 2005) ....................................................................59

*G4S Secure Integration LLC v. United States*,
    161 Fed. Cl. 387 (2022) ........................................................................................53

*Houser v. Pa. Dep't of Corr.*,
    2022 U.S. App. LEXIS 28156 (3d Cir. Oct. 7, 2022) (unpublished) ....................44

*In re Hruby*,
    512 B.R. 262 (Bankr. D. Colo. 2014) ....................................................................63

*In re Hurvitz*,
    554 B.R. 35 (Bankr. D. Mass. 2016) ....................................................................63

*JetSmarter Inc. v. Benson*,
    2018 U.S. Dist. LEXIS 60113 (S.D. Fla. Apr. 6, 2018) .......................................54

*Kennedy v. Medicap Pharmacies, Inc.*,
    267 F.3d 493 (6th Cir. 2001) ................................................................................63

*Kupscznk v. Blasters, Inc.*,
    647 So. 2d 888 (Fla. Dist. Ct. App. 1994) ...........................................24, 30, 36, 39

*In re Lager*,
    2022 WL 3330421 (Bankr. N.D. Tex. Aug. 11, 2022) .........................................63

*Lead Creation Inc. v. P'ships & Unincorporated Ass'ns Identified on Schedule A*,
    2023 U.S. Dist. LEXIS 25025 (M.D. Fla. Feb. 14, 2023) ....................................52

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
    998 F.2d 1144 (3d Cir. 1993).................................................................................47

*Marine Turbo Eng'g, Ltd. v. Turbocharger Servs. Worldwide, LLC*,
    2012 U.S. Dist. LEXIS 200492 (S.D. Fla. 2012)..................................................52

*Mission Prod. Holdings v. Tempnology, LLC*,
    139 S. Ct. 1652 (2019)....................................................................................62, 63

*Motio, Inc. v. BSP Software LLC*,
    2016 U.S. Dist. LEXIS 193379 (N.D. Tex. May 27, 2016) ..................................40

*In re Mullarkey*,
    536 F.3d 215 (3d Cir. 2008).................................................................................44

*News Am. Mktg. In-Store, LLC v. Emmel*,
    429 F. App'x 851 (11th Cir. 2011) (unpublished) ................................................52

*Palo Alto LLC v. Apotex, Inc.*,
   531 F.3d 1372 (Fed. Cir. 2008) ........................................................................61

*Penalty Kick Mgmt. v. Coca Cola Co.*,
   318 F.3d 1284 (11th Cir. 2003) ...............................................................25, 30

*Proudfoot Consulting Co. v. Gordon*,
   576 F.3d 1223 (11th Cir. 2009) ........................................................................59

*Roton Barrier, Inc. v. Works*,
   108 F.3d 1394 (Fed. Cir. 1997) ........................................................................58

*Russell v. Stickney*,
   62 Fla. 569, 56 So. 691 (1911) ........................................................................15

*Se. Mech. Servs., Inc. v. Brody*,
   No. 8:08-CV-1151-T-30EAJ, 2008 WL 4613046 (M.D. Fla. Oct. 15, 2008) ........................59

*Sexual MD Sols., LLC v. Wolff*,
   No. 20-20824-CIV, 2020 WL 2197868 (S.D. Fla. May 6, 2020) ...........................................59

*SI Handling Sys. v. Heisley*,
   753 F.2d 1244 (3d Cir. 1985) ................................................................. *passim*

*Sionyx LLC v. Hamamatsu Photonics K.K.*,
   981 F.3d 1339 (Fed. Cir. 2020) ........................................................................57

*Sir Speedy, Inc. v. Morse*,
   256 B.R. 657 (D. Mass 2000) ...........................................................................63

*Smith v. Katz*,
   2014 U.S. Dist. LEXIS 171493 (D.V.I. Dec. 11, 2014) ........................................42

*Southco, Inc. v. Kanebridge Corp.*,
   258 F.3d 148 (3d Cir. 2001) ..............................................................................40

*In re Stone Res., Inc.*,
   458 B.R. 823 (E.D. Pa. 2011), *vacated on other grounds*, 482 F. App'x 719
   (3d Cir. 2012) ......................................................................................................63

*Suppan v. Dadonna*,
   203 F.3d 228 (3d Cir. 2000) ..............................................................................46

*Taylor Corp. v. Four Seasons Greetings, LLC*,
   403 F.3d 958 (8th Cir. 2005) ............................................................................42

*Tex. Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc.*,
   895 F.3d 1304 (Fed. Cir. 2018) ........................................................................52

*U.S. v. Stinson*,
    729 F. App'x 891 (11th Cir. 2018) ....................................................................58

*Matter of Udell*,
    18 F.3d 403 (7th Cir. 1994) ............................................................................63

*Variable Annuity Life Ins. Co. v. Hausinger*,
    927 So. 2d 243 (Fla. Dist. Ct. App. 2006) ........................................24, 30, 36, 39

*Vital Pharms., Inc. v. Monster Energy Co.*,
    No. 19-60809-CIV, 2020 WL 3314724 (S.D. Fla. Jan. 24, 2020)........................57

*Walker v. R.J. Reynolds Tobacco Co.*,
    734 F.3d 1278 (11th Cir. 2013) .......................................................................46

*Whelan Assocs. v. Jaslow Dental Lab., Inc.*,
    797 F.2d 1222 (3d Cir. 1986)..........................................................................39

*Woodard-CM, LLC v. Sunlord Leisure Prod., Inc.*,
    No. 20-CV-23104-KMW, 2020 WL 5547876 (S.D. Fla. Aug. 17, 2020)..............59

**Statutes**

11 U.S.C. § 363(k) ..............................................................................................61

11 U.S.C. § 523(a)(2)(A) ........................................................................................8

Bankruptcy Code section 101(5) .....................................................................61, 63

Bankruptcy Code section 363 ...............................................................................61

Bankruptcy Code section 363(f) ................................................................1, 60, 61

Copyright Act.....................................................................................................62

MSA Article 4....................................................................................... *passim*

MSA Art. 4.4......................................................................................................11

MSA ("Confidential Information")........................................................................10

MSA ("Deliverables")..........................................................................................10

MSA § 3.4..............................................................................................17, 18, 19

MSA § 4..........................................................................................................3, 39

MSA Section 4.2.................................................................................49, 50, 51, 56

**Other Authorities**

Seventh Amendment .................................................................................................42, 63

Be Our Guest *was not done by DeCurtis* .......................................................................38

*Carnival* "Gangway." P-690 .........................................................................................38

 "DeCurtis Experience Platform" (the "DXP System") ....................................................8

Disney "Be Our Guest" ..................................................................................................38

Federal Rule of Bankruptcy Procedure 1007(b) ...........................................................47

*Kenzo S.A. v. ariefstore*, No. 19-60198-CIV ................................................................59

Rule 65 ..............................................................................................................................3

of the Sale Order (A) .....................................................................................................61

SOLD "FREE AND CLEAR" ........................................................................................60

www.decurtis.com (last accessed May 1, 2023) ............................................................55

Pursuant to the Court's direction at the June 21, 2023 Hearing and the joint proposed Scheduling Order submitted on June 30, 2023 (D.E. 307-1), Carnival Corporation submits this combined (a) Opposition to Debtors' Opening Brief in Support of Their Motion for Entry of an Order Declaring that Debtors Own the Assets that Debtors Seek to Sell and that Carnival Has No Ownership Interest in the Assets (D.E. 295), (b) Opening Brief in Support of its Request for Declaratory and Injunctive Relief in Carnival's Adversary Complaint (D.E. 292), and (c) Response to Debtors' Request to Sell Property Free and Clear Under Section 363(f).

## INTRODUCTION

1.      DeCurtis[2] concedes that it possesses Carnival Deliverables created under the parties Master Services Agreement ("MSA"), and that it may not lawfully use or sell those Deliverables. D.E. 295 ("Opening Brief") at 3 n.1. The record from the Florida litigation established that Carnival Deliverables are intermingled with and incorporated into DeCurtis's DXP system, not segregated in an "archive server," as DeCurtis now suggests. *See, e.g.*, P-753 (April 2018 email with live link to Carnival application prototype); P-1344 ████████ ████████████████; D.E. 146-34 (2019 email forwarding compilation of Carnival deliverables); P-1849 ████████████████████████. The undisputed fact that DeCurtis continues to possess Carnival's Deliverables (as well as other forms of Confidential Information) forecloses DeCurtis's argument that mere possession establishes a *prima facie* claim of ownership over the intellectual property in dispute.

2.      DeCurtis's brief demonstrates that these bankruptcy proceedings are an improper collateral attack on the judgment Carnival obtained in the Florida litigation.  Most of its Opening Brief seeks to relitigate the same false and meritless positions the jury in Florida rejected earlier

---

[2] "Debtors" and "DeCurtis" in this brief refer to DeCurtis Holdings LLC and its affiliated debtors.

this year.  At the same time, DeCurtis is also trying to introduce new arguments and evidence that are contrary to what it presented in the Florida litigation.  Despite arguing in the Florida litigation that DeCurtis began developing DXP *after* it stopped working for Carnival, *e.g.*, Ex. A[3] ("In 2015, DeCurtis developed an early architecture and technology stack for the system, which evolved into DeCurtis DXP system"), DeCurtis now argues that it started working on DXP *before* its engagement with Carnival, Opening Brief ¶ 9. DeCurtis' own documents and prior testimony make clear that DeCurtis's representations to this Court about DXP's origins are false. The devastating record in the Florida litigation and Judge Scola's ability to assess in person the credibility of DeCurtis's trial witnesses are precisely why DeCurtis seeks a "do-over" of the trial.

      3.      DeCurtis formulates Carnival's burden as follows: "Carnival must show affirmative use of specific materials that constitute Carnival Information in creating a specific piece of what the Debtors want to sell."  Opening Brief ¶ 48. Carnival just did that in Florida this March.  During eight days of trial, Carnival put in overwhelming evidence that the DXP was created using "Carnival Information" – which the MSA defines to include both "Confidential Information" and "Deliverables," each of which is itself defined in the MSA.  In particular, Carnival's evidence established that the DXP architecture and technical framework; the DXP location engine (which is relied upon throughout DXP); the DXP Greeter, Photo, Gangway, and Food & Beverage applications; and DXP documentation (e.g., architectural documents and technical specifications) were created by referencing, replicating, modifying, or simply straight up copying Carnival architectural diagrams, product requirements, use cases, prototype applications, user interfaces, and computer code.  *Infra* Section III.B.

---

[3] Citations to Exhibits refer to the documents attached to the Declaration of Robert L. Uriarte.  Documents marked for trial in the Florida Litigation are cited by their trial exhibit designations.

4.      DeCurtis understood that the likely outcome in the Florida litigation would be an injunction that would have thwarted DeCurtis and Invictus's attempt to launder Carnival's intellectual property through a dubious "sale" of "DXP Assets." This is particularly so given Florida's substantive protections for confidential business information, which requires Florida courts to issue injunctions in cases like this one by default.  As set forth in Section IV, *infra*, separate from the question of who owns legal title to the constituent components of the DXP Assets, Carnival is entitled to injunctive relief under Rule 65 to protect its intellectual property rights in the DXP Assets.  If DeCurtis believed otherwise, it would have taken the shortest path to a determination of Carnival's right to injunctive relief: having the Florida court rule on Carnival's motion on the schedule DeCurtis previously agreed to.

5.      DeCurtis initiated these costly and complex bankruptcy proceedings instead, knowing that they would spawn more litigation.  DeCurtis's pattern of litigious conduct—from filing its doomed lawsuit against Carnival, to its failed attacks on Carnival's patents in the Patent Office, to trying to sell Carnival's property "free and clear" in these bankruptcy proceedings—has caused Carnival substantial irreparable harm, depriving Carnival of its exclusive property rights for years and forcing Carnival to incur millions of dollars defending baseless claims.

6.      Carnival has no desire to "put the Debtors out of business."  *Contra* Opening Br. at 1.  Carnival has no quarrel with Debtors selling products they do own, like Mobile Assembly Suite ("MAS"), or for performing services for others in the cruise industry; indeed, as Debtors note, the MSA gives Debtors the right to do so. Carnival only wants Debtors to get out of the business of selling Carnival's property. Debtors' determination to compete with Carnival unfairly – in the face of a contrary trial verdict and overwhelming evidence that Debtors know they are competing unfairly – is leaving Carnival no choice but to defend its rights once again.

**FACTUAL BACKGROUND**

7.      Carnival's motion for relief from the automatic stay and objection to DeCurtis's

sale motion provide detailed summaries of the Carnival-DeCurtis relationship and history of the

Florida litigation, which have already been accepted into evidence in these proceedings.  *See*

D.E. 102 at ¶¶ 9-28; D.E. 105 at ¶¶ 6-44; Declaration of T. Vann Pearce, Jr. (D.E. 146) ("Pearce

Decl.") at ¶¶ 3-36.  In brief:

8.      In 2014, Carnival hired DeCurtis Corporation to help develop prototypes for a

"game-changing" new technology platform built around the concept of using fine-grained guest

location information to drive delivery of all services aboard a cruise ship.  P-681; P-888, P-1356;

Ex. B (company principal David DeCurtis's trial testimony) at 247:8-249:10 & 258:24-261:17.

At the center of Carnival's platform is an operating system (referred to early on as the

"ExperienceOS" or "ConnectedOS") designed to tie together all cruise ship systems of record

using real-time location information as the central unifying data element. P-680. Code named

"Project Trident," Carnival's project ultimately resulted in launch of the acclaimed OCEAN

platform in 2017. DeCurtis left Project Trident in May 2016 (*e.g.* P-720), ███████████████

█████████████████████████████████████████████ (*e.g.* P-665).

9.      Prototyping, developing, and productizing the OCEAN platform required a

substantial amount of innovation across numerous hardware, software, and networking domains.

Carnival had to build bespoke hardware and software to capture and process the volume and

quality of data that its new system required. E.g., P-77 at p. 56 ¶¶ 154-159. Figuring how to

build, tune, and test a "location engine" capable of accurately determine guest location in the

noisy radio environment of a steel-hulled cruise ship proved to be a particularly daunting

challenge that costs millions of dollars in and of itself. *See, e.g.,* Ex. C at 118:23-124:7; 211:2-

213:1. All told, it took Carnival over three years and several hundred-millions of dollars to complete its work on the OCEAN platform, *id.*, for which it was awarded multiple United States utility and design patents.

10.    Carnival became suspicious when it learned in 2019 that Norwegian Cruise Lines (NCL), in an effort to "play catch up" to Carnival, had hired DeCurtis to develop an OCEAN-like system for NCL. *See* S.D. Fla. Case No.: 1:20-cv-22945-RNS ("SDFL") D.E. 88 ("Florida Complaint" ¶ 86). Carnival's suspicions were heightened further when upstart cruise line Virgin Voyages announced that it, too, would launch its first ever ship with an OCEAN-like system developed by DeCurtis.  In January 2020, Carnival sent patent notice letters to Virgin, NCL, and DeCurtis, and in February 2020, Carnival attempted to audit DeCurtis's compliance with its intellectual property obligations under the MSA.

