**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| DECURTIS HOLDINGS LLC, *et al.*,[1] | ) Case No. 23-10548 (JKS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Re: Docket Nos. 318, 319 and 359** |
| | ) |
| | ) |
| | ) |

**INVICTUS GLOBAL MANAGEMENT, LLC'S POST-TRIAL BRIEF IN FURTHER SUPPORT OF ITS COMBINED OBJECTION TO (I) MOTION OF CARNIVAL CORPORATION TO DENY OR LIMIT INVICTUS GLOBAL MANAGEMENT, LLC'S RIGHT TO CREDIT BID AND (II) MOTION OF CARNIVAL CORPORATION FOR STANDING TO PROSECUTE CLAIMS AGAINST DEFENDANTS**

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number include: DeCurtis Holdings LLC (2384) and DeCurtis LLC (9241). The location of the Debtors' service address in these Chapter 11 Cases is 3208 East Colonial Drive, Suite C190, Orlando, FL 32803.

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ........................................................................................1

POST-TRIAL ARGUMENT ...........................................................................................5

    A.  Carnival Has Failed to Demonstrate Cause to Limit Invictus' Credit Bid Rights..............6

        1.  There is No Evidence of Inequitable Conduct by Invictus. ..........................................6

        2.  Overwhelming Evidence Supports Invictus' Statutory Right to Credit Bid...............13

        3.  Carnival's Attempts to Recharacterize the Senior Secured Credit Agreement
           as Equity Fall Flat. .......................................................................................14

    B.  Carnival Has Failed to Demonstrate that Derivative Standing is Appropriate.................18

CONCLUSION.............................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bank of N.Y. v. Epic Resorts-Palm Springs Marquis Villas, LLC (In re Epic Capital Corp.)*,
   290 B.R. 514 (Bankr. D. Del. 2003) ...................................................................8

*Burtch v. Owlstone, Inc. (In re Advance Nanotech, Inc.)*,
   2014 WL 1320145 (Bankr. D. Del. 2014) ........................................................8

*Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*,
   160 F.3d 982 (3d Cir. 1998)...................................................................8, 10

*Cohen v. KB Mezzanine Fund II, LP (In re SubMicron)*,
   291 B.R. 314 (D. Del. 2003) .............................................................................8

*Cohen v. KB Mezzanine Fund II, LP (In re SubMicron)*,
   432 F.3d 448 (3d. Cir. 2006)...............................................................8, 14

*In re Aéropostale, Inc.*,
   555 B.R. 369 (Bankr. S.D.N.Y. 2016) ............................................................6

*In re Autostyle Plastics, Inc.*,
   269 F.3d 726 (6th Cir. 2001) .......................................................................15, 17

*In re Mobile Steel Co.*,
   563 F.2d 692 (5th Cir. 1977) ...........................................................................8

*In re Radnor Holdings, Corp.*,
   353 B.R. 820 (Bankr. D. Del. 2006) .............................................................8, 9

*In re STN Enterprises*,
   779 F.2d 901 (2d Cir. 1985)............................................................................19

*Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders North Am., Inc.)*,
   405 B.R. 527 (Bankr. D. Del. 2009) ...............................................................14

*Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery*,
   330 F.3d 548 (3d Cir. 2003)...........................................................................18

*Official Unsecured Creditors' Committee of Broadstripe, LLC v. Highland Capital Management, L.P. (In re Broadstripe, LLC)*,
   444 B.R. 51 (Bankr. D. Del. 2010) ..................................................................8

*Seaver v. Ashefelter* (*In re MSP Aviation, LLC*),
    531 B.R. 795 (Bankr. D. Minn. 2015) ................................................................16

*Shubert v. Lucent Techs. Inc. (In re Winstar Communs., Inc.)*,
    348 B.R. 234 (Bankr. D. Del. 2005) ........................................................................9

*United States v. Noland*,
    517 U.S. 535, 116 S. Ct. 1524, 134 L. Ed. 2d 748 (1996) .......................................8

## STATUTES

11 U.S.C. § 363 .............................................................................................................5, 14

## OTHER AUTHORITIES

Carnival Corporation (June 28, 2023), *Form 10-Q for the Quarter Ended May 31, 2023*,
    https://www.sec.gov/ix?doc=/Archives/edgar/data/1125259/00008150972300
    0051/ccl-20230531.htm ............................................................................................5

Michael A. Mora (Law.com), *What Happens': Strategy Behind Carnival's $21M Verdict*, March 16, 2023,
    https://www.law.com/dailybusinessreview/2023/03/16/punch-them-in-the-
    face-and-see-what-happens-strategy-behind-carnivals-21m-verdict/ .......................2

Invictus Global Management, LLC ("Invictus"), the prepetition senior secured required lender and the debtor-in-possession required lenders to the above-captioned debtors and debtors-in-possession (collectively, "DeCurtis" or the "Debtors") hereby submits this post-trial brief (this "Brief") in further support of *Invictus Global Management, LLC's Combined Objection to (I) Motion of Carnival Corporation to Deny or Limit Invictus Global Management, LLC's Right to Credit Bid and (II) Motion of Carnival Corporation for Standing to Prosecute Claims Against Defendants* [Docket No. 340] (the "Objection")[2] submitted in opposition to the Standing Motion [Docket No. 318] and Credit Bid Motion [Docket No. 319] (together, the "Motions") filed by Carnival Corporation ("Carnival").  In support of this Brief, Invictus respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      Bankruptcy is a rehabilitative process designed to preserve going concern value and provide distressed companies with a fresh start.  And yet, even after software provider DeCurtis filed for bankruptcy following an adverse prepetition judgment for breach of contract and patent infringement in favor of unsecured creditor Carnival, the cruise giant with a market capitalization of ***more than $23 billion dollars*** has continued its relentless, value-destructive fight with DeCurtis.