11.    Rather than permit an audit, *DeCurtis sued Carnival* in April 2020, asserting a raft of declaratory relief, tort, and antitrust claims.  SDFL D.E. 1. Three years and four law firms later, DeCurtis's tort and competition claims were disposed of on summary judgment and the case proceeded to trial on Carnival's claims for patent infringement and breach of contract.  *See* SDFL Docket Report. The jury determined that DeCurtis breached the MSA and infringed multiple Carnival patent claims embodied in the OCEAN platform.  SDFL D.E. 563.

12.    The Argument section below identifies the aspects of DXP that can be directly tied to DeCurtis's misuse of Carnival Information and catalogues the evidence proving that DXP is infused and inextricably intertwined with Carnival's intellectual property.  The documents and the record speak for themselves, so Carnival does not address all the factual misstatements in DeCurtis's brief, many of which are simply attorney statements unsupported by evidence.  A few of DeCurtis's more egregious misstatements merit special attention, however.

13.     *First*, and most remarkably, DeCurtis claims throughout its brief that "Carnival never made an ownership claim in the Florida action."  Opening Brief at ¶¶ 1-2, 6, 19-21, 46. The Florida litigation was expressly about Carnival's ownership of the *intellectual property* embodied in DXP, which formed the core of Carnival's theory of the case.  From day one in filing its Complaint in the Florida Litigation, Carnival has asserted ownership in the Deliverables based on the plain language of the MSA: "*DeCurtis has breached its obligations under the MSA by*…making unauthorized disclosures *and/or use of work product and deliverables* produced for Carnival under the MSA *and which are Carnival's property*." SDFL D.E. 88 at ¶ 105 (emphasis added); *see also id.* at ¶¶ 1, 2, 87, 89 (Carnival "is the creator and owner of a ground-breaking technology platform…referred to as the…OCEAN Platform," that "DeCurtis acknowledged Carnival's ownership of the technology," and that "DeCurtis has passed off Carnival's inventions as its own" and "marketed Carnival Information and Carnival's intellectual property as DeCurtis's own 'solution to the cruise industry'" for providing " 'Customized Experiences' that track closely with OCEAN Platform functionality…."); SDFL D.E. 155 ¶1 ("DeCurtis denies that Carnival is the…owner of…some aspects of…OCEAN®").

14.     Carnival presented extensive argument and evidence to the jury that the Carnival Information in dispute is owned by Carnival.  *See, e.g.* P-1 (MSA) Article 4.1; Ex. D (2/27/2023 trial transcript of Carnival Opening Statement) at 83:13-16 "…they are software developments at Carnival's direction, that Carnival owns, that [DeCurtis has] in their files."); 154:16-22 (the parties' contracts make clear that "all Carnival Information shall remain the sole property of Carnival"); 161:17-162:18 ("…there also were discussions of this concept of ownership of the intellectual property…Basically, Mr. DeCurtis is acknowledging what is in the contract, and what Mr. Padgett is saying in his top email, this is all work being done for Carnival, at Mr.

Padgett's direction, with everything about the system overall in components to be owned by Carnival."); 166:20-24 ("these are all things DeCurtis was developing and all were [D]eliverables under the contract that we looked at, and so all were owned by Carnival…"); 180:18-24 ("DeCurtis was paid for the work it did.  And, Carnival owned it.").[4]

15.     DeCurtis's evidence and arguments in Florida also focused on ownership. For example, at trial, one of DeCurtis's favorite pieces of evidence was an architectural schematic and list of applications and services received in evidence as P-1261 and filed as a demonstrative on the SDFL docket as D.E. 583-9.  DeCurtis asserted repeatedly that DeCurtis, not Carnival, owned architecture and collection of experience concepts reflected in DTX-1261. See, e.g., Exhibit B (David DeCurtis trial testimony) at 158:10-168:7. DeCurtis also tried to convince the jury that the prototypes created during Project Trident did not embody any Carnival Information because those prototype materials were actually old work product that DeCurtis merely "re-skinned" with Carnival "logos and stuff."  *See, e.g.*, Ex. F (Groombridge cross examination of Michael Jungen) at 179:24-180:19;  Ex. B. at 205:9-24; Ex. C. (Groombridge cross examination of Carnival technical expert Erik de la Iglesia) at 228:6-21; Ex. J (Nicholas Groombridge closing argument for DeCurtis) at 86:19-21 ("Everything that's in here [referring to P-1261] is free and clear because it was something that DeCurtis did before…]"). The jury was not deceived; the record included time entries showing thousands of hours of work performed on Project Trident

---

[4] *See also, e.g.,* Ex. D at 158:10-22 (Carnival…would get exactly what it wants and at the end of that will own exactly what it has paid for.");  Ex. O at 120:9-19 (John Padget: "That's what we intend, that is what I intend, everything will be proprietary and owned by Carnival."); 122:2-7 (there is "zero ambiguity" in DeCurtis's understanding that Carnival owned the property coming out of the MSA.); Ex. F at 91:20-8 ("This states, in essence, that Carnival will own everything that is delivered by the contractor…every document and every derived work derivative thereof….all of that becomes the sole property of Carnival.")

prototypes—hours DeCurtis billed to Carnival and was paid millions for.  *E.g.,* P-885.[5]

16.    *Second*, as to DeCurtis's claims about its pre-Carnival work (Opening Brief ¶¶ 3,

9) multiple witnesses (including DeCurtis's) and documents confirmed that ███████████

███████████████████████████████████████████, *e.g.,* P-640 at 19 ████████

████████████████████████, DeCurtis did *not* have any location engine or

location services before working with Carnival, *e.g.,* P-509 (2/7/2018 email: "we have to try and

build [location services] outside of the office in India"), and DeCurtis admittedly did not begin

designing the DXP high-level architecture until sometime in 2015, that is, after it began working

for Carnival, e.g., SDFL D.E. 87 (DeCurtis FAC) ¶¶ 29-37; Ex. A, 7/19/2021 DeCurtis

Interrogatory Response ("In 2015, DeCurtis developed an early architecture and technology

stack for the system, which evolved into DeCurtis DXP system…DeCurtis has been

continuously developing and improving its DXP system since 2015.").  *See infra* Section III.B.4;

*see also* SDFL D.E. 87 ¶¶ 29-37 (DeCurtis's operative affirmative pleading in the Florida

Litigation ("FAC") representing that "Sometime in 2015, circumstances made it impossible for

DeCurtis LLC to continue working on the guest engagement project for Carnival…*Thereafter*,

independent of its relationship with Carnival, *DeCurtis LLC developed other systems and*

*methods* … known as the "DeCurtis Experience Platform" (the "DXP System"). The DXP

System is an end-to-end, enterprise grade software solution for cruise lines that enables location

and proximity-based services.").  "A party is bound by what it states in its pleadings." *Berckeley*

---

[5] There is a name for the type of conduct DeCurtis claims to have engaged in: fraud. *See, e.g., Bashlow Realty Co. v. Zakai*, 2010 Bankr. LEXIS 1162, at *18 (Bankr. D.N.J. 2010) (pre-petition sale of stolen goods held actual fraud under 11 U.S.C. § 523(a)(2)(A)). "The Bankruptcy Code has long prohibited debtors from discharging liabilities incurred on account of their fraud." *Cohen v. De La Cruz*, 523 U.S. 213, 217 (1998).  Relatedly, when a debtor obtains a discharge because of its fraud, "and the requesting party did not know of such fraud until after the granting of such discharge," such fraud is grounds for revocation of the debtor's discharge.  *In re Delloso*, 2022 Bankr. LEXIS 741, at *23 (Bankr. D. Del. Mar. 24, 2022).

*Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 211 n.20 (3d Cir. 2006) (collecting cases).

17.    *Third*, DeCurtis misstates the record in claiming that DeCurtis began working with Virgin Voyages ████████████ and NCL ██████████████████ *after* Carnival made the OCEAN Platform public at CES in January of 2017. Opening Brief at ¶¶ 16-17.  DeCurtis began pitching the idea of an experience platform to Virgin ████ in advance of contracting with Virgin ████████.  *See infra,* Section III.B.1; *see also* P-498 (July 2016 emails between DeCurtis and Virgin regarding "Virgin Voyages Protype Proposal"); P-1090, P-1091 (September 2016 email between DeCurtis and Virgin circulating draft SOW identifying DeCurtis as Virgin's "General Contractor and Solution Architect").  Testimony from NCL's Vice President of Guest Experiences and Innovation established that DeCurtis began soliciting NCL sometime in late 2016, including by disclosing to NCL the fact that Carnival was working on a secret new guest engagement platform.  Ex. G (NCL corporate testimony) at 40:20-41:01, 49:15-20.  Shortly thereafter, David DeCurtis delivered to NCL a Carnival Medallion prototype for analysis. *Id*. at 59:1-6, 62:12-15; *see also* P-771 (February 2017 email attaching "the document that was created for CSP" and suggesting "we might need to add relevant links in this doc for NCL") and P-772 (attachment) (demonstration for NCL using Carnival Information). ████████████████████ ████████████████████████████ P-746.  NCL understood that "DeCurtis was trying to market or sell the work…done for Carnival" and subsequently hired DeCurtis on that basis in August 2017.  Ex. G at 61:10-62:15.

18.    The three foregoing misstatements are significant not only for their brazenness, but also because they underscore the extent to which DeCurtis is using these bankruptcy cases to improperly obtain a different kind of "fresh start" than contemplated under the Bankruptcy Code: a complete nullification of the verdict and judgment in the Florida Litigation and, because

Carnival has been willing to challenge DeCurtis's strategy for obtaining a "free and clear" sale of Carnival Information, then a do-over trial on issues DeCurtis already lost before a Florida jury. The letter and spirit of the law do not permit DeCurtis's tactics to succeed. Nor does the record.

## ARGUMENT

I.    **CARNIVAL HAS OWNERSHIP RIGHTS PURSUANT TO THE EXPRESS TERMS OF THE PARTIES' CONTRACTS**

19.    The evidence at the trial in Florida established, as will be shown here, that Carnival owns certain modules of the DXP, in addition to other Carnival Information prepared under and learned by DeCurtis in connection with the MSA that remain in DeCurtis's possession. P-1, MSA Art. 4.

A.    **The Carnival-DeCurtis MSA**

20.    Carnival and DeCurtis entered into a Master Services Agreement ("MSA") on July 24, 2014. P-1. DeCurtis concedes that Carnival's ownership rights in the DXP platform are determined by the MSA, as interpreted under Florida law. Opening Brief ¶ 4. DeCurtis also concedes that Carnival's property rights are detailed in MSA Article 4, which establishes Carnival's ownership of all "Carnival Information." *Id.* There is no dispute that Carnival Information includes both (1) tangible and intangible non-public information learned by DeCurtis "in connection" with the MSA ("Confidential Information"); and (2) all work product created under or as a result of the MSA ("Deliverables"). "Deliverables" are broadly defined:

> all material prepared for Carnival under this Agreement (including each SOW hereto), which may include but not be limited to inventions, business methods, programs, processes, discoveries, improvements, developments, designs, software programs, systems, specifications, documents or abstracts, or summaries thereof or any other material, and ***any derivative works thereof***, developed, prepared, produced or created by Company, its employees or agents under or as a result of this Agreement, including any works in progress, in whatever form or media, and all rights in patent, copyright, trademark, trade secret, that may subsist therein…

10

(emphasis added).  P-1, MSA Art. 4.

21.     Importantly here, "Deliverables" expressly includes "any derivative works" of the material prepared for Carnival under the MSA as shown above.  Underscoring this point, the MSA expressly bars Debtors from using "the aid of written materials of any type produced in connection herewith" in executing projects for other clients.  P-1, MSA Art. 4.4.

22.     "Confidential Information" includes "information and material which is not generally available to third parties and which Carnival considers confidential," specifically "any information of any nature and in any form … disclosed by Carnival, or which is otherwise learned by [DeCurtis] in connection with [the MSA], which relates in any way to Carnival's … business or operations … including … strategies … the identity of suppliers of goods and/or services and competitors, software and hardware products, trade secrets, other non-public intellectual property, and the terms and existence of [the MSA]."  P-1, MSA Art. 4.  Carnival's property rights in Carnival Information are express and exclusive: "'Deliverables" and, collectively with the Confidential Information, the 'Carnival Information'[,] shall from the time of creation *be and remain the sole property of Carnival and be solely for Carnival's benefit*, whether or not Carnival uses such Deliverable(s)."  *Id.*  (emphasis added).  The MSA further directs that "all rights in patent, copyright, trademark, trade secret, that may subsist therein" solely belong to Carnival.  *Id.*

23.     By its terms, the obligations under Article 4 of the MSA, which governs ownership, use and disclosure of Carnival Information, survive termination.  P-1 at §§ 2.1, 4.6.  Article 4 further specifies that upon termination or expiration of the MSA, or if required by Carnival, "any Carnival Information in any form, in [DeCurtis's] possession, shall be either (i) promptly returned to Carnival or its duly authorized representative, or (ii)" destroyed at Carnival's written instruction, and under Carnival's supervision.  *Id.* at § 4.1.

**B.    Carnival-DeCurtis SOWs**

24.    In addition to the MSA, Carnival and DeCurtis entered into multiple Statements of Work ("SOW") that set forth the specific services DeCurtis was to perform for Carnival under the MSA. Ex. F (Michael Jungen trial testimony) at 95:23-96:14; P-1966.  The MSA specifically states that "[e]ach SOW will be governed by, issued under and incorporate the terms of" the MSA.  P-1 at § 1.1.

25.    The SOWs were consistent with Article 4 of the MSA. For example, SOWs specifically noted that all code, work product, and deliverables generated by DeCurtis or its contractors were the property of Carnival.  Ex. F at 112:24-113:4.

26.    If DeCurtis intended to incorporate anything DeCurtis believed it owned or that predated DeCurtis's work for Carnival, DeCurtis was required to disclose its intent in writing and seek Carnival's approval. Ex. F. at 103:4-17; *see, e.g.*, P-1960 at 2, 18 ("For demonstration purposes only and disclosed in writing with the approval of Carnival Global Experience and Innovation lead, [DeCurtis] may integrate [DeCurtis] proprietary components and/or existing component that will not be considered property of Carnival").

27.    DeCurtis never disclosed, in writing or otherwise, that there were proprietary or existing prototypes or other work product that were being integrated into its work for Carnival under *any* of the SOWs. Ex. F at 103:18-104:6, 107:4-13, 110:21-111:2, 114:2-9, 129:11-21. Nor did Carnival ever provide the approval required for DeCurtis to incorporate proprietary or preexisting work. *Id*

28.    Pursuant to the first SOW, DeCurtis agreed to "design, build and support various Experience Prototypes" for Carnival under the MSA. P-1960 at 1.  Experience prototypes were intended to be early illustrations of the vision for what would ultimately become the OCEAN platform. Ex. F at 98:18-20. However, Project Trident leadership instructed all team members,

including DeCurtis, that prototypes were *not* to be produced solely for a presentation; rather, the goal was continuity to what would ultimately be the OCEAN Platform. *Id.* at 98:21-99:10. Pursuant to additional SOWs, DeCurtis continued to progress the Experience Prototypes forward towards ultimate useability. *Id.* at 108: 3-108:3.