2.      DeCurtis is a company still in its start-up phase that does not have enough money to finance its own operations while also fending off behemoth Carnival's litigation onslaught, which appears to have no end in sight.  Indeed, after three days of evidentiary proceedings, Carnival's goal in these chapter 11 cases could not have been any more clear: expend unlimited resources to destroy DeCurtis and inflict harm on DeCurtis' customers and employees until the

---

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Objection.

Debtors submit and go out of business. It also is apparent that Carnival does not care about whether it receives any recovery as an unsecured creditor while it continues its warpath of scorched-earth litigation: its strategy centers on absolute destruction at all costs,[3] including asking this Court to improperly revive its trade secret claims that were dismissed with prejudice by the Florida District Court as newly-asserted ownership claims in these chapter 11 cases.

3.     Carnival litigated its claims to conclusion in the Florida District Court and was ultimately awarded $21 million in damages by a jury consisting of: (i) $1 million for breach of contract and (ii) $20 million for patent infringement. But Congress determined when it enacted the Bankruptcy Code that judgment creditors stand *pari-passu* with other unsecured creditors. It is inequitable and contrary to the rehabilitative purpose of the Bankruptcy Code for Carnival now to stand in the way of DeCurtis' only opportunity to survive as a going-concern supporting the safety functions for thousands of passenger and crew on its customers' cruise ships and to maximize the value of its estates through a standard 363 sale process, which will now provide a recovery to general unsecured creditors (including Carnival) on account of their claims.[4]

4.     Invictus joins in vigorous support of the *Debtors' Post-Trial Brief (A) In Support of Debtors' Motion for a Declaration That Debtors Own Their Assets, (B) In Opposition to Carnival's Motion for Declaratory Relief and for a Permanent Injunction, and (C) In Opposition to Carnival's Response on the Free and Clear Dispute* (the "Debtors' Post-Trial Brief"), filed contemporaneously herewith. The Debtors have satisfied their prima facie burden of

---

[3]   As Carnival's counsel has proudly stated, its focus with respect to DeCurtis is to "punch them in the face and see what happens." Michael A. Mora (Law.com), *'Punch Them in the Face and See What Happens': Strategy Behind Carnival's $21M Verdict*, March 16, 2023, https://www.law.com/dailybusinessreview/2023/03/16/punch-them-in-the-face-and-see-what-happens-strategy-behind-carnivals-21m-verdict/.

[4]   *See* July 17, 2023 Hrg. Tr., 4:6-5:2 (Debtors' counsel describing the bid enhancements offered by Invictus to provide "a real potential and opportunity for there to be unsecured creditor recoveries.").

demonstrating ownership of the 68 modules of software that comprise the DXP Assets and ask this Court to permit them to satisfy their fiduciary duties to maximize the value of their estates for all stakeholders through a Court-supervised bidding and auction process supported by a baseline stalking horse bid that guarantees preservation of the going-concern value of the business, more than one hundred jobs, and continuation of critical safety services for customers, while providing a recovery to unsecured creditors.

5.      In contrast, Carnival's relentless litigation strategy has caused the filing of these bankruptcy cases,[5] harmed the Debtors' sale process[6] and left the Invictus stalking horse bid as the Debtors' only opportunity to maintain their operations as a going-concern.  Transparently, Carnival's Standing Motion and Credit Bid Motion are mere pretexts for its continued value-destructive campaign against DeCurtis and are designed to cut off any life-preservers for the Debtors.  Indeed, Carnival's success in its Standing Motion or Credit Bid Motion would further harm the Debtors and their estates by forcing a value-destructive liquidation and unduly derail the operations of the Debtors' customers and the safety of their passengers.[7]

6.      Relying upon what has been shown at last week's hearing to be no more than baseless conjecture, Carnival asks this Court for the extraordinary relief of depriving Invictus of its statutory right to credit bid the full amount of its prepetition secured claims at the Debtors'

---

[5]  Carino Declaration [Docket No. 372], ¶ 27.

[6]  July 20, 2023 Hrg. Tr., 37:18-38:1 (Debtors' financial advisor testifying that buyers have expressed a reluctance to participate in the sale process because of the "hair" on the Debtors' assets caused by the Carnival litigation and the concern of whether "Carnival [would] sue [a purchaser] if [the purchaser] bought this company post-bankruptcy").

[7]  *See, e.g.*, June 21, 2023 Hrg. Tr. at 45:18-46:2 (Carnival's Counsel: "We think the Court should not allow [the Debtors] to cut off the contract the way they have . . . . [I]t leaves us sitting right now with risk to ships that they will not be able to sail or will not be able to continue sailing without major disruption . . . . we're going to have to take steps that will undermine the normal operations of our business and could inconvenience our customers and others.").

auction.[8]  Carnival seeks this drastic relief based on baseless intimations of inequitable conduct by Invictus, and the unsubstantiated claim that Invictus and the Debtors intended its perfected senior secured loan to be an equity investment.  And yet, just like in its Motions—where Carnival failed to cite to ***any*** documentary evidence despite thousands of documents produced in an expansive and expedited discovery process—across three full days of an evidentiary trial, Carnival did not offer a single witness—***not even one***—in support of its theories.  Resting exclusively on cross-examination of the Debtors' and Invictus' affirmative witnesses, Carnival failed to elicit ***any*** testimony or evidence in support of its theories, and seemingly relies on an investment memorandum prepared for co-investor Corbin Capital that describes nothing more than the clear terms of the senior secured credit agreement.