29. Pursuant to the SOWs, DeCurtis also generated architecture strategy for what was internally referred to as "strategic services," which included backend technical capabilities. *Id.* at 109:13-110:17. DeCurtis also provided software to Carnival, including integration scripts, deployment scripts, and test scripts. *Id.* at 113:17-114:1. DeCurtis provided deliverables for a photo system, including the first functional prototype for Project Trident. *Id.* at 105:5-106:6. According to DeCurtis's own records, DeCurtis employees worked at least 2,990 hours on that photo system. P-885. DeCurtis developed a Gangway embarkation prototype application for Carnival. *Id.* at 124:17-125:17; P-816. DeCurtis employees worked at least ***31,230 hours*** on that Gangway application. P-885. DeCurtis developed a Greeter application for Carnival. Ex. F at 118:22-25. DeCurtis employees worked at least 1795.5 hours on that Greeter application. P-885. DeCurtis prepared a Food and Beverage prototype. Ex. F at 127:25-129:17; P-2 (SOW 1). DeCurtis employees worked at least 2,488 hours on that Food & Beverage application. P-885.

30. Contrary to DeCurtis's misleading representation (Opening Brief at ¶ 10), DeCurtis remained involved in Project Trident through May 2016. P-720 (May 2016 email canceling outstanding CR Requests). Until that time, DeCurtis personnel participated in Architecture Review Board meetings with Carnival and other contractors, and DeCurtis had access to all Project Trident records and documents. See, e.g., P-1019. Carnival paid DeCurtis $3,766,675 for its work under the SOWs. P-1966.

## II. CARNIVAL OWNS CARNIVAL INFORMATION POSSESSED BY DEBTORS AND CONTAINED WITHIN DXP

31.    Debtors have failed to establish that they can sell the "DXP Assets." *First*, the Debtors have not established a prima facie case of ownership. The presumption of ownership from "possession" of *personal* property, upon which the Debtors rely, does not apply to *intangible intellectual* property at issue here. *Infra* Section II.A.1.  Even if that presumption did apply, Debtors' own admissions alone rebut that presumption, along with other evidence. *Infra* Section II.A.2. *Second*, assuming for the sake of argument that Debtors have met their initial burden, Carnival amassed overwhelming evidence that Debtors made "affirmative use of specific materials that constitute Carnival Information in creating" the DXP Assets, including the DXP architecture, the DXP's location engine (which is used throughout DXP), a host of specific applications like Gangway and Greeter, and deliverables and technical documentation. *Infra* Section II.B.1-3.  Debtors' claims to have created software before working with Carnival are inaccurate and, in any event, miss the point. *Infra* Section II.B.4.  Debtors' insistence upon a source code comparison for each application does not comport with the MSA or the law. *Infra* Section II.B.5.  And DeCurtis's desire to treat the Florida jury trial as if it never happened is understandable but legally forbidden. *Infra* Section II.B.6. *Third*, and finally, Debtors brand-new list of sixty-eight "applications" which supposedly comprise DXP (which will be the subject of further discovery) does not define the scope of what is at issue here. *Infra* Section III.C.

### A.    DeCurtis Has Not Established a Prima Facie Case of Ownership

32.    DeCurtis's statement of assets defines the DXP as "intangible property."  D.E. 232 at 33-34.  Establishing where Carnival's intangible property ends and where DeCurtis's begins is the task presented by DeCurtis's sale motion.  DeCurtis admittedly bears the burden of proof on this issue. *See, e.g.*, Opening Brief § III(A). DeCurtis has not carried its burden,

particularly given its critical concessions.  Because DeCurtis offers no other argument as to why it has met its initial burden, it follows that it has not and cannot do so.

## 1.    DeCurtis Relies Upon an Inapplicable "Presumption"

33.    The cases DeCurtis cites to support its "rebuttable presumption" of ownership specifically relate to "personal property." *In re Cogswell*, 622 B.R. 109 (Bankr. M.D. Fla. 2020), the primary case relied on by DeCurtis,[6] concerned computers and hard drives. *Id.* at 111. DeCurtis makes no effort how these holdings apply to intellectual property.  Accordingly, the law cited by DeCurtis concerning "possession" is off-base and has no place here.  This is made plain when a basic scenario is considered: under DeCurtis's theory, a former employee who takes with him copies of the company source code when he leaves would be considered the presumptive owner merely because it is in his possession.  That is clearly the wrong analysis in the intellectual property context. Tellingly, DeCurtis cites no law regarding what's at issue here: intellectual property obtained by one party via a relationship of confidence with another.

34.    *In re Clark Entertainment Group, Inc.*, 183 B.R. 73 (D. N.J. 1995) is instructive. In that case the court recognized the necessary distinction between physical property and intellectual property.  *Id.* at 79-80.  There, the Debtor attempted to claim ownership by virtue of possession of certain tapes. *Id.* at 79.  The court noted that "it is well settled that intellectual property rights are separate and distinct from the material object in which the work is embodied." *Id.* Unlike here, the Debtor was rightfully in possession of the tapes in question, but even then the Court held that such possession did not extend to other rights not specifically authorized by the owner of the intellectual property.  *Id.* at 79-80.

---

[6] The other DeCurtis cites are to *Russell v. Stickney,* 62 Fla. 569, 56 So. 691 (1911) and *Adams v. Board of Trustees of Internal Imp. Fund*, 37 Fla. 266 (1896), each well over 100 years old, which concerned ownership of land and coupons, respectively.  Those cases noted that the "presumption of ownership from possession arises ***only when the character of possession is unexplained***…"  Here, the possession is not unexplained.

## 2. Carnival Admittedly Owns Prototypes and Other Information Still Possessed by DeCurtis, Negating Any Presumption of Ownership over the "DXP Assets."

35.     The Debtors concede two critical points that undermine their *prima facie* ownership case in its entirety: (1) they *still do* possess Carnival's property under the MSA and (2) they cannot sell that property. Specifically, Debtors acknowledge that they "provided Carnival a number of Deliverables pursuant to that MSA" and that they "have retained a copy of the Deliverables." D.E. 297 ("Fournier Decl.") ¶ 26. Debtors also at least suggest that they possess "derivative work" of such Deliverables and/or Carnival's "Confidential Information" under the MSA. *See* Fournier Decl. ¶ 129 n.6; Opening Brief ¶ 5 n.1. Debtors specifically "exclude" from their Motion any such Carnival Deliverables, derivatives thereof, or Carnival Confidential Information, which the Debtors call "Excluded Materials." *Id.*

36.     Even if a rebuttable presumption were to exist in this context, under Florida law "*the rebuttable presumption created by possession of personal property is the 'lowest species of evidence'*" and "the presumption can be overcome by 'any evidence showing the character of possession, and that it not necessarily as owner.'" *Cogswell,* 622 B.R. at 116. At the outset, Debtors' concessions negate any presumption of ownership through possession. Debtors assert that they own the "DXP Assets" because "software code for each of the sixty-eight DXP modules resides in the Debtors' code repositories, over which the Debtors have possession, custody, and control." Opening Brief at ¶ 29. But the admitted Carnival property *also* resides in the Debtors' code repositories (according to Mr. Fournier, an "archive server"), over which the Debtors *also* have possession, custody, and control. Fournier Dec. at ¶ 26.

37.     Accordingly, even if the Debtors could rely on the presumption of ownership via possession in this context (which they cannot, *supra,* Section II(A)(1)), their own evidence rebuts that presumption. To put it in the language of *Cogswell*, the Debtors themselves have "show[n]

that the Debtor's possession of the disputed assets was just as consistent with [Carnival's] ownership of them as it was with the Debtor's ownership of them" such that "the presumption of ownership has been overcome." *See* Opening Brief ¶ 47 (quoting *In re Cogswell*, 622 B.R. at 116).

38.     More generally, these admitted facts show why possession tells us nothing about ownership in this context.  This case concerns intellectual property rights under a work-for-hire contract; it is not analogous to a piece of physical property like a car sitting in someone's garage. Debtors admit that, under the MSA, it is *expected* that Debtors would have possession over Carnival's property.  *See* Fournier Dec. ¶26 (Debtors retained copies of Deliverables "pursuant to the MSA"). That is why the MSA has a specific provision for Debtors to return or destroy Carnival's property upon termination of the MSA. P-1 Art.4.  It also is why the MSA specifically allows Carnival to audit Debtors' records to determine whether Debtors are complying with their confidentiality obligations.  MSA § 3.4. Debtors, of course, "den[ied]" Carnival's request for such an audit in 2020 (as explained further below), which was one of the events leading to litigation.

39.     The sole evidence put forward by DeCurtis about the whereabouts of Carnival's property is Mr. Fournier's statement that Carnival "Deliverables" were "placed on an archive server in 2018."  Fournier Dec. ¶ 26. This alleged "fact" is being disclosed by DeCurtis for the first time; DeCurtis never made this claim during the three-plus years of litigation in Florida. Leaving that aside, DeCurtis does not even state that all of Carnival's property is resident on the server. In fact, Debtors' brief states that the Deliverables are "e.g., on the Debtors' archive servers," apparently leaving open the possibility that the Deliverables are not all on this server. The Debtors' brief also references "derivative work[s] from those Deliverables," but does not address where any such derivative work[s] are located.  Thus, even accepting the Fournier Declaration as true, it does not establish that Carnival's property is separate from the DXP Assets.

40.    Setting aside the holes in the Fournier Declaration, it is flatly wrong.  DeCurtis did not carefully isolate Carnival's property on some forgotten server in 2018. Instead, DeCurtis has comingled Carnival's property with its work for Virgin and other customers all along. In responding to Carnival's request to audit DeCurtis's books and records under the MSA, in February 2020 (before litigation), DeCurtis "declin[ed] the requested audit" citing in part its need to "maintain the confidentiality of information from third parties whose information you have requested."  P-23. Carnival responded the next day by reiterating that its audit demand was no broader than the scope provided for under the MSA and expressing concern at DeCurtis's statement that the audit of records related to work for *Carnival* would somehow implicate confidential information of DeCurtis's *other customers*.  P-1829.

41.    Notably, in requesting an audit (again), Carnival also explicitly asked DeCurtis to identify "all location(s) where relevant books and records are stored and the repositories / custodians that maintain those books and records." *Id.*  If it were true, as DeCurtis now claims, that all Carnival Information had been moved to an archive server in 2018, then it would have been a simple task for DeCurtis to simply say that in response to Carnival's 2020 audit request. But DeCurtis never did that and never permitted Carnival's audit.

42.    Instead, DeCurtis misrepresented to Carnival and the Florida District Court that it did *not* have Carnival's Deliverables any longer. In its last communication to Carnival before filing suit, DeCurtis's counsel stated that "the digital deliverables were placed in the local EIC servers and the source code was placed on github" and "Since the project ended more than 4 years ago [i.e., since 2016 or earlier], DeCurtis *has not had access to these servers or the source code.*" DTX-0928.  In filings in the Florida Litigation, DeCurtis unequivocally represented on more than one occasion that "[b]y the end of 2015, DeCurtis was no longer involved with [Carnival's

OCEAN] project. *DeCurtis has since had no access to any of the project's digital deliverables or source code.*" *E.g.*, SDFL D.E. 30 at 2 (emphasis added); SDFL D.E. 15 (similar).

43.    Discovery later confirmed that the Carnival Information possessed by Debtors is broader than what Mr. Fournier suggests, was not simply held in some archive in 2018, and instead is commingled with the DXP Assets that Debtors intend to sell.  *See infra,* Section III.B. Even after 2018, DeCurtis was using Carnival prototypes and other information, and those documents were *not* stored on some archived server but rather were being emailed around among DeCurtis employees and stored elsewhere.  Here is one example: in May 2019, at Mr. Fournier's request, DeCurtis employee Megha Agrawal emailed to Mr. Fournier links to a PowerPoint with "screenshots of all CSP Applications" along with links to "CSP/EIC Videos" for applications including "F&B Flow" and "Greeter."  P-773 (D.E. 146-34).  Mr. Fournier responded, "Great. Please upload all to" a Google drive location.  *Id.*  Here is another example: documentation for the DXP Location Service, last updated on January 17, 2020 and produced during the Florida litigation in 2021, contains pages of *Carnival* source code. P-448 at 31-36.

44.    In summary: Debtors admittedly possess Carnival's property. This admission negates any presumption that Debtors' possession of "DXP Assets" establishes Debtors' ownership. Debtors have not otherwise presented evidence sufficient to show that the DXP Assets do *not* include Carnival's property. The Fournier Declaration is unsupported, contrary to Debtors' prior statements to Carnival and the Florida court and contradicted by Debtors' documents. For these reasons alone, Debtors have not established their ownership over the DXP Assets.

**B.    Carnival Owns Portions of the DXP & Modules Comprising Carnival Information**

45.    Debtors have failed to make a *prima facie* showing of ownership of the DXP Assets; but even if they had, overwhelming evidence developed in the Florida Litigation –

primarily based on Debtors' documents and the admissions of DeCurtis' employees and leadership – demonstrate that Debtors repeatedly used Carnival Information to develop DXP.

46.     While DeCurtis agrees and acknowledges that Carnival owns the Deliverables and "anything that is a derivative work from those Deliverables," Opening Br. at 3 n.1., DeCurtis ignores that significant portions of the DXP fall into those categories.  Those aspects of DXP are Carnival Information and thus belong to Carnival pursuant to MSA Article 4.

47.     DeCurtis correctly notes that Carnival can establish "chain of title" to a DXP asset by "show[ing] affirmative use of specific materials that constitute Carnival Information in creating a specific piece of what the Debtors want to sell."  D.E. 295 ¶ 48.  Carnival already did this for the jury in Florida and does so once again here.

### 1.     DeCurtis's "Affirmative Use" of Carnival's PRDs, HLA, and Technical Framework to Create the DXP Assets

48.     At the start of Carnival's project in 2014, neither the hardware nor software required to execute on the OCEAN vision existed anywhere in the world.  So, Carnival designed and built them from scratch.  Carnival created its first set of formal product requirements documents, referred to as "PRDs," in August 2015.  *Id*.  These PRDs described a new type of small wearable device equipped with dual BLE and NFC antennas, sensors designed to capture and process data transmitted by the wearables, and sensor-connected peripheral devices, like door access panels, for providing personalized guest experiences.  Although DeCurtis was not responsible for developing any hardware for Carnival, DeCurtis had access to all of Carnival's PRDs created from August 2014 to May 2016 as a member of Carnival's Architectural Review Board, or "ARB".  *See* P-1019.