7.      Notably, Carnival makes no allegations of collusion, undisclosed agreements, or any other actions Invictus designed to chill bidding, unfairly manipulate the sale process for its own benefit, or damage the estate.  Carnival does not dispute the validity or extent of the liens securing Invictus' prepetition loan or DIP loan obligations (nor can it).  *See* Docket No. 359, ¶ 66 (identifying ***only*** the Prepetition Senior Secured Obligations under the Final DIP Order as the amounts remaining subject to challenge by Carnival).

8.      Rather, Carnival bases its entire argument on two far-fetched theories: (i) the implausible theory that Invictus used its one and only seat on the DeCurtis Board, otherwise comprised of five directors completely unaffiliated with Invictus (including those appointed by DeCurtis's controlling shareholder, Shamrock Capital, and the company's founder, David DeCurtis) to take control of litigation that had ensued between DeCurtis and Carnival almost two

---

[8] Tellingly, Carnival has not objected to Invictus' right to credit bid the debtor-in-possession ("DIP") financing and fees approved under the final DIP Order, all of which Carnival has consented to and which stand unchallenged by any party, which itself would render the success of the Credit Bid Motion a pyrrhic victory.

years ***before*** Invictus made its secured loan and ultimately push the Debtors into a bankruptcy case that would force Invictus to put millions more of its money at risk, and (ii) a standard and unremarkable conversion feature that would have permitted Invictus to convert its prepetition loans into less than 30% of the Debtors' equity.  Simply put, by seeking to recharacterize Invictus' secured loans, Carnival asks this Court to single-handedly upend a $400 billion convertible debt market, including $1.5 billion of convertible notes issued in 2022 by Carnival, ***which Carnival itself acknowledges constitutes debt in its audited public securities filings***.[9]

9.      Carnival has failed to satisfy its burden of proof to demonstrate any of its claims are colorable or that there exists cause to limit Invictus' statutory right to credit bid.  There is no evidence before the Court that establishes inequitable conduct, let alone any actions by Invictus that suggest it impermissibly furthered its own interests in any way that damaged the Debtors or their estate.  Carnival has failed to allege even a plausible argument for equitable subordination, and has failed to proffer any evidence that would support recharacterization, of Invictus' secured claims, which have been booked by the company and treated by all parties as debt from day one. Nor has Carnival demonstrated that the absence of a credit bid will result in a competitive auction. Indeed, the evidence in the record, and adduced at trial, shows the opposite.  For these reasons, the Credit Bid Motion and the Standing Motion each fail and should be denied.

## POST-TRIAL ARGUMENT

10.      The Credit Bid Motion should be denied because Carnival has failed to satisfy its burden to demonstrate cause to overcome Invictus' statutory right under section 363 of title 11 of the United States Code (the "Bankruptcy Code") to bid its secured claim for the Debtors' assets.

---

[9]  *See, e.g.*, Carnival Corporation (June 28, 2023), *Form 10-Q for the Quarter Ended May 31, 2023*, at 13 (accessible at https://www.sec.gov/ix?doc=/Archives/edgar/data/1125259/000081509723000051/ccl-20230531.htm).

Likewise, the Standing Motion should be denied because Carnival fails to allege colorable claims sufficient to obtain the extraordinary relief of derivative standing and has not demonstrated the Debtors unjustifiably refused to pursue the claims asserted in its draft complaint.

**A.  Carnival Has Failed to Demonstrate Cause to Limit Invictus' Credit Bid Rights.**

11.    As described in the Objection, courts only have found "cause" to grant the extraordinary relief of limiting a secured creditor's statutory right to credit bid in extremely limited circumstances where there is inequitable conduct that "directly impacts the estate or the bidding process," or "when the validity of a creditor's lien is in dispute." *See, e.g.*, *In re Aéropostale, Inc.*, 555 B.R. 369, 415 (Bankr. S.D.N.Y. 2016).  Additionally, courts have restricted credit bidding in circumstances where there is overwhelming evidence of active bid chilling.  *But see id.* at 417 ("the Court is unaware of any cases where the chilling of bidding alone is sufficient to justify a limit on a credit bid.").  Carnival cannot substantiate either such allegation.

### 1.    <u>There is No Evidence of Inequitable Conduct by Invictus</u>.

12.    Carnival argues in its Motions that Invictus engaged in inequitable conduct through its alleged control of the Debtors' litigation strategy in the Carnival Litigation.  Instead of offering evidence of such control, however, Carnival relies on unsubstantiated claims and even asserts that it should not be required to present evidence at this stage.  *See* Docket No. 359, ¶ 15.  But this is not a case in its preliminary pre-discovery stages.  This case has endured months of document productions, depositions, and now a three-day evidentiary trial with eight witnesses testifying in open court.  The Court need not entertain a fool's errand where, even after extensive and burdensome discovery, the paucity of evidence is so clear.