49.     When DeCurtis was expecting a bigger role in the project in 2014, DeCurtis readily agreed that this new platform was a "core differentiator for Carnival" and "the thing that

no one else can have" and was solely owned by Carnival.  P-680, Ex. B at 244:19-247:7.  Mr.

DeCurtis further praised Carnival for "chang[ing] the game" when it came to guest engagement

by using long range technology (specifically BLE).  *Id.* at 247:8-249:10; P-681.

      50.     But once DeCurtis became unhappy with its role on the project, DeCurtis began

using its access to Carnival's design and development documents to create the DXP. 

P-473.[7]

*Id.*

      51.     DeCurtis ramped up its effort to win business from Virgin in the weeks after

David DeCurtis circulated Carnival's PRDs.

P-641. On November 1, 2015, DeCurtis sent a

proposed contract to Virgin offering to provide "shipboard hardware and infrastructure planning

related to proximity enabled applications and experiences."  P-664; *see also* P-1852 (Jan. 6, 2016

e-mail from Mr. DeCurtis to Virgin).

      52.

P-666.

P-665.

---

[7]

.

53.    On March 17, 2016, DeCurtis discussed the need to "update the theme" of the "High Level Architecture" document ("HLA") that was "created for Carnival" by changing the "branding" to "a combination of DeCurtis and Virgin Cruise." P-890.  On March 25, 2016, DeCurtis memorialized in writing its plan to "work on two tasks in parallel."  P-888.  The first task was to "to immediately start" to "rebuild/*replicate* the core entity services in Java." *Id.* (emphasis added.)  Based on his review of Carnival and DeCurtis's development files, Carnival's technical expert confirmed that "core entity services in Java" refers to the specific subset of software Carnival deemed "core services" during Project Trident. Ex. C at 103:6-109:13; 125:24-126:25. The second task was to change "the CCL HLA" so that it would "not look similar" to Carnival's documentation. P-888. DeCurtis supervisors gave specific instructions to change the "colour scheme" and "rename services and platforms" so that there would be "no Carnival reference" or reference to "terminologies like the xIC, Experience etc." *Id.*

54.    DeCurtis also gave instructions to categorize Carnival's list of applications into two groups.  The first group, referred to as "Basic/Core Applications," involved "applications that may remain common for different clients." *Id.* The second group, referred to as "Game Changing/Experience/Next Gen Applications" included applications designed to work with wearables like "Greeter," "food delivery, and personalized guest experience." *Id.* DeCurtis's internal communications at the start of DXP development referring to Carnival conceived, wearable-enabled applications as "game changing" puts the lie to DeCurtis's tired argument that everything in DXP was a carryover from DeCurtis's pre-Carnival work. Ex. J (Groombridge closing argument for DeCurtis) at 86:19-21 ("Everything that's in here [referring to P-1261] is free and clear because it was something that DeCurtis did before…]").

55.     Also in March 2016, in violation of their respective obligations to Carnival, DeCurtis and Level 11 secretly began discussions about potential joint venture involving a location services-based photo project. ███████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████ P-565. ████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████ P-1161. ████████████████████████████████

███████████████████████████████████████████████████ *Id.*

56.     ████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████ DTX-0267.   The contract's "Schedule of Deliverables" included ████████████████████████████. The deliverables Virgin hired DeCurtis to create also included ████████████████████

████████████████████████████████████████████

57.     ████████████████████████████████████████████████

█████████████████████████████████ P-634.  The Fournier Declaration identifies "DCMS" as the "DeCurtis Cruise Management System" that "served as the foundation of what became DXP."  Fournier Declaration at ¶ 20.  Attached to this email were two documents cataloging *Carnival's* unique compilation of guest and crew applications, respectively.  *See also* PTX-358 █████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

58.   ████████████████████████████████████████

████████████████████████   P-497; P-1855; P-1844.   ████████████

████████████████████████████████████████████████████

████████████   P-1351.  DeCurtis ultimately contracted to do so with Virgin. P-1898.

59.     In sum, the starting point for the DXP (as it was created for Virgin and still exists today) was Carnival's architecture, architectural documentation, and collection of applications. Because DeCurtis based the DXP on Carnival's technical framework, DXP embodies proprietary business information that Carnival has exclusive rights to under the MSA and Florida law.  *E.g.*, *Kupscznk v. Blasters, Inc*., 647 So. 2d 888, 890 (Fla. Dist. Ct. App. 1994) (enforcing company's exclusive right to exploit "trade secret or, at a minimum, confidential business information" taken by former employee in breach of contract);[8] *Variable Annuity Life Ins. Co. v. Hausinger*, 927 So. 2d 243, 245 (Fla. Dist. Ct. App. 2006) (discussing right to statutory injunctive relief to protect sensitive business information); *Envtl. Servs. v. Carter*, 9 So. 3d 1258, 1266 & n.6 (Fla. Dist. Ct. App. 2009) (Florida recognizes "legitimate business interest" in the protection of "confidential business information"); *see also Fla. Soc'y of Newspaper Editors, Inc. v. Fla. Pub. Serv. Com*., 543 So. 2d 1262, 1265 (Fla. Dist. Ct. App. 1989) (discussing different statutory protections for "proprietary confidential business information."); *Athletes United States*, 2018 Fla. Cir. LEXIS 10424, *40-41 (approving of claim for constructive trust).

60.     The legal principles underlying Florida's public policy are also consistent with federal law, which has long recognized that "confidential business information" is "property," *Belt v. United States*, 868 F.2d 1208, 1212 (11th Cir. 1989), and that "a person who acquires special

---

[8] The MSA protects against misappropriation of Carnival's trade secrets, like its source code, but it also expressly presents information that does not rise to the level of a trade secret.  *See* MSA Art. 4.

knowledge or information by virtue of a confidential or fiduciary relationship with another is not free to exploit that knowledge or information for his own personal benefit," *Carpenter v. United States*, 484 U.S. 19, 27-28, 108 S. Ct. 316, 321 (1987). The Carnival Information incorporated into DXP remains Carnival's property. *See, e.g.*, *SI Handling Sys. v. Heisley*, 753 F.2d 1244, 1259 (3d Cir. 1985) (approving district court's finding that because defendants developed concept by "misappropriating the unmatured development effort paid for by SI. . . . [the] concept developed by defendants…is deemed to be the property of SI"); *CommScope, Inc. v. Rosenberger Tech. (Kunshan) Co.*, 2021 U.S. Dist. LEXIS 76200, at *18 (D.N.J. Apr. 20, 2021) ("The manufacture or sale of materials "substantially derived" from a trade secret constitutes "use" of that trade secret")(collecting cases); *Penalty Kick Mgmt. v. Coca Cola Co.*, 318 F.3d 1284, 1293 (11th Cir. 2003)("an actor is liable for using the trade secret with independently created improvements…").

61.     At a minimum, the DXP is a "derivative" of Carnival Information that was created by DeCurtis "as a result of" the MSA and thus constitutes Carnival's "sole property" of which Carnival is the "author." P-1, MSA Art. 4; *SI Handling*, 753 F.2d at 1259 (finding ownership as a matter of contract); *Dun & Bradstreet Software Servs. v. Grace Consulting, Inc.*, 307 F.3d 197, 212 (3d Cir. 2002) (finding ownership as a matter of copyright: "race's W-2 program using Copy and Call commands copies Geac's computer copyrighted code. Thus, it is a derivative work").

## 2.     DeCurtis's "Affirmative Use" of Carnival's Applications

62.     Shortly after repurposing Carnival's HLA, DeCurtis turned to building out that architecture by replicating Carnival's specific software applications and features.

63.     In August 2016, employees of DeCurtis's technical development center took all the details they had regarding Carnival's project and created a CSP "prototype reusability matrix" listing all the prototypes built for Carnival. P-897, P-898; *see* Ex. K (DeCurtis employee Agrawal trial testimony) at 92:02-07 (CSP refers to Carnival Studio Prototype), 141:11-19 (MI6

refers to Virgin Voyages).  The "prototype reusability matrix" shows that, ███████████

████████████████████████████████████████████████████████████.  P-

898.  *See also* P-895 (July 2016:"We should be looking to reuse CCL Lab Prototypes as much as

possible for creating hi-fi [high-fidelity] L2 prototypes instead of starting from scratch.")

64.     In an October 20, 2016 internal email, various DeCurtis employees discussed

DeCurtis's directive to "'follow' the CSP UI," which is a reference to Carnival's creative and

original user interface.  P-1325; P-77.  According to the email, DeCurtis's marching orders were

to "reuse as much as possible," repurposed with a "theme for VV [Virgin Voyages]," and "build

afresh only those modules that were not built for CSP."  P-1325. To operationalize these orders,

DeCurtis set up a process whereby "all future reviews of wireframes and mockups will have a

side-by-side comparison with CSP." *Id.* This process included a "static excel/list with links to all

CSP work, that can be access by everyone, anytime." *Id.*

65.     DeCurtis employees were asked to factor in the reuse of Carnival's property when

estimating the number of hours they planned to work on the DXP for Virgin, further

demonstrating that the DXP is built upon and interwoven with Carnival property. P-766 (internal

email in which DeCurtis employee writes, "Please re-estimate MI6 prototype hours considering

that we will re-use the CSP lab prototype and backend services.").

66.     Testimony from DeCurtis employees presented at trial confirmed that DeCurtis's

standard practice was to "use any of our previous documents" made for Carnival and to carry out

"side-by-side comparison[s] with [Carnival Studio Prototypes" to develop work for other

DeCurtis clients.  Ex. K (employee Agrawal testimony) at 87:1-8; 159:21-160:17. Carnival

proved at trial that DeCurtis repeatedly and systematically misused Carnival information

throughout the development, marketing, and implementation of DXP. DeCurtis maintained a

"carnival wiki," e.g., P-752, P-889, and made sure that "all [Carnival Studio Prototype] work [could] be accessed by everyone anytime" to reference, use, and copy in connection with performing work for other customers and developing DXP, Ex. K at 159:21-160:17.

67.    DeCurtis executed on its plan to copy the Carnival applications.  Specific examples include the DXP's Gangway, Greeter, Photo, and Food & Beverage applications.

68.    *Gangway*.  In the cruise industry, gangway processes and technology control people's boarding and exiting off a ship. As part of its work under the MSA, DeCurtis developed new Carnival-owned gangway software designed to work with, for example, Bluetooth low energy technology. P-816. In flagrant disregard for Carnival's ownership under the MSA, DeCurtis reused gangway technology developed for and owned by Carnival for DeCurtis's own benefit and the benefit of Carnival competitors.

69.    In a June 2017 e-mail thread titled "Gangway!!!!!!" David DeCurtis directly instructed the head of DeCurtis's development center as follows (P-690) (emphasis added):

> I got a demo of Gangway and I may have to cancel the demo to VV. It is embarrassing. I don't know where to start. It is an abso-lutely AWFUL gangway app. it does NOTHING that a gangway needs to do. . . . . *IT HAS VIRTUALLY NONE OF THE CAPABILITIES OF CCL GANGWAY* which is what I told you guys to use as your blueprint over a year ago. . . . *How many times have you heard me say 'use the existing apps as a blueprint'?* … What part did you not understand? *Take the CCL code and replicate it out new platform.*"

70.    Other evidence confirms that the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. P-756 ("We took the idea of this alert from the Carnival Gangway app."); *Mar 9 Tr.* 28:13-25 (Mr. DeCurtis testifying that he wanted gangway features that were in the CCL version to be included in the DXP version).  DeCurtis admitted at trial that the work it was doing on the Carnival gangway was "game-changing" and applications that were built to "very high development an architectural standards."  P-888, P-1356, Ex. B at

258:24-261:17 (David DeCurtis Testimony).  The gangway DeCurtis continues to use today is the gangway resulting from the instruction to "replicate [Carnival's] code." P-690, Ex. B at 24:8-25:15 (David DeCurtis admitting DCMS/DXP gangway was being built on CCL code).

71.    **Greeter**.  As discussed *supra,* Section I(B), DeCurtis created for Carnival a location aware Greeter application prototype capable of displaying guest information based on detection of a Bluetooth low energy communication. *See* P-2 (SOW 1).  PRDs for Carnival's Greeter show that information was proprietary to Carnival and "will be developed" by DeCurtis. P-749; Ex. B at 12:23-14:17 (David DeCurtis Testimony).

72.    ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████ P-1884; P-887.

73.    In a September 2016 email discussing the "build details" for Greeter prototype applications delivered to Virgin ███████████████, DeCurtis COO Jim Learish asks, "Is it not possible to have greeter detect nearby beacons like we did at the CCL studio? I thought we were using the same app"?  P-349 at 2-3.  A DeCurtis employee confirmed, "we used the same prototype which we used during carnival prototype phase." *Id.*

74.    **Photo**. DeCurtis's work for Carnival under the MSA included work on photo applications that could be integrated into Carnival's location-services infrastructure. *E.g.*, P-5 █████████████████ P-809 (CCL SOW). DeCurtis photo-related work under the MSA ranged from creating low fidelity prototypes for Project Trident "studio shows" to work on the production version of photo software integrated into Carnival Cruise Line's ("CCL") location-aware gangway application—software that remains in service today.

75. 

P-565.

*See* P-348

; P-755 (September 2018 email in which DeCurtis employee states, "Current code base is with Carnival copy right and the project files are created [sic] the Carnival name spaces so after publishing the binaries will be visible with Carnival name").

76. ***Food & Beverage***.  As early as July 2015, DeCurtis began incorporating Carnival's property related to the Food and Beverage application, including Carnival code, into a "dupe" functionality on the DXP. P-886 at 2 (discussing removal of references to Carnival from multiple food and beverage apps); P-1157 at 15 ("DXP Studio Plam [sic] document stating, "Possibly use all CSP Demos" and under "F&B" stating "CSP Code – Change Colors""); P-519 (DeCurtis employee attaching "CSP F&B (Carnival Studio Prototype) crew mock-ups" as a reference for DXP app). Today, DeCurtis's DXP system continues to enable location-based delivery of food and beverages using BLE technology. Ex. H (Virgin testimony) at 62:22-63:7.

77. As a result of DeCurtis's rampant reuse of Carnival code, Carnival's trademarks, copyright notices, and Carnival-specific UI features were being discovered in DeCurtis's DXP product long after DXP development began.  For example, in April 2018, the DXP UI still displayed a bouncing Carnival medallion.  P-752.  DeCurtis was still affirmatively using Carnival prototypes to develop the DXP in August 2018. P-753.

78. Because DeCurtis based the DXP on Carnival's original and proprietary applications and features, the DXP embodies Carnival Information that Carnival has exclusive

rights to under the MSA and Florida law.  P-1, MSA Art. 4; *See, Kupscznk*, 647 So. 2d at 890;

*Variable Annuity Life Ins.*, 927 So. 2d at 245; *Belt*, 868 F.2d at 1212; *accord SI Handling*, 753

F.2d at 1259; *CommScope,* 2021 U.S. Dist. LEXIS 76200, at *18; *Penalty Kick*, 318 F.3d at

1293.  At a minimum, the DXP is a "derivative" of Carnival Information that was created by

DeCurtis "as a result of" the MSA and thus constitutes Carnival's "sole property" of which

Carnival is the "author."  MSA Art. 4; *SI Handling*, 753 F.2d at 1259 (finding ownership as a

matter of contract); *Dun & Bradstreet*, 307 F.3d at 212 (ownership as a matter of copyright.).