13.    Carnival does not dispute the validity of Invictus' liens, which were perfected by its collateral agent following execution of the Senior Secured Credit Agreement, but instead rests

the entirety of its request to limit credit bidding upon its unsupported theories of equitable subordination and recharacterization. Carnival, however, offers no evidence of inequitable conduct by Invictus, let alone inequitable conduct that harmed creditors or otherwise impacted the estate at any point prior to or during these chapter 11 cases to warrant the extraordinary relief requested. Indeed, it would be difficult to demonstrate such inequitable conduct where, as Carnival itself acknowledges, Ms. Chen Delano "did not have day to day responsibilities for DeCurtis' DXP or other software products." July 20, 2023 Hrg. Tr. at 110:7-9. Carnival instead relies exclusively on the involvement of Ms. Chen Delano, at the direction of the Debtors' Board, in certain settlement negotiations relating to the Carnival Litigation.

14.     In contrast, the evidence admitted through the declarations of Ms. Chen Delano [Invictus Ex. 4] (together with its attachments, the "Chen Delano Declaration"), Mr. Carino [Debtors Ex. 38] (together with its attachments, the "Carino Declaration"), and Mr. Atkinson [Debtors Ex. 36] (together with its attachments, the "Atkinson Declaration"), combined with the fulsome trial record, clearly undermines Carnival's argument and compels the Court to deny Carnival's Motions. It is an undisputed fact that Invictus proposed an independent director to serve as its board designee, but was unsuccessful given that DeCurtis did not have the funds available to pay the costs associated with hiring an independent director, so Ms. Chen Delano agreed to serve at the Board's request and at no cost to the company. Carino Declaration at ¶ 19-21. It also is an undisputed fact that, at all times, the Board was controlled by a supermajority of directors unaffiliated with Invictus who set forth negotiation guidelines approved by the Board with the input of counsel in the exercise of its business judgment to govern Ms. Chen Delano's settlement discussions, which she only undertook at the Board's direction. *Id.*

15.     Contrary to these undisputed facts, equitable subordination is a "'drastic' and 'unusual' remedy." *In re Radnor Holdings*, *Corp.*, 353 B.R. 820, 840 (Bankr. D. Del. 2006) (quoting *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron)*, 291 B.R. 314, 327-29 (D. Del. 2003)).  The Third Circuit Court of Appeals has stated:

> Before ordering equitable subordination, most courts have required a showing involving three elements: (1) the claimant must have engaged in some type of inequitable conduct, (2) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant, and (3) equitable subordination of the claim must not be inconsistent with the provisions of the bankruptcy code.

*Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 986-87 (3d Cir. 1998) (footnote omitted) (citing *United States v. Noland*, 517 U.S. 535, 116 S. Ct. 1524, 134 L. Ed. 2d 748 (1996) (describing existing case law as consistent with the three-part test identified in *In re Mobile Steel Co.*, 563 F.2d 692, 700 (5th Cir. 1977)); *see also SubMicron*, 432 F.3d at 461-62.  "[C]ourts recognize three general categories of behavior that may constitute inequitable conduct: 1) fraud, illegality, or breach of fiduciary duties; 2) undercapitalization; and 3) claimant's use of the debtors as a mere instrumentality or alter ego." *Bank of N.Y. v. Epic Resorts-Palm Springs Marquis Villas, LLC (In re Epic Capital Corp.)*, 290 B.R. 514, 524 (Bankr. D. Del. 2003); *see also Burtch v. Owlstone, Inc. (In re Advance Nanotech, Inc.)*, 2014 WL 1320145 at *8 (Bankr. D. Del. 2014).

16.     When evaluating equitable subordination, Courts apply differing standards to insiders and non-insiders.  An insider's conduct is rigorously scrutinized, and the plaintiff bears the burden of presenting material evidence of unfair conduct that the insider claimant then must rebut by proving the fairness of his transactions with the debtor." *Official Unsecured Creditors' Committee of Broadstripe, LLC v. Highland Capital Management, L.P. (In re Broadstripe, LLC)*, 444 B.R. 51, 79 (Bankr. D. Del. 2010) (internal quotations omitted).

17.     Carnival alleges that Invictus is an insider as a result of its appointment of one member of the Debtors' six-member Board, and its alleged "control" of the Carnival Litigation. In addition to evidence controverting Carnival's supposition of control over the Carnival Litigation, *see, e.g.*, Carino Declaration at ¶ 24, Carnival readily admits that its allegations would be insufficient to meet the insider requirements.  As Carnival's counsel argued, Invictus' ability to appoint a single member to the Debtors' Board "put [Invictus] in a position, essentially, of being able to run the company, ***not hands-on on a day-to-day basis on business*** . . . ."[10] And yet, day-to-day control of the business is ***exactly*** what courts have required be shown to qualify as an insider. *See In re Radnor Holdings Corp.*, 353 B.R. at 841 (holding that a lender's appointment of one of four members of the debtors' prepetition board of directors did not make the lender an 'insider' for equitable subordination purposes because the plaintiff "failed to prove [the lender] exercised 'day-to-day control' over Radnor's business affairs and dictated Radnor's business.") (citing *Shubert v. Lucent Techs. Inc. (In re Winstar Communs., Inc.)*, 348 B.R. 234, 279 (Bankr. D. Del. 2005) ("there must be day-today control, rather than some monitoring or exertion of influence regarding financial transactions in which the creditor has a direct stake.").