### 3.    DeCurtis's "Affirmative Use" of Carnival's Location Engine

79.    One of the biggest challenges Carnival faced in developing the OCEAN Platform

was creating a software system capable of collecting, processing, and operationalizing the vast

amounts of high-quality location and proximity information that would be produced by

Carnival's new hardware.  In early Project Trident communications, David DeCurtis referred to

this "proprietary ConnectedOS" (operating system) Carnival was building as the foundation of

the Carnival's "core Experience Connection Platform."  P-680.  As David DeCurtis explained,

Carnival's plan was to create a connected operating system for "connecting the guest via a

wearable to the platform."  David DeCurtis further explained that under Carnival's vision, "the

guest-wearing-a-module" model "is the core of all primary use cases" and expressed his view

that the ConnectedOS software Carnival was creating would be "the core differentiator-the thing

that no one else can have, *even by assembling components*."  *Id.* (emphasis added).

80.    The software Carnival developed for "connecting the guest via a wearable to the

platform" is the centerpiece of the entire OCEAN platform.  This software module, which

ultimately came to be known as Carnival's Location Engine, took years of collaborative effort

between Carnival, Level 11, and Nytec to develop and cost Carnival millions of dollars.

81.     On August 27, 2015, pursuant to a Carnival-Level 11 MSA, Carnival and Level 11 entered into SOW 5, entitled "Location Services and Management Console." P-1484.  The project description explained that the location engine "will track the status of a person's Medallion and be able to report detection at a location, movement away from location, or changes from one location to another…The use of BLE based guest and static beacons will allow Guest and Crew mobile devices to participate in the Location Services ecosystem."

82.     Carnival-Level 11 SOW 5 noted that, with Carnival's permission, Level 11 would incorporate into Carnival's location engine "the use of pre-existing code" from "Level 11's core location 'singulation' engine," referred to as Lok8.  SOW 5 also made clear, however, that Carnival's "overall solution" would require "more than Lok8" because of Carnival's new requirements; "these requirements will necessitate the development of bespoke code that will be proprietary and owned by Carnival."  P-1484.  Deliverables under Carnival-Level 11 SOW 5 included "code for core location event handling," such as code necessary to provide *inter alia* centralized logging, performance counters for service metrics, and security mechanisms for location services.  These and other advanced features, which were necessitated by Carnival's new and unique requirements, required "bespoke" code that is solely owned by Carnival. P-1484.

83.     Carnival's expert Erik de la Iglesia reviewed the source code and deliverables generated by Level 11 under SOW 5 and other SOWs entered into under the Carnival-Level 11 MSA.  Based on his review of Level 11 documentation and source code that existed before, during, and after Level 11's work for Carnival, Mr. de la Iglesia identified materials Level 11 created for Carnival under the MSA as work-for-hire materials and detailed his findings in a lengthy and detailed expert report. P-77 at p.63 ¶139- p.63 ¶179.

84.     With respect to Carnival's location engine, Mr. de la Iglesia determined that the work performed for Carnival by Level 11 included a Level 11 location service comprising a Singulation element with three configurable algorithms: Closest Sensor, Trilateration and Centroid and a useCentroid function with Kalman filtering operations.  The code created to implement these functions was created by Level 11 for Carnival under the MSA sometime subsequent to March 2016.  *Id*.  Upon inspection of source code for the DXP location engine, Mr. de la Iglesia discovered that DeCurtis had replicated Carnival's location engine architecture and collection of location algorithms in the DXP location engine.  *Id*.

85.     Mr. de la Iglesias's source code analysis is consistent with DeCurtis's internal emails, DXP documentation, and communications with Level 11. An internal DeCurtis email chain from early February 2018 with the subject line "Re: Location Services demo" reflects a state of panic at DeCurtis in response to Virgin's request for a DXP demonstration.  Virgin wanted its board to come to DeCurtis's headquarters to check on DeCurtis's progress on location detection, but DeCurtis did not even have the most basic hardware or software needed to demonstrate anything of the sort.  P-509.  Fournier responded candidly that in order to develop location services, they might need to take the project outside of DeCurtis due to DeCurtis's "mediocre talent" and "concerning" lack of "intellectual horsepower."  With respect to algorithms in particular, Fournier confessed "[w]e've discussed very complicated pieces of the algorithms but all of them need to be coded and then they need to be built in a way that they can be used by multiple platforms and be performant. I do not believe we can do that …I honestly think we have at least 50% of the team who should not be employed."

86.     Faced with revealing to Virgin's Board that DeCurtis had sold them a bill of goods, DeCurtis turned to Level 11 for help in developing a location engine as quickly as

possible.  P-465.  On March 29, 2018, Level 11's Glen Curtis sent an email to David DeCurtis

with the subject line "Architecture for discussion in an hour."  P-346.  Attached to the email is a

document containing a trove of Carnival's Confidential Information. For example, the document

disclosed that Carnival's implementation "uses multiple position computation algorithms-

Strongest Signal, Trilateration, Centroid, mix of Strongest Signal and Trilateration/Centroid."

The document also disclosed that Carnival's implementation "uses Kalman filters for signal

smoothing." The document also disclosed system components utilized by Carnival and disclosed

the results of Carnival's performance testing.  However, the document noted "two issues:" the

software described in the document reflected "quite a bit of Carnival-specific code," as well as

"quite a bit of code for managing Nytec readers."  Nevertheless, DeCurtis and Level 11

ultimately agreed to replicate Carnival's location engine architecture in the DXP.

88.    DeCurtis and Level 11 entered into a joint development agreement to build a

"new" location engine on May 1, 2018.  P-1639.  DeCurtis-Level 11 SOW 1 proposed to replicate

Carnivals location engine architecture in DXP.  DXP's location engine architecture contains

Carnival's core components, arranged in the same configuration used by Carnival.  Exhibit C at

211:22-213:1.

88.    In addition to the foregoing evidence that DeCurtis misappropriated Carnival's

location engine, Mr. de la Iglesia also found a smoking gun when reviewing DeCurtis's source

code.  Despite its years-long effort to hide its use of Carnival materials, DeCurtis left

approximately 200 lines of code in the DXP location engine that were copied nearly verbatim

from Carnival's location engine source code. This code, which reflects Carnival's particular

proprietary implementation of a Kalman filter, is critical to permitting the location engine to

function properly aboard a cruise ship.  P-77 at p.61-62; Ex. C at 120:16-126:25.

89.     DeCurtis argues that "the 200 lines of code were not learned in connection with the MSA and therefore are not subject to its provisions."  Opening Brief ¶ 59. No facts or law support this assertion.  Both before and after DeCurtis left Carnival's project, while working on their own non-Carnival projects, Level 11 and DeCurtis circulated and discussed confidential documents bearing prominent Carnival confidentiality legends and describing Carnival's technology.  DeCurtis also learned, during its time on Carnival's project, that in order to avoid running afoul of Carnival's rights, Level 11 and DeCurtis would have had to do a "clean room implementation" of a totally new location engine.  P-704.  The notion that Carnival's source code does not qualify as "Confidential Information" under the MSA so long as DeCurtis obtains it surreptitiously from another Carnival contractor is antithetical to the plain language of the MSA. Moreover, DeCurtis's argument does not change Carnival's ownership of the code.

90.     DeCurtis also cavalierly asserts, with no evidentiary support, that Level 11, not Carnival, owns the 200 lines of Kalman filter code.  Opening Brief ¶ 59.  But as set forth above, Mr. de la Iglesia concluded from his review of Level 11 source code that the Kalman filter code was created under the Carnival MSA; the code was not preexisting code subject to the license agreement DeCurtis misleadingly points to in its brief.

91.     At trial in the Florida case, DeCurtis baselessly asserted in closing argument that Carnival's Kalman filter code is "open source" and free for DeCurtis to use.  DeCurtis now offers slightly different attorney argument in this Court, baldly asserting (again with no evidentiary support) that "the 200 lines of code *originate* from open-source software code." Opening Brief ¶ 59 (emphasis added).  DeCurtis's attorney argument is as irrelevant as it is incompetent, however.  Even assuming that some portion of Carnival's Kalman filter code "originated" from an open-source library, that would not change Carnival's status as the author

and owner of *modifications* to that purported "open-source" code, nor would it change the

Confidential Information status of Carnival's custom Kalman filter code.  DeCurtis tried and

failed to create a Kalman filter on its own for years. Exhibit C 120:16-126:25. It could not solve

the location engine problem until it used Carnival's intellectual property.

92.     Because DeCurtis based the DXP's location engine on Carnival Information and

Deliverables, the DXP location engine embodies Carnival Information that Carnival has

exclusive rights to under the MSA and Florida law.  *Kupscznk*, 647 So. 2d at 890; *Variable*

*Annuity Life Ins.*, 927 So. 2d at 245.  At a minimum, the DXP location engine is a "derivative" of

Carnival Information that was created by DeCurtis "as a result of" the MSA an thus constitutes

Carnival's "sole property" of which Carnival is the "author."  MSA Art. 4; *SI Handling*, 753

F.2d at 1259; *Dun & Bradstreet*, 307 F.3d at 212.

## 4.     DeCurtis's Alleged Work Prior to July 24, 2014 is Beside the Point

93.     DeCurtis's claim that it created software before the MSA does not matter, because

Carnival is not claiming ownership over what (if anything) DeCurtis created before the MSA. The

DXP assets are not simply the same as anything DeCurtis had before working with Carnival.

94.     Initially, this is the same argument that was the centerpiece of DeCurtis's failed

trial strategy in the Florida Litigation. There, as here, DeCurtis asserted that it had not breached

the MSA because "the exact same function[s] that [are] now in the DeCurtis Experience Platform

… that Carnival was complaining about saying was stolen from them, that DeCurtis was already

working on that and doing it for Disney years before." *E.g.*, Ex. L (Groombridge opening

statement) at 202. DeCurtis presented documents and testimony describing its supposed pre-

Carnival Greeter, Food & Beverage, and Gangway applications (among others).  DeCurtis

prominently displayed a large blow-up of a purported "high-level architecture" diagram (P-1261)

allegedly created before DeCurtis's work with Carnival and Mr. DeCurtis testified at length about this document. E.g., ¶ 15, *supra*.

95.     The jury nonetheless found that DeCurtis had breached the MSA. This finding was unsurprising, because DXP did not exist until after DeCurtis began it HLAs work for Carnival. In the Florida Litigation, Carnival served an interrogatory asking DeCurtis to describe its "development of the Relevant Systems [DXP], including the date on which development began." Ex. A at 2-6. DeCurtis responded: "In 2015 [i.e., while DeCurtis was working for Carnival], DeCurtis developed an early architecture and technology stack for the system, which evolved into DeCurtis DXP system." *Id*. The evidence also establishes that DeCurtis did not have the critical location engine technology that is infused throughout DXP and makes it work as the "end-to-end" solution DeCurtis markets. *See* ¶¶79-92, *supra*.

96.     And the evidence further establishes that many DXP modules use and are derived from the Deliverables that DeCurtis created *for Carnival*. As one example, DeCurtis did not use some preexisting "Gangway" in creating its DXP for Virgin; it used the *Carnival* "Gangway." P-690, 03.09.23 Trial Tr. 24:8-25:15 (David DeCurtis Testimony admitting DCMS/DXP gangway was being built on CCL code).  This was a *new* Gangway that DeCurtis spent over **30,000 hours** – the equivalent of 15 people working full time on the project for a year – working to develop for Carnival. P-885 (hours spreadsheet).  Of course, DeCurtis chose to use what it created for Carnival, rather than anything it may have created before, because the Carnival technology was different from and better than what DeCurtis already had.  P-756 ("We took the idea of this alert from the Carnival Gangway app."); *Mar 9 Tr.* 28:13-25 (Mr. DeCurtis testifying that he wanted gangway features that were in the CCL version to be included in the DXP version).

97.      It does not matter if DeCurtis previously created software that has the same name as a module in DXP, or if its prior software has some (unspecified) "functional[] similar[ities]" (which, to be clear, DeCurtis has not shown).[9] Opening Brief at ¶ 51. Carnival is not claiming ownership based on such general similarities between the DXP and Carnival Information, and likewise, DeCurtis's prior knowledge (if any) of such names and general functions does not fall within any exclusion to the MSA's ownership provisions. Carnival owns all material prepared under the MSA and any derivative works thereof.  As detailed above, the DXP as it exists now contains and is derived from Carnival Information.

### 5.      DeCurtis's Source Code Arguments Are All Red Herrings

98.      DeCurtis argues that Carnival must prove ownership by way of a source code comparison between a Deliverable and the DXP, and claims that "any code provided to Carnival [by DeCurtis under the MSA] was written in Microsoft .NET, which is an entirely different programming framework than is used for the vast majority of the DXP modules, making it impossible to copy any such code into those DXP modules."  Debtors' Br. at ¶¶ 49-56.  DeCurtis offers no legal authority nor any competent evidence to support this argument, which is wrong as an evidentiary matter, wrong as a technological matter, and wrong as a matter of law.

---

[9] The Fournier Declaration is replete with half-truths, omissions, and misleading statements about Debtors' prior work. Here is a simple example: In Paragraph 11, Mr. Fournier discusses Debtors' supposed work on the Disney "Be Our Guest" restaurant. But all the location-related work described by Mr. Fournier for Be Our Guest **was not done by DeCurtis** – it was carried out by Disney, and specifically the Disney employees and contractors who went on to develop the OCEAN platform at Carnival.  As the testimony at the Florida Litigation – both from the actual inventors of the MagicBand system and Be Our Guest, and admissions from David DeCurtis himself – established, DeCurtis had no role in any of the location related features.  Ex. B at 238:11-17, 239:12-25; 4:23-5:8 (David DeCurtis Testimony); Ex. I at 192:2-11, 193:12-194:13; 28:4-21, 40:24-48:6 (Doug Steele Testimony describing work done at Disney). DeCurtis did not have any location services prior to working with Carnival and indeed even after working with Carnival could not figure out how to make them work on their own.  Trial Tr. 254:23-255:5 (David DeCurtis Testimony: no location engine prior to work with Carnival); *See supra* Section III.B.3.

99.     Carnival's rights under the MSA extend far beyond prohibition of verbatim source code copying.  MSA Art. 4; *Kupscznk*, 647 So. 2d at 890; *Variable Annuity Life Ins.*, 927 So. 2d at 245.  By its plain language, the MSA gives Carnival rights in "derivatives" of work product and forbids DeCurtis from employing the "the aid of written materials of any type produced in connection herewith" in its other projects.  MSA § 4. Limiting the MSA's protections to verbatim incorporation of code from DeCurtis's work product for Carnival into another product is flatly inconsistent with these terms of the MSA.