18.     Contrary to Carnival's threadbare allegations, the trial record shows that Invictus did not exercise any financial or operational control in any way over the Debtors, which, at all times, made decisions about litigation strategy and other aspects of its business at the direction of its management team and a Board comprised of unaffiliated directors, which outvoted Invictus' board representative five to one.  When appropriate, and based on the Board's reasonable business judgment that Ms. Chen Delano's professional experience and distance from the emotional nature of the underlying dispute would be beneficial, the Board, as a whole, authorized Ms. Chen Delano

---

[10]  July 18, 2023 Hrg. Tr. at 38:6-8 (emphasis added).

to seek a value-maximizing consensual resolution to the Carnival Litigation. *See* July 20, 2023 Hrg. Tr. at 110:16-25; *see also* Carino Declaration, ¶ 22 ("Given Ms. Chen Delano's legal background, the board highly valued and requested Ms. Chen Delano's outside perspective on the Carnival litigation as an independent board member. In her capacity as a board member, and at the direction of the board and the Debtors' management, Ms. Chen Delano also sent settlement communications to Carnival throughout 2022 and early 2023 and participated in settlement discussions with Carnival. However, at no point did Ms. Chen Delano exercise control over the Debtors' litigation strategy, and all such decisions about litigation strategy remained with the board.").

19.     Carnival's allegations of Invictus' "control" over the Carnival litigation are not just unsupported, but also are irrelevant to the question before the Court. Regardless of whether Invictus' actions are analyzed through the lens of an insider or not, much more must be proven for the drastic remedy of equitable subordination to be justified. Most notably, Carnival must show that (i) this "control" constituted inequitable conduct, (ii) such inequitable conduct resulted in harm to the creditors, and (iii) the proposed remedy of equitable subordination comports with the aims of the Bankruptcy Code. *Citicorp Venture Cap., Ltd.*, 160 F.3d at 986-87. ***The record is devoid of any such evidence***.

20.     Carnival alleges two potential theories of inequitable conduct: *first*, that "through its domination and control of the Debtors, Invictus compelled the Debtors to continue pursuing a disastrous litigation, refusing to reach a reasonable settlement, even after the Debtors' affirmative claims were dismissed." Docket No. 359, ¶ 36. *Second*, "Carnival alleges that [Invictus'] decision to invest and exercise its contractual remedies was done to harm the Debtors and their creditors." *Id*. ¶ 42.

21.     Following the evidentiary proceedings before this Court, it only has become even more clear that such assertions are baseless and unfounded.  Carnival's implausible assertions that Invictus somehow "controlled" a litigation that commenced almost two years prior to Invictus' secured loan border on frivolous, and testimony elicited by Carnival showed precisely the opposite at every stage.  Invictus appointed only one member of the DeCurtis Board, a supermajority of which was controlled by the company's private-equity sponsor and largest shareholder, and which also included the company's founder and second-largest shareholder.  Carino Declaration, ¶ 19.  Invictus never held any equity or voting interests in DeCurtis.  Carino Declaration, ¶ 21.  During settlement negotiations, Ms. Chen Delano at all times acted at the direction and request of the Board, which retained complete control and decision-making authority over DeCurtis' litigation strategy.  Carino Declaration, ¶¶ 22 and 24; *see also* July 20, 2023 Hrg. Tr. 119:1-131:17 (Ms. Chen Delano testimony regarding six of the Board's attempts to settle the Carnival litigation).  Carnival offers no contrary evidence.

22.     Moreover, Carnival seeks to distort Invictus' constant support for the Debtors and their business into somehow harming the Debtors.  To the contrary, the evidence is overwhelming that Invictus' funding and support repeatedly benefited DeCurtis and its creditors, often in times of dire need.  Indeed, when DeCurtis was facing the potential default on its pre-existing secured debt facility, it solicited a number of proposals, and ultimately agreed with Invictus on the terms of a $15 million senior secured credit facility to refinance its existing lender, take over its collateral package, and "fund the working capital, satisfaction of a portion of accelerated debt, and litigation expenses."  Carino Declaration, ¶¶ 9-11.  Following Invictus' loan in January 2022, DeCurtis operated its business in the ordinary course and paid vendors timely without issue.  This can easily be seen by reference to the Debtors' list of Top 20 Unsecured Claimholders, which is comprised

almost exclusively of Carnival and professional service firms and experts retained by the Debtors in connection with the Carnival Litigation.  Debtors Ex. 1.

23.     Following the unanticipated adverse judgment in the Carnival litigation, as the Board contemplated its options and when it became clear that there was a risk of potential adversity between DeCurtis and Invictus, Ms. Chen Delano resigned her position on DeCurtis' Board.  July 20, 2023 Hrg. Tr. 132:13-19 (Ms. Chen Delano: "right after the adverse decision, the company was trying to figure and the board was trying to figure out the net impact of the adverse decision.  But in terms of right after the notice of default was delivered, I recused myself from any discussions from the board at that point and, in mere days, I officially resigned from the board.").  After relinquishing its board position, Invictus continued to support DeCurtis and provided an additional $2.78 million in emergency bridge loans over the next month to fund DeCurtis' immediate cash needs and avoid a value-destructive free-fall liquidation that would have harmed all creditors. Carino Declaration, ¶ 27.  Additionally, Invictus agreed to provide a debtor-in-possession financing facility and a stalking horse term sheet to guarantee the preservation of the Debtors' business as a going concern and reassure the market that these chapter 11 cases would not prevent DeCurtis from operating.  *See, e.g.*, July 20, 2023 Hrg. Tr. 32:16-19 (Mr. Atkinson: "what I wanted to communicate to employees . . . is there would be no disruption to their jobs [and] the company would have the liquidity to . . . continue to operate.").

24.     Even after spending millions of additional dollars to support the Debtors, Invictus has been a supportive stalking horse bidder, agreeing to extend the sale process for months, reducing the amount of its minimum overbid at the auction to foster competitive bidding, and, subject to definitive documentation, agreeing to enhance its credit bid to provide an opportunity for recoveries to unsecured creditors on top of the assumption of contracts and associated

liabilities.  *See* Atkinson Declaration, ¶¶ 11 and 14; *see also* July 17, 2023 Hrg. Tr. 4:6-5:2; July 20, 2023 Hrg. Tr. 19:14-20:8.