100.    The MSA's terms accord with the settled law that intellectual property protection "may extend beyond the programs' literal code to their structure, sequence, and organization," including even to user interfaces.  *Whelan Assocs. v. Jaslow Dental Lab., Inc.*, 797 F.2d 1222, 1245 (3d Cir. 1986) ("There is no general requirement that most of each of two [code bases] be compared before a court can conclude that they are substantially similar").  *A fortiori*, these copyrightable aspects of software may also be protected as confidential information or trade secrets. *See* MSA Art. 4; *Motio, Inc. v. BSP Software LLC,* 2016 U.S. Dist. LEXIS 193379, at *6 (N.D. Tex. May 27, 2016) (SSO as trade secret information).  The law does not exclude, *e.g.,* translations from the scope of "derivative" works.  *See Automated Mgmt. Sys. v. Rosenthal*, 2022 U.S. Dist. LEXIS 61328, at *22 (S.D.N.Y. Mar. 31, 2022) ("that two programs are written in different languages does not preclude a finding of substantial similarity"); *accord* MSA Art. 4.

101.    Thus, under the plain language of the MSA and well settled intellectual property law, even if DeCurtis had not copied verbatim code (which it did), it still breached the MSA by misappropriating Carnival Information regarding the OCEAN technical framework, the sequence, structure and organization of Carnival's software, the look and feel of Carnival's system (both in terms of copied user interface schemes and in terms of the collection of

experiential offerings), Carnival's system architecture, Carnival's original and creative software compilations, and Carnival's non-public algorithms and filtering methods. *See, e.g., id.*, *see also Southco, Inc. v. Kanebridge Corp.*, 258 F.3d 148, 150 n.3 (3d Cir. 2001) (discussing copyright protection over compilations) (quoting *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 358 (1991)).  Carnival owns all intellectual property rights attendant to its creative and unique compilation of software materials, including rights arising from Florida's law protecting intangible business property, common law rights in confidential business materials, trade secret rights, and copyright rights. P-1, MSA Art. 4.

102.    For the same reasons, DeCurtis is flatly wrong to argue that because some of the emails establishing DeCurtis misdeeds "generally pre-date when DeCurtis began writing the operational software code for DXP, which largely occurred between 2018 and 2020 (as opposed to prototypes for DXP), making any such emails irrelevant to what is included in DXP."[10]  Here again, DeCurtis hopes to escape the Florida trial record establishing the importance of the prototyping and requirements gathering process, the whole point of which is figuring out what code needs to be written. *See, e.g.*, Ex. E (Learish trial testimony) at 178:1-4; DTX-0001.

103.    DeCurtis states without any evidentiary support that it would be "impossible" for any of Carnival's prototypes to be "put…into the source code for DXP."  Opening Brief ¶ 49.  In addition to being devoid of evidentiary support and flatly incorrect, *see* P-690 (instructing employee to take features and "replicate" them in DXP), DeCurtis's unsupported attorney argument ignores the role of prototyping in the development process. *See* DTX-0001. Project Trident prototypes, which ranged from lo-fidelity materials like storyboards and PowerPoints to

---

[10] Carnival's evidence of misappropriation is not limited to the period before 2018.  DeCurtis obtained Carnival's location engine architecture, collection of algorithms, and Kalman filter code after 2018, for example.

high-fidelity alpha version applications with limited functionality, were an important part of the

technical and experiential requirements gathering process that ultimately resulted in Carnival's

creative and unique OCEAN platform.  DeCurtis's reuse of Carnival's Confidential Information

and Deliverables allowed DeCurtis to ████████████████████████████████████

████████████████████████████████████. P-628.

104.    Finally, Debtors' have confirmed in an interrogatory response that ████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████ Ex. M (May 19, 2023 Responses at 8-9). And Debtors

themselves define the "DXP Assets" in terms of the system implemented for Virgin Voyages.

Fournier Decl. at ¶ 49; *see also* PTX-1157 (2017 Fournier email instructing that "everything in

the DXP is built on that platform" being built for MI6, i.e., Virgin). Accordingly, the DXP

Assets as they now exist and that Debtors seek to sell can be traced back directly to the Carnival

Information copied by Debtors.

### 6.    The Court Must Give Effect to the Florida Jury's Verdict

105.    DeCurtis understandably wants the Court to ignore the jury finding in the Florida

Litigation.  But the jury's verdict means something, and the Court is constrained by what the jury

has already necessarily determined.  *E.g., Chisholm v. Def. Logistics Agency*, 656 F.2d 42, 48 (3d

Cir. 1981).  "Disrupting the prior jury's factual determinations would be an affront to the Seventh

Amendment right to a jury trial." *Smith v. Katz*, 2014 U.S. Dist. LEXIS 171493, at *7 (D.V.I.

Dec. 11, 2014) (citing *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1182 (3d

Cir. 1993).[11]  DeCurtis assertion that it is "impossible" to credit the jury's verdict because "the

---

[11] Of course, there is no Seventh Amendment right to a jury determination of claims for equitable relief, e.g., *Taylor Corp. v. Four Seasons Greetings, LLC*, 403 F.3d 958, 969 (8th Cir. 2005), nor is there any problem posed by the routine practice of having a court rule on equitable remedies after liability has been determined. *See, e.g., Classical*

jury verdict is a black box" is simply wrong as a matter of law.  D.E. 295 ¶¶ 42, 45.

106.    At the outset, it is important to set straight another of DeCurtis's misstatements. Carnival did not present to the jury "several independent grounds for breach of contract" at trial. D.E. 295 ¶ 42.  Carnival presented two theories of breach to the jury.  First, Carnival alleged that DeCurtis breached MSA by using Carnival Information to develop the DXP. SDFL D.E. 88 ¶ 105. Second, Carnival alleged that DeCurtis breached the MSA's audit provision in order to conceal its misuse of Carnival Information to develop the DXP.  But the jury was only asked to award compensatory damages for breach of Article 4.

107.    According to Carnival's damages expert Dr. Mary Coleman, DeCurtis's misuse of Carnival Information deprived Carnival of the benefit of its bargain for exclusive control of Confidential Information under MSA Article 4.   Ex. N. Dr. Coleman opined that Carnival's exclusive rights over Carnival Information represented substantially all of the value in that intellectual property and thus concluded that Carnival should be awarded expectation damages equal to all of the money Carnival paid to DeCurtis under the MSA (approximately $3.8MM). Dr. Coleman did not offer any damages figure for breach of the MSA's audit provision, and the parties agreed that Judge Scola would be the one to determine Carnival's request for attorney's fees. Thus, in awarding Carnival compensatory damages, the jury necessarily found Carnival suffered damages as a result of DeCurtis's use of Carnival Information to develop the DXP.[12]

---

*Silk, Inc. v. Dolan Grp., Inc.*, 2016 U.S. Dist. LEXIS 193774, at *14 (C.D. Cal. Mar. 21, 2016) ("in a case where legal claims are tried by a jury and equitable claims are tried by a judge, and the claims are 'based on the same facts,' in deciding the equitable claims 'the Seventh Amendment requires the trial judge to follow the jury's implicit or explicit factual determinations.'")(quoting *Los Angeles Police Protective League v. Gates*, 995 F.2d 1469, 1473 (9th Cir. 1993)).  Had Judge Scola been presented with Carnival's injunction motion, he would have been in the same position as this Court is: bound by the jury's implicit findings. *Id.*

[12] DeCurtis argued that despite its misuse of Carnival Information, Carnival received the benefit of its bargain, because the DeCurtis prototypes helped Carnival secure the funding it needed to develop the OCEAN platform.  The

108.    DeCurtis attempts to create uncertainty about the jury's verdict by mischaracterizing Carnival's Article 4 claim as two separate "theories": "[1] misusing Confidential Information in violation of Article 4, Section 4.1, or [2] by misusing Deliverables in violation of Article 4, Section 4.1."  DeCurtis's strained attempt to recast Carnival's theory of the case fails.  Carnival's theory was that DeCurtis misused "Carnival Information," which includes *both* Confidential Information and Deliverables.   P-1, Art. 4.

109.    "The preclusive effect of a federal-court judgment is determined by federal common law." *Houser v. Pa. Dep't of Corr.*, 2022 U.S. App. LEXIS 28156, at *2 (3d Cir. Oct. 7, 2022) (unpublished) (quoting *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008)).   Under federal common law, there are two types of preclusion: claim preclusion and issue preclusion.  *Talyor*, 552 U.S. at 892.  The doctrine of claim preclusion bars claims that were brought, or *could have* been brought, in a previous action. *In re Mullarkey*, 536 F.3d 215, 225 (3d Cir. 2008).  The doctrine of issue preclusion, also referred to as collateral estoppel, is narrower doctrine than claim preclusion that applies when "(1) the issue sought to  be precluded is the same as that involved in the prior action; (2) the issue was actually litigated; (3) it was determined by a final and valid judgment; and (4) the determination was essential to the prior judgment."  *Arlington Indus. v. Bridgeport Fittings, Inc.*, 106 F. Supp. 3d 506, 513-14 (M.D. Pa. 2015) (quoting *Peloro v. United States*, 488 F.3d 163, 175 (3d Cir. 2007)).

110.    The original Stalking Horse Agreement makes clear that DeCurtis's bankruptcy case is a collateral attack on the Florida judgment.  That Agreement, which is the centerpiece of Debtors reorganization strategy, originally required DeCurtis to obtain from this Court

---

fact that the jury did not award Carnival all the money damages it was seeking does not change the fact that the jury necessarily must have credited Carnival's theory that DeCurtis used Carnival Information to develop the DXP.

declaratory judgments that are directly contrary to the Florida judgment.  For example, by agreeing to the original Stalking Horse Agreement, DeCurtis promised to obtain for Invictus a declaration that "post-petition use, operation, and licensing of the DXP Assets does not infringe…or violate any intellectual property rights of Carnival Corporation…" D.E. 15 at 11.  Had DeCurtis tried to make good on those promises by filing adversary claims for declaratory judgment of non-infringement and the like, those claims would have been dismissed out of hand on claim preclusion grounds because (1) DeCurtis did in fact assert and lose declaratory judgment claims regarding non-infringement of Carnival's patents; and (2) DeCurtis did not seek a declaration of ownership of the disputed IP, although it could have.[13]  DeCurtis also promised to obtain for Invictus a declaration that "the DXP Assets are not subject to any outstanding order, ruling or…any claim, motion, or petition" for an injunction, which would have required DeCurtis to seek a declaration that Carnival is not the holder of any claim that could entitle it to injunctive relief—which of course, *Carnival is*.  *Id.*

111.    DeCurtis and Invictus pivoted to a new strategy last month.  DeCurtis and Invictus decided that DeCurtis would not file an adversary proceeding and would instead attempt to achieve its objectives through a "summary" sale motion.  And in a tacit admission that they'd been caught with their hand in the cookie jar, DeCurtis and Invictus eliminated the provision in the Stalking Horse Agreement that required DeCurtis to obtain declaratory judgment.  DeCurtis's

---

[13] Paragraphs 33-38 of DeCurtis's brief confuses the issues.  Carnival has not asserted ownership in any DeCurtis property by virtue of the jury's patent infringement verdict in Carnival's favor, so DeCurtis's arguments related to patent infringement and ownership are red herrings.  Although Carnival does not assert ownership based on any patent theory, the fact that DeCurtis misappropriated Carnival's patented technical framework before it was even made public is evidence both of Carnival's ownership of its unique technical framework and DeCurtis's intentional misappropriation of Carnival's technical framework in developing the DXP.  And, to be clear, if DeCurtis or its successor in the future violate any of Carnival's patents, Carnival will have the legal right to assert those patents.

procedural machinations do not change the fact that DeCurtis is coming to the Court with a claim

for declaratory judgment of ownership of Carnival Information that it did not bring in Florida.

112.    DeCurtis's Sale Motion is also foreclosed by the narrower preclusion doctrine of

collateral estoppel.  "When a party seeks collateral estoppel based on a jury verdict, the court

must determine 'whether a rational jury could have grounded its verdict upon an issue other

than' the issue sought to be precluded." *E.g., Arlington Indus. v. Bridgeport Fittings, Inc*., 106 F.

Supp. 3d 506, 521 (M.D. Pa. 2015) (citations omitted).  "From a general verdict, the court may

presume the existence of fact findings implied from the jury's having reached that verdict." *Id*.

113.    Whether a jury actually decided an issue is a question of fact.  *Walker v. R.J.

Reynolds Tobacco Co.*, 734 F.3d 1278, 1289 (11th Cir. 2013).  If the issues that were necessarily

decided in a prior proceeding are not "immediately discernable" from a general jury verdict, "the

court must examine the record," including "the pleadings, evidence, jury instructions and other

relevant matters in order to determine specifically what issues were decided." *Chisholm v. Def.

Logistics Agency*, 656 F.2d 42, 48 (3d Cir. 1981).  "The court's task when undertaking this

analysis is (1) to consider whether 'substantial overlap [exists] between the evidence or argument

to be advanced . . . and that advanced in the first'" proceeding; and "(2) to assess '[h]ow closely .

. . the claims involved in the two proceedings' relate to one another." *Suppan v. Dadonna*, 203

F.3d 228, 233 (3d Cir. 2000) (internal citations omitted).

114.    First, there is more than "substantial overlap" between the evidence and

arguments the parties asserted in the Florida Litigation and the evidence and arguments that will

be presented in this case.  The same witnesses, documents, arguments, and intellectual property

are at issue.  Indeed, the parties have agreed that all evidence entered in the Florida Litigation

may be received in evidence in this case without objection.

115.     Second, the claims in both proceedings—if not identical—could not be any more closely related.  The Florida Litigation was about Carnival's ownership of the intellectual property underlying both the OCEAN platform and the DXP.  Here, to obtain the relief it seeks in its sale motion, DeCurtis must prove that Carnival has no ownership or other interest in the same exact intellectual property.  But the jury in the Florida Litigation necessarily decided that Carnival *does* have rights in the intellectual property DeCurtis used to develop DXP.  This Court is not at liberty to reach a contrary conclusion. *Chisholm*, 656 F.2d at 48; *Ashe,* 397 U.S. at 444; *In re Lower Lake Erie Iron Ore Antitrust Litig*., 998 F.2d at 1182.

C.     **Initial Response to Debtors' Newfound "Schedule A" List of Sixty-Eight Software Modules**

116.     Debtors have not adequately informed the Court, Carnival, or other creditors of what assets they are seeking to sell. Debtors focus on "Schedule A" to the Fournier Declaration, which is purportedly ███████████████████████ the DXP system as implemented for Virgin Voyages ████████. Opening Brief at ¶ 7. Debtors have attempted to frame their requested relief as confined to these ██████t modules along with associated documents (and the "Non-DXP Assets"). *Id.* at ¶ 5.  The Debtors at least suggest that the Court and Carnival should be considering each of the sixty-eight modules one-by-one and deciding if each is Carnival's property. *See, e.g., id.* at ¶ 51.