25.     Carnival's assertions of inequitable conduct are unconvincing and stand in opposition to the evidence submitted to this Court.   Carnival's argument for equitable subordination of Invictus' senior secured claims is not colorable.

**2.   <u>Overwhelming Evidence Supports Invictus' Statutory Right to Credit Bid</u>.**

26.     Carnival does not proffer any evidence of any chilling effect caused by Invictus asserting its rights as a secured lender.  As described in the testimony of the Debtors' financial advisor, Mr. Atkinson, the Debtors have run a fulsome sale process and have contacted approximately sixty prospective buyers.  Atkinson Declaration, ¶ 10.   Moreover, while no prospective purchaser was willing to continue the sale process beyond initial diligence, the lack of interest resulted from the Debtors' historical operations over the past four years and the overhang associated with Carnival's litigious posture prior to and during these chapter 11 cases.  Atkinson Declaration, ¶¶ 14-16; *see also* July 20, 2023 Hrg Tr. 23:4-24:19 (Mr. Atkinson testifying that prospective purchasers have decided not to submit a bid because of the Debtors' poor cash flow since 2020 and "the hair on the assets and Carnival's sort of involvement").

27.     There is no evidence or support for the contention that a robust bidding process would thrive and generate material value for the estate above any Invictus credit bid, whether limited to the DIP obligations or not.  Indeed, the only evidence in the record directly contradicts this notion.  As previously stated, the Debtors' financial advisor has testified that the sale process has been ongoing for more than two months, during which time he has contacted over sixty potential purchasers, including to inform such purchasers of Invictus' voluntary determination to reduce the minimum qualifying bid by $15 million.  Nonetheless, still no bids have materialized. Atkinson Declaration, ¶¶ 14-15.  That is because the party "chilling bidding" is Carnival with its

litigious posture in these chapter 11 cases, including the threat to sue any purchaser despite a free-and-clear sale under section 363 of the Bankruptcy Code. *Ibid.*; *see also* July 20, 2023 Hrg. Tr. 38:2-14 (Mr. Atkinson: "[DeCurtis] ha[s] revenue of about $13 million. So it's a pretty small entity right now. I think it would require a significant amount of capital to sort of jump-start this post-bankruptcy. And you know, this – this litigation potential is something that would be concerning. ***So that's why I don't see someone bidding more than even $10 million***.") (emphasis added).

28.    Finally, Carnival does not even allege any manipulation of the bidding process or other issues related to the sale. Carnival fails to meet the high bar required to limit a secured creditor's statutory right to credit bid its secured claims.

### 3.  Carnival's Attempts to Recharacterize the Senior Secured Credit Agreement as Equity Fall Flat.

29.    As the Third Circuit has held, "the overarching inquiry with respect to recharacterizing debt as equity is whether the parties to the transaction in question intended the loan to be a disguised equity contribution." *Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders North Am., Inc.)*, 405 B.R. 527, 554 (Bankr. D. Del. 2009) (citing *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron)*, 432 F.3d 448, 455-56 (3d. Cir. 2006))). While "[n]o mechanistic scorecard suffices," the parties' intent "may be inferred from what the parties say in their contracts, from what they do through their actions, and from the economic reality of the surrounding circumstance." *SubMicron*, 432 F.3d at 456.

30.    The intent of the parties to the transaction is not in dispute by either party; both Invictus and the Debtors, the parties to the Senior Secured Credit Agreement, have testified as to their intent for the Senior Secured Credit Agreement to be a loan. July 20, 2023 Hrg. Tr. 46:7-19;

Chen Delano Declaration, ¶¶ 12-14.  In support of that loan, DeCurtis and Invictus entered into a

Guarantee and Security Agreement and a Patent Security Agreement to attach liens to all of

Invictus' assets, and DeCurtis permitted Cantor Fitzgerald, the collateral agent appointed by

Invictus to manage its collateral and security interests, to file UCC-1 financing statements to

perfect those security interests and liens on all of DeCurtis' assets.  *Id.*

       31.      The Court need not merely rely on the parties' statements, however, as a fulsome

review of the evidence submitted to the Court demonstrates the parties intended and treated the

Invictus loans as such, as more fully set forth below.

       32.      Each of the factors outlined in *In re Autostyle Plastics, Inc.*, 269 F.3d 726 (6th Cir.

2001), clearly support a finding that the Senior Secured Credit Agreement constitutes debt:

| Factor | Evidence | Favors |
|---|---|---|
| Instrument Name | The instrument in question is the Senior Secured Credit Agreement.  Chen Delano Declaration, Ex. A [Invictus Ex. 5]<br><br>Carnival has argued that the Court should disregard the title of the document and the treatment provided to such loans in each party's books and records because DeCurtis inadvertently on a single occasion displayed the loan proceeds in a row in an Excel chart listed as "equity."  July 20, 2023 Hrg. Tr. 51:17-53:8.  Carnival's reliance upon a single cell in a spreadsheet falls flat and is heavily outweighed by the overwhelming evidence to the contrary.<br><br>As Mr. Carino explained, this entry was mislabeled at a time when the parties were working quickly to close a transaction that would provide necessary working capital to refinance already-defaulted secured loans.  Mr. Carino's explanation that this entry was always intended to reflect a debt instrument is supported by the Debtors' books and records in the year-plus since the January 2022 loan was issued, as well as the Debtors' cash projections prepared for its Board and shared with Invictus ***less than a month later***, where this entry was no longer mislabeled.  *See* Carino Declaration, Exhibit 5 [Debtors Ex. 43] at 53 (DECURTISBK_00004144) (showing sources of cash in | ***Debt*** |