117.     This list of sixty-eight modules is entirely new. Debtors never produced this list during the three-plus years of litigation in Florida or defined DXP as consisting of these sixty-eight modules during that litigation.

118.     The list of sixty-eight modules also does not correlate with Debtors' Schedule of Assets and Statements of Financial Affairs pursuant to Federal Rule of Bankruptcy Procedure 1007(b).  There, Debtors listed as "Intellectual Property and Intangible Assets" a Schedule of

"Product Offerings and Modules" listing sixteen "Products." Dkt. 232 at 33-34 (Schedule AB 64). The two Schedules are different, and Debtors have not attempted to show how the sixty-eight modules relate to the sixteen products. Accordingly, Debtors have not shown that the sixty-eight module list defines the scope of what is at issue, and it is not the job of the Court or Carnival to parse out this list line-by-line.

119. It also would not be correct to look at the sixty-eight modules in isolation because, as described above, DXP is a cohesive "end-to-end" system rather than a set of freestanding applications.[14] Debtors cannot provide a "guest engagement system" to customers without integrating the DXP applications into one system. Debtors also cannot provide a "guest engagement system" to customers without a location engine. DXP as a whole thus implicates at least both the location engine which was copied in part from Carnival and the overall architecture that DeCurtis learned of and copied from Carnival. *See supra* Section III.B.

120. Should the Court deem it necessary to parse through the list of sixty-eight modules individually, initially, Carnival notes that the record is still being developed. Moreover, the Fournier Declaration also includes new information, while also providing only a cursory description of each module that fails to describe their structure and functions sufficiently. Carnival has served discovery requests directed to facilitating a mapping of this new list of sixty-eight modules to the evidence Debtors' actually provided in the Florida Litigation. Carnival also intends to submit expert analysis of this list as discovery develops. Carnival will brief this issue further, if necessary, following further investigation and the upcoming evidentiary hearing.

---

[14] The exception is Mobile Assembly Suite, or "MAS," which is a stand-alone product. MAS is the one DeCurtis product that clearly predates DeCurtis's work with Carnival on Project Trident or its development of DXP beginning in 2015. MAS also is sold separately from DXP; as the Court well knows by now, Carnival Cruise Line uses MAS, but does not use DXP. Debtors's inclusion of MAS as a "DXP Asset," rather than as a "Non-DXP Asset" like other "non-DXP software," is not consistent with the real-world marketing of Debtors' products.

121.     While Carnival reserves its right to respond further, based on the limited

information made available to Carnival at this point, the list of sixty-eight assets appears to be

implicate Carnival Information in two categories. The first category are modules that comprise or

are derived from the applications Debtors prepared or had access to through their work for

Carnival, e.g., Gangway (row 26), Greeter (row 16), and other applications which Debtors

"reused" Carnival Information to develop. The second, and overlapping, category, are modules

which incorporate and make use of the location engine, e.g., the "Location Services" modules.

## IV.     CARNIVAL IS ENTITLED TO AN INJUNCTION

122.     As was found by the jury in Florida, DeCurtis breached Article 4 of the MSA,

thereby subjecting Carnival to "irreparable harm for which money is inadequate compensation"

and "entitl[ing Carnival] to temporary and permanent injunctive relief," as expressly provided

for in Section 4.2 of the MSA.  As the case was presented to the jury, injunctive relief was a key

component of the remedy that would flow from a verdict in favor of Carnival on the breach of

contract claim, pursuant to the Court's exercise of its equitable jurisdiction. E.g., Ex. O at

113:16-114:5 (J. Padgett); Ex.P at 34:5-11; Ex. P at 68:13-69:1 (closing argument); *see also* Ex.

N at 242:17-243:20 (Coleman discussing "irreparable" nature of harm).

123.     Because monetary damages cannot adequately redress DeCurtis's breach of the

MSA, Carnival seeks a permanent injunction enjoining DeCurtis from further unauthorized sale

or use of the location engine software and other materials developed under the MSA or otherwise

derived from "Carnival Information," as those terms are defined in Article 4 of the MSA. To

comply with Carnival's requested injunction, DeCurtis need only refrain from use of the discrete

items of Carnival intellectual property discussed in this brief and at trial.

124.    Carnival is entitled to an injunction because continued sale, use or disclosure by DeCurtis of Carnival Information or materials or products derived therefrom would perpetuate the irreparable harm Carnival has already suffered.  At trial, DeCurtis repeatedly represented it is, and will continue to be, a direct competitor of Carnival on the products at issue in this litigation by continuing to market its DXP system and its "suite" of related products. Ex. Q at 104:12-105:20 ("DXP product works better than Carnival's Ocean Platform. . . The market has given us the answer there"). Indeed, DeCurtis's witnesses and counsel represented specifically that DeCurtis's DXP system will inflict significant competitive injury on Carnival and its OCEAN system going forward and that Carnival's breach of contract claim was motivated by a fear or such future injury. Ex. R at 196:17-198:11 ("…why is this huge company suing this little company? Right? The reason is because this is a better product, and they know it"); 228:25-229:5; Mar 7 Tr. 17:2-5; Mar 8 Tr. 228:10:229:17; Mar 10 Tr. 80:6-7 101:18-102:5; Mar 10 Tr. 80:6-7.  The jury rejected DeCurtis's baseless assertions regarding motivation for Carnival's breach of contract claim and confirmed the merit of the claim. But the verdict did not negate DeCurtis's acknowledgement that its DXP system—products that have benefitted from misuse of Carnival Information—will continue to threaten and cause injury to Carnival and to confer an unfair competitive advantage on DeCurtis unless the Court enjoins DeCurtis.

**A. Governing Legal Standards**

125.    The facts set forth above are incorporated by reference.  The MSA expressly provides that "Carnival will be entitled to…permanent injunctive relief to enforce this Article 4," see MSA § 4.2, including Article 4.1's requirement that DeCurtis "shall not use any Carnival Information for its own use or for any purpose other than the specific purpose of completing the Services contemplated" in the MSA. *Id.* Article 4.2 provides:

Injunctive Relief. Because Company's breach of this Article may cause Carnival irreparable harm for which money is inadequate compensation, it agrees that Carnival will be entitled to temporary and permanent injunctive relief to enforce this Article 4, in addition to damages and other available remedies. If any action is necessary to enforce this Article 4, the prevailing party shall be entitled to recover its attorneys' fees.

126.    Section 4.2 reflects the parties' mutual understanding that damages resulting from DeCurtis's breach of Article 4 would be "almost impossible to articulate."  Ex. O at 113:14-23 (J. Padgett). As Mr. Padgett explained at trial, once Carnival information or deliverables are "released into the marketplace, pieces and parts of it could be used…and change the economic value of [Carnival's product]."  *Id.* at 113:24-114:5. The protection provided in MSA § 4.2 was fundamental to what Carnival bargained for: the right to exclusive control over the information and deliverables developed in connection with the MSA. *Id.*  ("that is the whole point of intellectual property protection."). That right can only be vindicated by an injunction.

127.    The four factors governing a permanent injunction request are: (1) the existence or threat of irreparable injury; (2) whether remedies at law are inadequate to address that injury; (3) the balance of hardships between the plaintiff and defendant; and (4) the public interest. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 126 S.Ct. 1837, 1839, 164 L.Ed.2d 641 (2006).

### B.    Carnival is Entitled to an Injunction

#### 1.    Carnival Has Suffered and Continues to Face Irreparable Injury

128.    Injury that "cannot be undone through monetary remedies" is irreparable. *Boggs Contracting, Inc. v. Freismuth*, 2021 U.S. Dist. LEXIS 252335, at *9 (M.D. Fla. Dec. 27, 2021). Here, the record demonstrates that DeCurtis's deprivation of Carnival's exclusive rights to its confidential information and MSA deliverables. Carnival treated Carnival Information developed under the MSA with the highest level of protection.  Not even Carnival's high-level executives had access to the secure facility where DeCurtis and other Carnival contractors were working on

49

the OCEAN project.  Yet before Carnival made any details of its OCEAN project public,

DeCurtis disclosed details about the project to Virgin Voyages and NCL, prompting them to start

working with DeCurtis on guest engagement system projects of their own. DeCurtis then used

MSA Deliverables and other Carnival Information—including Carnival's application prototypes

and proprietary location engine—to help others compete against Carnival. DeCurtis's conduct

caused and continues to cause several "hard-to-measure harms, such as impaired goodwill and

competitive position, that can justify injunctions." *Tex. Advanced Optoelectronic Sols., Inc. v.*

*Renesas Elecs. Am., Inc.*, 895 F.3d 1304, 1331 (Fed. Cir. 2018).

129.    *First*, DeCurtis's misuse of Carnival's "highly sensitive, confidential, and

competitively valuable" information is irreparable harm in and of itself because it causes

Carnival to "lose the exclusivity and confidentiality of [their] proprietary and confidential

information." *Boggs Contracting, Inc.*, 2021 U.S. Dist. LEXIS 252335, at *9-10). An owner's

"loss of control over its intellectual property rights" is a prototypical form of irreparable harm.

*E.g.*, *Lead Creation Inc. v. P'ships & Unincorporated Ass'ns Identified on Schedule A*, 2023

U.S. Dist. LEXIS 25025, at *12 (M.D. Fla. Feb. 14, 2023). "The right to exclude competitors

from using one's property rights is important," and "the need to protect this exclusivity" warrants

an injunction. *E.g.*, *Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 642 (Fed. Cir. 2015); *accord*

*News Am. Mktg. In-Store, LLC v. Emmel*, 429 F. App'x 851, 853 (11th Cir. 2011) (unpublished)

(permanent injunction barring defendant from any further disclosures of confidential

information); *Marine Turbo Eng'g, Ltd. v. Turbocharger Servs. Worldwide, LLC*, 2012 U.S.

Dist. LEXIS 200492, at *31-32 (S.D. Fla. 2012) ("some form of permanent injunction is

appropriate with regard to [defendant's] use of Plaintiffs' Confidential Information").

130.    *Second*, the injury to competitiveness caused by misappropriation of valuable confidential information is a classic form of irreparable harm, as such injury "cannot be reversed or repaired." *Frankel*, 2023 U.S. Dist. LEXIS 534, at *50 (collecting cases); *G4S Secure Integration LLC v. United States*, 161 Fed. Cl. 387, 418 (2022) ("lost opportunity to compete on a level playing field" found sufficient to prove irreparable harm). For example, because of DeCurtis's breach of the MSA, Carnival never realized the time-to-market advantage that it should have had over competitors like DeCurtis, Virgin Voyages, and NCL. DeCurtis, Virgin, and NCL each had the invaluable benefit of piggybacking off Carnival's research and development and were able to come to market and compete with Carnival years before they would have otherwise been able to. Ex. O at 167:25-168:12 (discussing impact); *see also* P-125 ███████████████. Relatedly, Carnival's competitiveness has been harmed by the fact that, due to DeCurtis' misconduct, competing guest engagement systems exist in the market that otherwise would not. SDFL D.E. 88 ¶¶ 86, 138, 148; Ex. O at 167:25-168:12; 177:16-23 ("In virtually every single investor presentation I did, I was told, your platform is not bespoke"). The only way to partially restore Carnival's competitive position is to enjoin DeCurtis from continuing to leverage the Carnival intellectual property.

131.    *Third*, DeCurtis's breach of the MSA prevented Carnival from realizing all of the business and goodwill that should have inured to its proprietary technological innovations and business strategies. Ex. O at 176:22-179:1 (noting that Carnival was harmed by DeCurtis's breach in a number of ways including opportunity cost from having to deal with litigation and inability to engage in alternative monetization strategy of selling OCEAN). "The law is clear: [] loss of customers and goodwill is an irreparable injury." *JetSmarter Inc. v. Benson*, 2018 U.S. Dist. LEXIS 60113, at *19 (S.D. Fla. Apr. 6, 2018) (citing *Ferrero v. Associated Materials Inc.*,

923 F.2d 1441, 1449 (11th Cir. 1991)).  The initial buzz around Carnival's OCEAN platform

was significant. Ex. O at 164:19-166:8 (60 billion media impressions). But shortly after OCEAN

launched, NCL and Virgin began advertising their DXP-powered copycat guest engagement

systems.  Press reports around the time of the commercial launch of the DXP system suggested

that Virgin and NCL were offering effectively the same guest experience technology as Carnival

(SDFL D.E. 88 ¶¶ 86, 94), which led to market confusion about the fact that, in truth, only

Carnival's technology enabled the OCEAN experience. *See* Ex. O at 167:25-168:16. This

continuing injury to Carnival's ability to attract customers and investment constitutes irreparable

harm. *Ferrero*, 923 F.2d at 1441 (irreparable injury to customer goodwill); *Facebook, Inc. v.*

*Brandtotal Ltd.*, 499 F. Supp. 3d 720, 745 (N.D. Cal. 2020).

132.     As noted, the irreparable harm Carnival faces is ongoing. DeCurtis continues to

sell today the same DXP system that the jury found to have been the basis for DeCurtis's breach

of contract claims. *See* DDX-1 at 1.3 (DeCurtis's opening demonstrative describing current

offerings of DXP system); see also generally www.decurtis.com (DeCurtis website offering DXP

System for sale). Indeed, at trial DeCurtis introduced no evidence or attorney argument to

suggest that it has mitigated the harm caused by its misuse of Carnival confidential information.

To the contrary, DeCurtis argued that DeCurtis's operations did not breach the parties'

agreements. *See generally* DDX-15.

133.     The testimony from DeCurtis's most important executives, DeCurtis's continued

actions in the face of its contractual obligations, and the policies by which it conducts business

demonstrate that DeCurtis will continue to misappropriate Carnival's confidential information.

DeCurtis employee Megha Agrawal testified that it is DeCurtis's regular practice to rely on past

work product so that they did not need to start any assignment from scratch. Ex. K. (Agrawal) at

83:16-84:11. DeCurtis employees were also instructed to compare ongoing work for DeCurtis's

DXP customers with work DeCurtis performed for Carnival. *Id.* at 159:21-161:14. DeCurtis

personnel even went so far as to create a "Prototype Reusability Matrix" to systematically reuse

Carnival deliverables. *Id.* at 151:20-152:4. This was not a one-time thing: DeCurtis's reuse of

and reliance on Carnival's materials continued for years. P-773.

134.    The record evidence additionally shows that when performing work for new

clients, DeCurtis factored into their bids a percentage cut based on DeCurtis's plan to reuse prior

work for Carnival. Ex. E (Learish) at 167:18-23; 168:22-169:2 (75% cut (which was the

employee's initial estimate as to how much they could reuse) too big for presumably budget

management expectations). Indeed, DeCurtis's leadership maintained at trial the assertion—

which the jury rejected—that DeCurtis can properly reuse work prepared for Carnival and others,

so long as it removes copyright information. Ex. B at 208:7-24 (DeCurtis testified that

replicating out Carnival code was not problematic for DeCurtis); 171:11-172:5 (DeCurtis could

not have done the work for Padgett without bringing "assets" to Carnival); 205:9-206:15

(Carnival prototypes were DeCurtis's property and therefore DeCurtis could reuse them with

others); Ex. E at 129:23-130:2 (Learish testifying that use of Carnival Confidential Information

not improper). DeCurtis's empirical business model demonstrates that DeCurtis will continue to

misuse Carnival confidential information unless enjoined.