| | January 2022, including $6,887,000 from debt and $0 from equity contributions). | |
|---|---|---|
| Fixed Maturity and Schedule of Payments | The loans matured on January 21, 2026. Invictus Ex. 5 at 19 (definition of "Maturity Date").<br><br>Interest was required to be paid in cash (at a rate of 12%) or capitalized (at a rate of 14%) at the company's election on a quarterly basis. *Id.* § 2.10.<br><br>Every fiscal year, 50% of all Excess Cash Flow was required to be paid to the lenders in satisfaction of the loans. *Id.* § 2.7(e). | ***Debt*** |
| Fixed rate of interest | Interest was required to be paid in cash (at a rate of 12%) or capitalized (at a rate of 14%) at the company's election on a quarterly basis. *Id.* § 2.10.<br><br>Carnival argues that the loans had "no actual interest rate," despite two explicit interest rate payment options contained in the document. *See* Docket 359, ¶ 23. Carnival further argues that the interest "was illusory" because the notes were convertible. *Ibid.* As was made clear, Carnival misunderstands the terms of the Senior Secured Credit Agreement. Pursuant to section 2.3(a) of the Senior Secured Credit Agreement, even if Invictus were to elect to convert its Loans to equity, it would receive shares of common equity "together with cash for any accrued but unpaid interest on the Loans to be converted." Accordingly, interest was never "illusory" and was required to be paid in cash either at maturity or upon conversion of the loans into less than 25% of equity on a fully-diluted basis. *See* July 20, 2023 Hrg. Tr. 101:19-102:8. | ***Debt*** |
| Source of repayments | The Senior Secured Credit Agreement is secured by substantially all assets of the Debtors, clearly indicating that repayment is not dependent solely on the success of the Debtors' business. *See, e.g.*, *Seaver v. Ashefelter* (*In re MSP Aviation, LLC)*, 531 B.R. 795, 807 (Bankr. D. Minn. 2015) ("when the creditor has secured the transaction with a lien, courts will generally find in favor of a loan.").<br><br>Moreover, the Debtors' financial cash projections showed that in the month prior to the loan's maturity date, DeCurtis projected having $22.8 million in cash on hand, more than sufficient to pay the entirety of the loan and all accrued interest thereon, even if DeCurtis never made any interest payments in cash. July 20, 2023 Hrg. Tr. 67:9- | ***Debt*** |

| | | |
|---|---|---|
| | 68:15; Carino Declaration, Exhibit 5 [Debtors Ex. 43] at 54 (DECURTISBK_00004145).<br><br>Carnival asks this Court to disregard the liens granted in favor of Invictus to support repayment of the loan. | |
| Adequacy of Capitalization | Following the execution of the Senior Secured Credit Agreement, Invictus' loan infused DeCurtis' balance sheet with millions of dollars to support working capital needs and the company's financial projections demonstrated sufficient capital not only to operate, but to repay the secured loan in full by its maturity date.    Carino Declaration, ¶ 14 and Exhibit 5 [Debtors Ex. 43] at 54 (DECURTISBK_00004145) (showing a remaining cash balance as of year-end 2025 equal to $22.8 million). | *Debt* |
| Identity of Interest Between Creditor and Stockholder | Invictus has never owned equity in the Debtors and has never had any voting rights in the Debtors.  Carnival fails to address this factor. | *Debt* |
| Security for the Advances | "The absence of a security for an advance is a **strong indication** that the advances were capital contributions rather than loans." *Autostyle*, 269 F.3d at 752 (emphasis added).  Here, the Senior Secured Credit Agreement is secured by substantially all assets of the Debtors pursuant to the *Guarantee and Security Agreement*, dated as of January 21, 2022 [Debtors Ex. 41], and the *Patent Security Agreement*, dated as of January 22, 2022 [Debtors Ex. 41]. Security Agreement § 1.01 (defining "Collateral"); Patent Security Agreement § 2.  Carnival fails to address this factor. | *Debt* |
| Ability to Obtain Outside Financing | Invictus was a third-party outside lender with no pre-existing relationship to the borrower. | *Debt* |
| Subordination to All Other Creditors | The liens were subordinated under the Intercreditor Agreement solely as to specific sources of collateral, including the proceeds of any Carnival Litigation settlement or favorable judgment, and only to CNB. Otherwise, Invictus maintained validly perfected first-lien security interests in all assets of the Debtors. | *Debt* |
| Use of Proceeds to Purchase Capital Assets | Here, proceeds of the Senior Secured Credit Agreement were not used to acquire capital assets.  Instead, they were used to, among other things, pay down certain existing debt and supplement working capital.  Credit Agreement § 3.14 ("The proceeds of the Loans shall be used by the Borrower (i) to finance the Initial CNB Payment, (ii) for general corporate purposes, including among other things, | *Debt* |

| | funding working capital and/or payment of litigation expenses and (iii) for the payment of Transaction Costs."). | |
|---|---|---|
| Sinking Fund | Pursuant to the *Guarantee and Security Agreement*, dated as of January 21, 2022 [Debtors Ex. 41], and the *Patent Security Agreement*, dated as of January 22, 2022 [Debtors Ex. 41], the Senior Secured Credit Agreement is secured by substantially all of the Debtors' assets, thus a sinking fund is unnecessary.  Security Agreement § 1.01 (defining "Collateral"); Patent Security Agreement § 2. | ***Debt*** |

33.     Carnival relies heavily on a common and standard conversion feature in the Senior Secured Credit Agreement to seek recharacterization of Invictus' loans.  Chen Delano Declaration, ¶ 10.  But it is simply not the case that convertible debt must be treated as if converted to equity.  Carnival's logic would eviscerate the foundations of a $400 billion convertible debt market, and such argument rings particularly hollow when Carnival lists its own $1.5 billion of convertible notes as debt in its audited, public securities filings.  *See supra* n. 10.