## 2.    Remedies at Law Are Inadequate

135.    DeCurtis' continued misuse of Carnival Information cannot be adequately

remedied by damages. The parties recognized as much when they agreed to Section 4.2 of the

MSA, which provides for injunctive relief as shown above.  Consistent with the parties' express

agreement that a breach of Article 4 of the MSA will result in irreparable harm, the record shows

that monetary remedies are indeed insufficient to remedy DeCurtis' misconduct.  Carnival's

damages expert, Dr. Coleman, confirmed the inadequacy of money damages in her trial testimony. Although she was able to provide a "conservative estimate" of the harm to Carnival caused by DeCurtis's breach of Article 4, Dr. Coleman stressed that this was necessarily a "minimum estimation" given the difficulties inherent in quantifying this type of damage. Ex. N at 225:5-11, 242:17-243:24. These difficulties are well known in intellectual property jurisprudence and are present in typical form here.

136.    *First*, the harm caused by permitting DeCurtis to continue to market, sell, and install its DXP system cannot readily be quantified because it is not possible to compute in monetary terms the value of the competitive harm to Carnival caused by DeCurtis' ability to leverage Carnival's technology going forward, rather than creating its own. *See, e.g.*, *Sionyx LLC v. Hamamatsu Photonics K.K.*, 981 F.3d 1339, 1350 (Fed. Cir. 2020); Ex. O at 176:22-179:1 (value unfairly taken from Carnival is incalculable).

137.    *Second*, Carnival cannot predict how much business it lost and will lose in the future because of DXP. *See, e.g.*, *All Leisure Holidays Ltd. v. Novello*, No. 12-62328-CIV, 2012 WL 5932364, at *5 (S.D. Fla. Nov. 27, 2012) (collecting cases) ("Irreparable injury includes loss of control of reputation, loss of trade, and loss of goodwill."); Ex. O at 176:22-179:1 (harm from OCEAN platform no longer "bespoke"); Ex. E at 237:12-17 (discussing competition).

138.    *Third*, DeCurtis's unlawful actions have undercut Carnival's distinctiveness and market appeal, damaging Carnival's reputation as an innovator within the marketplace. Ex. O at 167:25-168:16 (after successful CES show, competitors announced they too had copycat versions of OCEAN platform).  Loss of control over reputation and loss of goodwill are unquantifiable harms. *E.g.*, *Vital Pharms., Inc. v. Monster Energy Co.*, 2020 WL 3314724, at *9 (S.D. Fla. Jan. 24, 2020). Moreover, if DeCurtis is not enjoined from continuing its misuse of

Carnival Information, Carnival's only recourse would be to assert its audit rights under the MSA and/or to initiate future litigation. That is not an adequate remedy.

### 3.     The Balance of Hardships Favors Carnival

139.    The balance of hardships weighs in Carnival's favor. Absent an injunction, Carnival will suffer further irreparable harm, in addition to the substantial irreparable harm it has already had to endure. Carnival continues to compete against its own technology and will have to do so until DeCurtis is enjoined.

140.    DeCurtis has no legitimate countervailing hardship to point to, because DeCurtis has no right to use Carnival Information for non-Carnival purposes.  P-1. As such, DeCurtis has no legitimate right to use such information in its DXP System, and any claim of hardship stemming from such improper use merits no weight. "[T]he balance of hardships weighs in Plaintiff's favor, as Plaintiff's proprietary, confidential, and trade secret information is at stake, and an injunction will do no more than require Defendant's compliance with the obligations to which [it] has already agreed." *E.g.*, *Chetu, Inc. v. Hickey*, 2019 U.S. Dist. LEXIS 236148, at *6-7 (S.D. Fla. July 1, 2019).  A business model based on unlawful conduct does not tip the scales toward DeCurtis; "the greater risk" is to Carnival, the party that will be harmed by continued misconduct, and DeCurtis is free to pursue any business as long as it does not rely on misuse of Carnival Information. *U.S. v. Stinson*, 729 F. App'x 891, 898 (11th Cir. 2018) (unpublished) (balance of hardships favored government where defendant would be enjoined from pursuing his business in "fraudulent tax preparation" but could continue legitimate business efforts); *see also*, *e.g.*, *Roton Barrier, Inc. v. Works*, 108 F.3d 1394 (Fed. Cir. 1997) (affirming permanent injunction barring defendant's products that were inextricably linked with the plaintiff's confidential manufacturing information).  And if, as it claims, DeCurtis has applications (or

versions of those applications) that are uninfected by its misuse of Carnival Information, then

DeCurtis cannot now complain that an injunction would limit it to using those materials.

### 4. The Public Interest Will Be Served by a Permanent Injunction

141. The public has a vested interest in injunctions that protect intellectual property.

*E.g.*, *FMC Corp. v. Control Sols., Inc.*, 369 F. Supp. 2d 539, 578 (E.D. Pa. 2005) ("Protecting a

company's rights to its intellectual property is in the public interest."); *accord Kenzo S.A. v.

ariefstore*, 2019 WL 2008982, at *3 (S.D. Fla. Feb. 19, 2019) ("The public interest favors

issuance of the preliminary injunction to protect Plaintiff's intellectual property interests[.]").

Further, there is a public interest in "protecting against the misappropriation of confidential

information and otherwise unethical business behavior," such as the conduct DeCurtis has

engaged in here. *Freismuth*, 2021 U.S. Dist. LEXIS 252335, at *13-14 (M.D. Fla. Dec. 27,

2021). There is also a public interest in upholding the parties' contractual expectations, such as

the expectation that an injunction would be available for breaches of the MSA. *Sexual MD Sols.,

LLC v. Wolff*, 2020 WL 2197868, at *25 (S.D. Fla. 2020); *AutoNation, Inc. v. O'Brien*, 347 F.

Supp. 2d 1299, 1308 (S.D. Fla. 2004)); *Woodard-CM, LLC v. Sunlord Leisure Prod., Inc.*, 2020

WL 5547876, at *3 (S.D. Fla. 2020) (courts "uphold contracts as written."). This policy interest

is particularly important in cases involving Florida contracts like the MSA, because Florida law

contains "a comprehensive framework for analyzing, evaluating and enforcing restrictive

covenants." *Proudfoot Consulting Co. v. Gordon,* 576 F.3d 1223, 1230-31 (11th Cir. 2009).

## V.    THE DXP ASSETS CANNOT BE SOLD "FREE AND CLEAR"

142. Regardless of who owns legal title to the "DXP Assets," bedrock principles of

federal common law and intellectual property protection foreclose any "free and clear" sale.

143. The original Stalking Horse Term Sheet that was filed with this Court with the

initial DIP financing motion indicated that Debtors would seek a declaration that:

> (A) the post-petition use, operation and licensing of the DXP Assets does
> not infringe, misappropriate or violate on any patent or other intellectual
> property rights of Carnival Corporation or its affiliates, (B) the Purchased
> Assets shall not be bound, burdened, encumbered or affected in any way by
> the Carnival MSA (including all statements of work thereunder), and can
> be sold free and clear of any interest of Carnival Corporation and its
> affiliates pursuant to section 363(f) of the Bankruptcy Code, and (C) the
> DXP Assets are not subject to any outstanding order, ruling or injunction
> (including any claim, motion or petition therefor) by or in favor of Carnival
> Corporation or its affiliates that does or could reasonably be expected to
> restrict, impair or otherwise affect the ownership, use or value of the DXP
> Assets (collectively, the "DXP Condition")

ECF No. 15, Stalking Horse Term Sheet, p. 11. Carnival now understands that DeCurtis only seeks

an order pursuant to section 363(f) that would permit DeCurtis to sell the DXP Assets "free and

clear" of any "ruling or order" in favor of Carnival Corporation or its affiliates that does or could

reasonably be expected to restrict, impair or otherwise affect the ownership, use or value of the

DXP Assets.

144.    As an initial matter, precisely what DeCurtis seeks is unclear.  To the extent

DeCurtis seeks to sell the DXP Assets free and clear of "any outstanding order [or] ruling…in

favor of Carnival Corporation…that does or could reasonably be expected to restrict, impair or

otherwise affect the ownership, use or value of the DXP Assets," D.E. 15, that relief is precluded

by the jury's verdict and bedrock principles of intellectual property law.  For example, the jury

ruled that by selling DXP, DeCurtis induced its customers to infringe Carnival's asserted patent

claims. That ruling *does* "impair" the use and value of the DXP assets that have already been

adjudged infringing, because any use or sale of the already-adjudged-to-be-infringing

configurations of the DXP product would be willful infringement as a matter of law.  *Palo Alto*

*LLC v. Apotex, Inc*., 531 F.3d 1372, 1379 (Fed. Cir. 2008) (an infringement claim in a second

suit is the "same claim" as in an earlier Infringement suit if the accused products in the two suits

are "essentially the same.").  Relatedly, the jury's infringement verdict impairs DeCurtis's ability

to sell versions of the DXP product that are "no more than 'colorably' different products." *Cordis Corp. v. Bos. Sci. Corp.*, 635 F. Supp. 2d 361, 370 (D. Del. 2009). At the very least, the jury's verdict helps establish Carnival's likelihood of success on the merits in any future injunction proceeding involving similar products and the same patent claims. *Atlas Powder Co. v. Ireco Chems.*, 773 F.2d 1230, 1232 (Fed. Cir. 1985. And, of course, the Court cannot free DeCurtis or its successors from the consequences of post-petition infringement. *Cordis*, 635 F. Supp at 370 (each infringing act gives rise to a separate claim).

145.    In addition, Carnival is *at a minimum* a co-owner of DXP Assets comprising derivative works, under the Copyright Act, of Carnival's software and documentation. "[E]ven if [Carnival] is not a co-author of some of the derivative versions of [DXP modules], [Carnival] remains the co-author of the underlying work and has an ownership interest in derivative versions of the [DXP modules] to the extent that they incorporate the underlying work." *Brownstein v. Lindsay,* 742 F.3d 55, 68 (3d Cir. 2014); P-886 (discussing modification of Carnival application version to yield new version used by DeCurtis).

146.    In any event, Carnival reiterates its prior arguments that Carnival's right to an injunction survives rejection of the MSA under *Mission Prod. Holdings v. Tempnology, LLC*, 139 S. Ct. 1652 (2019) and other cases, and cannot be sold "free and clear" under section 363(f)(5). *See* ECF No. 102, ¶¶ 49-53, 65-71; *see also* ECF No. 205, ¶¶ 23-31.[15] An injunction to enforce a restrictive covenant to prevent *continuing and future harm* is not a

---

[15] *See Tempnology*, 139 S. Ct. 1652; *In re Ben Franklin Hotel Assoc.*, 186 F.3d 301 (3d Cir. 1999); *In re Lager*, 2022 WL 3330421 (Bankr. N.D. Tex. Aug. 11, 2022), *In re Stone Res., Inc.*, 458 B.R. 823 (E.D. Pa. 2011), *vacated on other grounds*, 482 F. App'x 719 (3d Cir. 2012); *Sir Speedy, Inc. v. Morse*, 256 B.R. 657 (D. Mass 2000); *Kennedy v. Medicap Pharmacies, Inc.*, 267 F.3d 493, 496 (6th Cir. 2001); *Matter of Udell*, 18 F.3d 403 (7th Cir. 1994); *In re Hurvitz*, 554 B.R. 35 (Bankr. D. Mass. 2016); *In re Hruby*, 512 B.R. 262 (Bankr. D. Colo. 2014); *In re fFuture Graphics*, 2010 WL 1965893 (Bankr. E.D. North Carolina May 17, 2010).

"claim" under section 101(5) of the Bankruptcy Code.  And Carnival has rights in its judgment and intellectual property that cannot be divorced from the DXP assets, as noted above.

147.    DeCurtis quizzically suggests that this Court should not decide Carnival's request for an injunction because of the Seventh Amendment.  *See* Debtors' Brief, ¶ 45; contra n.11, *supra*.  But it is *DeCurtis* who is treading on Carnival's jury trial right with its improper collateral attack on the Florida judgment. Notably, in all of the discussions with the Florida District Court about Carnival's post-trial Injunction Motion, DeCurtis never once suggested the Court was not in position to rule on Carnival's post-trial motion.  DeCurtis fought tooth and nail to prevent lifting of the automatic stay to have the injunctive relief issue adjudicated in the Florida District Court, where it could have been adjudicated more expeditiously pursuant to the parties' previous agreement.  It is obvious that DeCurtis' true goal is to deny Carnival the opportunity to protect its intellectual property.  Regardless, there is no Seventh Amendment problem presented by an injunction ruling that adheres to the jury's implicit findings.  *See* n.11, *supra*.  The only party with Seventh Amendment rights at stake is Carnival.

## CONCLUSION

148.    For the foregoing reasons, Carnival respectfully requests that the Court (a) deny Debtors' request for an order declaring that Debtors own the assets they seek to sell and that Carnival has no ownership interest in any of those assets; (b) enter a declaratory judgment that the assets Debtors seek to sell include assets comprised of or derived from Carnival Information which is the sole property of Carnival and may not be used or disclosed by Debtors, their successors, or any purchasers of any such assets and (c) issue a permanent injunction against Debtors.

Dated:  July 5, 2023
Wilmnigton, Delaware

*/s/ Domenic E. Pacitti*

Domenic E. Pacitti (DE Bar No. 3989)
Richard M. Beck (DE Bar No. 3370)
Sally E. Veghte (DE Bar No. 4762)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
919 Market Street, Suite 1000
Wilmington, Delaware, 19801-3062
Telephone:  (302) 426-1189
Email:  rbeck@klehr.com
            dpacitti@klehr.com
            sveghte@klehr.com

-and-

Raniero D'Aversa, Esq.
Michael Trentin, Esq.
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
51 West 52nd Street
New York, New York  10019-6142
Telephone:  (212) 506-5000
Email:  rdaversa@orrick.com
            mtrentin@orrick.com

-and-

Sheryl K. Garko, Esq.
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
222 Berkeley Street, Suite 2000
Boston, Massachusetts 02116
Telephone:  (617) 880-1800
Email:  sgarko@orrick.com

-and-

Steven J. Routh Esq.
T. Vann Pearce, Jr., Esq.
Diana S. Fassbender, Esq.
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
1152 15th Street NW
Washington, D.C. 20005
Telephone: (202) 339-8400
Email:  srouth@orrick.com
Email:  vpearce@orrick.com
Email: dszego@orrick.com

*Counsel to Carnival Corporation*