34.     The Court need not entertain Carnival's baseless assertions.  The parties have submitted uncontroverted evidence as to their intent when entering into the refinancing transaction that gave rise to the Senior Secured Credit Agreement.  Carnival's argument for recharacterization is not colorable.

**B.  Carnival Has Failed to Demonstrate that Derivative Standing is Appropriate.**

35.     In accordance with well-established Third Circuit Court of Appeals precedent, the controlling law in this District requires that a movant seeking derivative standing prove the existence of colorable claims ***and*** the debtor unjustifiably refused to pursue those claims.  *Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548 (3d Cir. 2003).  As discussed above, Carnival has not satisfied its burden of demonstrating that the challenges it seeks to assert are colorable.  Even if the Court were to find such assertions colorable, however,

Carnival does not even attempt to show that such claims may bring a net benefit to the Debtors' estates or that the Debtors' determination not to pursue such claims was unjustified.

36.    Carnival relies upon *In re STN Enterprises*, 779 F.2d 901 (2d Cir. 1985), which provides "the steps a court must take to determine 'whether the debtor unjustifiably failed to bring suit' when colorable claims are raised."  Docket No. 359, ¶ 56 (citing *In re STN*).  The court must 'examine, on affidavit and other submission, by evidentiary hearing or otherwise, whether an action asserting such claim(s) is likely to benefit the reorganization estate.  Further, if a creditor raising the claims would seek to impose attorneys' fees on other creditors or the chapter 11 estate, the court should consider how this would affect the cost benefit analysis the court must make in determining whether to grant leave to sue." *Id.*

37.    Despite citing these requirements in support of its Standing Motion, Carnival still has offered no evidence whatsoever—whether through affidavit, declaration, live testimony, or otherwise—as to the potential benefits of any of its asserted non-colorable claims.  To the contrary, the only evidence in the record with respect to the evaluation of such claims comes from the Debtors' financial advisor who testified that even reducing Invictus' credit bid to the unchallenged and finally-allowed DIP obligations was unlikely to result in any sale interest that might generate estate proceeds.  Let alone estate proceeds that would exceed the administrative expense claim that Carnival reserved the right to assert, in a manner that would prime and dilute the estate's unsecured creditors, post-prosecution of such claims.  *See* Docket No. 359, n. 3.

38.    The Debtors' determination not to assert unfounded claims against Invictus is justified because, almost four months into these chapter 11 cases, they are about to consummate a sale that will preserve the Debtors' assets as a going concern, save jobs, maintain critical safety services to their customers, and avoid a value-destructive and haphazard liquidation, all of which

the prosecution of Carnival's proposed complaint now undoubtedly would extinguish.  Simply put, the Debtors' decision to forego pursuing meritless claims at this late juncture of the case in favor of completing a going concern sale is more than a reasonable exercise of the Debtors' business judgment.  Moreover, transferring the prosecution and settlement of the challenges from the Debtors (the only party with fiduciary duties to all stakeholders) to Carnival (a party solely focused on advancing its own competitive interests in the cruise industry) would decentralize and destabilize these chapter 11 cases and terminate the Debtors' ability to preserve a going concern.

## CONCLUSION

39.    Carnival's transparent and repeated attempts to derail these chapter 11 cases to the detriment of the Debtors and their estates should not be rewarded by this Court.  Invictus joins in the arguments raised in the Debtors' Post-Trial Brief with respect to ownership of the Debtors' assets, and further respectfully requests that, for the reasons set forth above and in the Debtors' Post-Trial Brief, the Court (i) deny the Credit Bid Motion, (ii) deny the Standing Motion, (iii) enter the Debtors' Proposed Findings of Fact and Conclusions of Law, and (iv) grant such other and further relief as is deemed appropriate.

Dated:  July 28, 2023
        Wilmington, Delaware

**LANDIS RATH & COBB LLP**

/s/ Matthew B. McGuire
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Nicolas E. Jenner (No. 6554)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email:  landis@lrclaw.com
        mcguire@lrclaw.com
        jenner@lrclaw.com

- and -

**PROSKAUER ROSE LLP**
David M. Hillman (admitted *pro hac vice*)
Vincent Indelicato (admitted *pro hac vice*)
Bradley R. Bobroff (admitted *pro hac vice*)
Eleven Times Square
New York, NY 10036-8299
Telephone:  (212) 969-3000
Facsimile:  (212) 969-2900
Email: dhillman@proskauer.com
       vindelicato@proskauer.com
       bbobroff@proskauer.com

- and -

**PROSKAUER ROSE LLP**
Jordan Sazant (No. 6515)
70 West Madison, Suite 3800
Chicago, IL 60602-4342
Telephone:  (312) 962-3550
Facsimile:  (312) 962-3551
Email: jsazant@proskauer.com

*Counsel for Invictus Global Management LLC*