### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| DECURTIS HOLDINGS LLC, *et al.*,[1] | Case No. 23-10548 (JKS) |
| Debtors. | (Jointly Administered) |
| | **Related D.I. 73 and 302** |
| CARNIVAL CORPORATION, | |
| Plaintiff, | |
| v. | Adv. Pro. No. 23-50413 (JKS) |
| DECURTIS HOLDINGS LLC and DECURTIS LLC, | |
| Defendants. | **Related Adv. D.I. 1 and 4** |

### OPINION REGARDING OWNERSHIP OF THE DXP ASSETS AND CARNIVAL'S REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF

Debtors DeCurtis Holdings LLC and DeCurtis LLC (collectively, the "<u>Debtors</u>" or

"<u>DeCurtis</u>"), a software company, create software for cruise lines, among other potential

applications.  In 2014, Carnival Corporation ("<u>Carnival</u>") hired DeCurtis to perform work in

support of Carnival's development project, code named Project Trident, which eventually

matured into Carnival's patented One Cruise Experience Access Network, also referred to as the

O.C.E.A.N.™ or OCEAN® Platform ("<u>OCEAN</u>" or "<u>OCEAN Platform</u>").  The OCEAN Platform

"combines a first-of-its-kind wearable device (OceanMedallion™ or Medallion®) with a network

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include: DeCurtis Holdings LLC (2384) and DeCurtis LLC (9241). The location of the Debtors' service address in these chapter 11 cases is 3208 East Colonial Drive, Suite C190, Orlando, FL 32803.

of servers, sensors, readers, and software to deliver guest engagement and personal service to guests on Carnival's ships."[2]  The work DeCurtis performed was done under a Master Service Agreement (the "MSA"), Mutual Non-Disclosure Agreement ("MNDA"), and Statements of Work (each a "SOW"), which impose confidentiality and use restrictions on DeCurtis.

In 2016, Debtors left Carnival's Project Trident.  Debtors developed their own "comprehensive cruise experience" platform which eventually became known as the DeCurtis Experience Platform (the "DXP").

In 2017, Carnival publicly debuted the OCEAN Platform and, the following year, deployed its first OCEAN equipped cruise ship.

In 2019, Carnival began to suspect that DeCurtis was violating the parties' agreements and preparing to provide or providing infringing technology to Carnival's competitors.  In 2020, the parties commenced litigation in the District Court for the Southern District of Florida including issues of breach of contract and patent infringement (the "Florida Litigation").  The jury returned a verdict in favor of Carnival on both the breach of contract claim and a patent infringement claim.  Before any remaining issues could proceed before the Florida District Court, DeCurtis filed for bankruptcy.

Pending before the Court is expedited litigation regarding DeCurtis' motion to sell substantially all of its assets free and clear of all encumbrances pursuant to section 363 of the Bankruptcy Code ("Sale Motion").[3]  The terms of the debtor-in-possession financing and

---

[2] Adv. Pro. No. 23-50413, D.I. 1 (Compl.), ¶21.

[3] D.I. 73.

proposed sale order require the Court make certain findings regarding ownership of the DXP Assets,[4] referred to as the DXP Order (as discussed below).  Carnival disputes the Debtors' ownership of certain of its assets and filed the above-captioned adversary proceeding (the "Adversary Proceeding") requesting a declaratory judgment and seeking a permanent injunction preventing the Debtors from selling or using certain of assets.[5]  Prior to a sale, the Court must determine whether Carnival has an ownership interest in the DXP, whether DeCurtis should be enjoined from selling r using the DXP, and whether DeCurtis can sell the DXP free and clear of any claims that Carnival may have.

For the reasons set forth below, the Court finds that Carnival has an ownership interest in the DXP, monetary damages would not adequately remedy Carnival, and the Debtors cannot sell the DXP free and clear.  Furthermore, Carnival is entitled to an injunction against the use or sale of the DXP.

## JURISDICTION AND VENUE

This Court has subject matter jurisdiction to consider the relief requested by the Debtors and the Adversary Proceeding under 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue in this district is proper in accordance with 28 U.S.C. §§ 1408 and 1409(a).

---

[4] *See also* D.I. 433 (bid procedures order at Ex. 1 (bidding procedures)), p. 2 (emphasis added) ("The Debtors are seeking to sell all or substantially all of their assets, including but not limited to the equipment, intellectual property, unexpired leases, contract rights and other assets related to or necessary to operate the business currently operated by the Debtors (the 'Assets'), in each case **free and clear of all liens, claims, and encumbrances thereon**.").

[5] Adv. Pro. No. 23-50413.

The statutory bases for the relief requested by the Debtors are 11 U.S.C. §§ 105(a), 363, 541, and Bankruptcy Rules 6004 and 6006. This Court has personal jurisdiction over the parties. This Court has exclusive jurisdiction over the assets within the Debtors' bankruptcy estate pursuant to 28 U.S.C. § 1334.

## FACTUAL BACKGROUND[6]

### A. The Parties

DeCurtis LLC is a Delaware limited liability company headquartered in Orlando, Florida.[7] DeCurtis has approximately 25 employees in the United States.[8]

Invictus Global Management, LLC[9] ("Invictus"), an investment firm, is the Debtors' pre- and postpetition lender.[10] Invictus' affiliate, Invictus Special Situations Master I, L.P. (or its designees or assignees) is the stalking horse bidder (the "Stalking Horse Bidder").[11]

Carnival, a creditor, challenges Debtors' ownership of their assets and Debtors' ability to sell their assets free and clear of Carnival's claims (among other claims).

---

[6] D.I. 364-1 ¶ 1 (Joint Pre-Trial Order). The parties did not agree upon a proposed form of Pretrial Order ("PTO") and submitted separate proposals. References to the PTO, D.I. 364, refer to the unopposed facts contained in Exhibits 1 and 2 to D.I. 364.

[7] PTO ¶ 29 (D.I. 364-1).

[8] 07/19/2023 Tr. 88:3-8 (Fournier); DeCurtis Ex. 11 (Fournier Decl.), ¶ 4, D.I. 297.

[9] PTO ¶ 31 (D.I. 364-1).

[10] PTO ¶ 46 (D.I. 364-1) and D.I. 285.

[11] D.I. 73, ¶¶ 7, and 88.

## B. Procedural History

### i. *The Sale Motion*

On May 3, 2023, Debtors filed their Sale Motion.  The Stalking Horse Term Sheet

underlying the Sale Motion provides that by no later than 55 days after the Petition Date:

> Sellers shall have obtained an order of the Bankruptcy Court
> declaring that (A) the post-petition use, operation and licensing of
> the DXP Assets does **not infringe**, misappropriate or violate on
> any patent or other intellectual property rights of Carnival
> Corporation or its affiliates, (B) the Purchased Assets shall **not be
> bound, burdened, encumbered or affected in any way by the
> Carnival MSA** (including all statements of work thereunder), and
> can be sold free and clear of any interest of Carnival Corporation
> and its affiliates pursuant to section 363(f) of the Bankruptcy
> Code, and (C) the DXP Assets are **not subject to any outstanding
> order, ruling or injunction** (including any claim, motion or
> petition therefor) by or in favor of Carnival Corporation or its
> affiliates that does or could reasonably be expected to restrict,
> **impair or otherwise affect the ownership, use or value of the
> DXP Assets** (collectively, the "DXP Condition").[12]

The executed Asset Purchase Agreement between the Debtors and Stalking Horse Bidder,[13] also

contains the "<u>DXP Condition</u>" with respect to entry of the "<u>DXP Order</u>."

On May 17, 2023, Carnival objected to the Sale Motion.[14]  Carnival's objection argued

that Debtors cannot sell what they do not own (i.e., Carnival property) and that an adversary

proceeding would be required to determine the precise extent of Carnival's property in the DXP

or otherwise in DeCurtis' possession.[15]

---

[12] D.I. 15 (Ex. A (proposed financing order), Ex. A (DIP Term Sheet), Ex. F (Term Sheet for Stalking Horse Credit Bid, dated Apr. 30, 2022) at p. 11 (emphasis added) (page 185/280 of docket entry).

[13] D.I. 88.

[14] D.I. 102.

[15] D.I. 102, ¶ 8.  In accordance with a Scheduling Order (D.I. 321), on June 26, 2023, Debtors filed their Opening Brief and related declaration in support of their motion for a declaration that debtors own their assets. D.I. 295 (sealed); D.I. 302 (redacted).  On July 5, 2023, Carnival filed a combined opposition to Debtors' opening brief and its opening brief in support of its request for declaratory and injunctive relief its Adversary Proceeding, and response

*ii. The Adversary Proceeding*

Carnival sought, and this Court denied, relief from the automatic stay to seek an injunction in Florida.[16] Thereafter, Carnival timely initiated the Adversary Proceeding against DeCurtis on June 23, 2023.[17] Debtors answered the adversary complaint on July 12, 2023.[18] Debtors' answer does not assert any counterclaims.

***iii. The Trial on Ownership and Injunction***

The Court conducted a bench trial July 18-20, 2023, on the issues of ownership and injunction that are addressed herein; among other issues which will be ruled upon separately.[19]

---

to Debtors' request to sell property free and clear under section 363(f) and supporting declaration. D.I. 319 (sealed); D.I. 335 (redacted); D.I. 32 (sealed); D.I. 336 (redacted). On July 12, 2023, DeCurtis filed a combined brief in reply to Carnival's opposition to Debtors' motion for a declaration that Debtors own their assets, in opposition to Carnival's motion for declaratory relief and for a permanent injunction, and in opposition to Carnival's response on the free and clear dispute and supporting declarations. D.I. 342 (sealed), D.I. 377 (unsealed); D.I. 343, 344, and 356. Carnival filed a reply on July 17, 2023, in support of declaratory and injunctive relief and in response to Debtors' opposition to free and clear challenge and a declaration in support. D.I. 362. The parties also filed witness and exhibit lists, as well as videos and video testimony.

[16] D.I. 105.

[17] D.I. 292.

[18] Adv. D.I. 9.

[19] *See* Trial Transcripts D.I. 402 (07/18/2023), 403 (07/19/2023), and 404 (07/20/2023). In addition to the written and video record submitted, the Court heard the testimony of the following witnesses:

- **DeCurtis**
  - Derek Fournier, DeCurtis' President and Chief Executive Officer
  - James Learish, DeCurtis' Chief Operating Officer
  - Michael Atkinson, Principal of Province, LLC, Debtors' Financial Advisor
  - Joseph Carino, DeCurtis' Chief Financial Officer
  - Apurva Saxena (rebuttal witness), International Director of DeCurtis, LLC
- **Carnival**
  - John Padgett, Chief Executive Officer of Princess Cruise Lines, a division of Carnival
  - Erik de la Iglesia, Carnival's Expert Witness
- **Invictus**
  - Cindy Chen Delano, Partner and Co-Founder of Invictus Global Management

## C. Ownership

### i.  *Non-DXP Assets, the DXP, and MAS*

The Debtors' assets can be broken down into three segments: (i) Non-DXP Assets,

(ii) DXP, and (iii) MAS, which is part of the DXP and a stand-alone asset.

The "Non-DXP Assets" in DeCurtis's possession in the estate include bank accounts,

patents, trademarks and trade names, domain names, company files unrelated to DXP, and non-

DXP software.[20]  Carnival does not assert ownership over the Non-DXP Assets.[21]

The "DXP" is a software suite that relates to cruises.[22]  The "DXP Assets" in DeCurtis'

possession consist of 68 DXP software modules (listed below) and documents related to the 68

DXP software modules and to the DXP:[23]

|     | Product | Application |
| --- | --- | --- |
| 1. | ARS- Booking Management | Bookable Experiences |
| 2. | ARS- Booking Management | Dining |
| 3. | ARS- Booking Management | Excursions |
| 4. | ARS- Booking Management | Spa |
| 5. | ARS- Inventory Management | Inventory and Package Management (Excursion, Entertainment events) |
| 6. | ARS- Reports | ARS- Reports |
| 7. | ARS-Vendor management | Vendor Management |
| 8. | Sailor App | Pre-Cruise Experience Planning |
| 9. | Sailor App | Shipboard Experience Planning |
| 10. | Cabin Tablet and TV | Room Controls |
| 11. | Crew App - Framework | Crew Directory |
| 12. | Crew App - Framework | My Crew Profile |
| 13. | Crew App - Helpdesk VQ | Crew App - Helpdesk VQ |

---

[20]  DeCurtis Ex. 11 (Fournier Decl.), ¶ 129, D.I. 297.

[21]  D.I. 319 ¶¶ 6, 119, n.14.

[22]  PTO ¶ 7 (D.I. 364-1).

[23]  DeCurtis Ex. 12 (Schedule A to Fournier Decl.); DeCurtis Ex. 11 (Fournier Decl.), ¶ 49, D.I. 297.  Disney Cruise Line uses 20 of the 68 DXP modules.  07/18/2023 Tr. 219:18-23 (Learish); DeCurtis Ex. 76 (Fournier Supp. Decl.), ¶ 25, D.I. 343.  Virgin Voyages uses all 68 DXP modules.  07/18/2023 Tr. 219:18–23 (Learish); DeCurtis Ex. 76 (Fournier Supp. Decl.), ¶ 25. D.I. 343.

|  | Product | Application |
|---|---|---|
| 14. | Crew App - Incident Management | Incident Management |
| 15. | Crew App - Wearable Management | Cabin and Key Management |
| 16. | Dining Greeter, ARS Greeter | Greeter |
| 17. | Embarkation-Supervisor | Intelligence & Metrics |
| 18. | Embarkation-Visitor Management | Visitor Management |
| 19. | Sailor App, Crew App, Push Notification | Messages and Alerts |
| 20. | Support Queue | Support Queue |
| 21. | Crew App - Framework | Nearby Sailors |
| 22. | ACI | Mobile Check-in |
| 23. | ACI | Validate |
| 24. | Embarkation Supervisor (In Port Manning) | Embarkation Supervisor (In Port Manning) |
| 25. | Embarkation-Supervisor | Embarkation Rules Engine |
| 26. | Gangway | Gangway |
| 27. | MOCI | Moderate Online Check-in |
| 28. | MAS | Command Center |
| 29. | MAS | BT Controller |
| 30. | MAS | Muster Station |
| 31. | MAS | Fleetwatch |
| 32. | MAS Video Features | MAS, Sailor App, Cabin Tablet/TV) |
| 33. | Crew App - Delivery Manager | F&B Bartender |
| 34. | Crew App - Delivery Manager | F&B Kitchen |
| 35. | Crew App - F&B Server | F&B Server |
| 36. | Crew App - Table Management | F&B Greeter |
| 37. | Crew App - Table Management | Table Management |
| 38. | Venue Manager | F&B Venue Manager |
| 39. | Cabin Tablet and TV | In Stateroom Display |
| 40. | Cabin Tablet and TV | In Stateroom Tablet |
| 41. | Cabin Tablet and TV | My Stateroom (Room Service, Amenities and Room Control) |
| 42. | Sailor App | Book Activities, Excursions, Dining and Spa |
| 43. | Sailor App | Explore Destination |
| 44. | Sailor App | Explore Ship |
| 45. | Sailor App | Guest Mobile App |
| 46. | Sailor App | My Guest Folio |
| 47. | Sailor App | My Guest Profile |
| 48. | Sailor App | My Itinerary |
| 49. | Sailor App | Ready to Sail |
| 50. | Sailor App | Recommendations & Offers |
| 51. | Digital Poster | Digital Poster |
| 52. | Wayfinding/Ship Maps | Navigation |
| 53. | Crew App - Housekeeping | Housekeeper |
| 54. | Crew App - Housekeeping | Supervisor |

|     | Product | Application |
| --- | --- | --- |
| 55. | Crew App - Framework | Crew Framework |
| 56. | Crew Chat, Sailor App Chat | Social Networking |
| 57. | Location Services | Location Aggregator |
| 58. | Location Services | Person Location |
| 59. | Sailor App - Framework | Guest Framework |
| 60. | VXP Framework | Authentication Framework |
| 61. | VXP Framework | Centralized Logging |
| 62. | VXP Framework | Ship to Shore Synchronization |
| 63. | VXP Framework | Shiptime Service |
| 64. | VXP Framework | Enterprise Monitoring System (EMS) |
| 65. | VXP Framework | Mode Management |
| 66. | VirginVoyages.com | Book Voyage (Website) (back end) |
| 67. | Chartroom/Helpdesk app | Chart room /Helpdesk app |
| 68. | Crew App - Push notification | Push notification (web App) |

Apurva Saxena, the International Director at DeCurtis,[24] is the custodian of the DXP

Assets and has personal knowledge of each of the software modules.[25] Mr. Saxena testified he

has personal knowledge of the DXP code and has written code for the MAS modules.[26] As part

of his normal responsibilities, he testified that he is the custodian of the GitHub repositories

where the DXP code resides and is the owner of the CI pipeline through which code is compiled,

including code for the location engine.[27]

DeCurtis and DeCurtis contractors wrote code for the DXP as evidenced by the GitHub

server where the DXP code resides which retains a complete history of who committed code;

only programmers with a DeCurtis email ID could commit code through the DeCurtis GitHub

repositories.[28] Specifically, code written by DeCurtis or DeCurtis' contractors was committed to

---

[24] DeCurtis Ex. 184 (Saxena Decl.), ¶3, D.I. 390.

[25] 07/20/2023 Tr. 138:17-20, 140:11-19, 169:19-25 (Saxena).

[26] DeCurtis Ex. 184 (Saxena Decl.), ¶ 4, D.I. 390.  07/20/2023 Tr. 140:11-19, 155:15-20 (Saxena).

[27] 07/20/2023 Tr. 169:19-25 (Saxena).

[28] 07/20/2023 Tr. 148:21-149:18 (Saxena); D.I. 390 ¶ 7; DeCurtis Ex. 184 ¶ 7.

the DeCurtis-owned GitHub server which retains the history of code commits, the time when the code was committed, and who committed the code.[29] Newly written DXP code was generally committed within a short period of time, within two weeks, because DeCurtis' development practice is to write code in two week "sprints" where tasks are coded and committed to the GitHub repositories where DXP code is stored.[30]

DeCurtis personnel in its subsidiary DeCurtis International Private, Ltd. ("DIPL") also worked on developing the source code in the DXP.[31] DeCurtis contracted with Blueed Technologies, LLC ("Blueed"), Maxiru LLC ("Maxiru"), and Level 11 Consulting LLC ("Level 11") to write code for certain of the 68 DXP software modules.[32] Carnival did not know the identities of the contractors who wrote the DXP code.[33]

### ii.    *Mobile Assembly Suite*

Starting around 2010, in connection with its work for Disney, DeCurtis developed a software application called the Mobile Assembly Suite ("MAS") for mustering drills.[34] MAS is

---

[29] 07/20/2023 Tr. 147:13-17 (Saxena).

[30] 07/20/2023 Tr. 153:4-155:3 (Saxena). Although there was testimony regarding commit dates, proper storage of code, and the starting date for each module, there was also testimony from Mr. Saxena regarding storage of Carnival Information on his "personal Onedrive location." *See* 07/20/2023 Tr. 227:13-228:8 (Saxena) and Carnival Ex. 2208 (Email from A. Saxena to J. Revilla, dated 2/7/2016). Given Mr. Saxena's testimony, the Court concludes that some code resides outside the GitHub server.

[31] DeCurtis Ex. 182; 07/20/2023 Tr. 147:22-148:14 (Saxena); DeCurtis Ex. 184(Saxena Decl.), ¶ 7, D.I. 390.

[32] DeCurtis Ex. 11 (Fournier Decl.), ¶ 53, D.I. 297. DeCurtis Ex. 83 (Learish Decl), ¶ 6, D.I. 344. DeCurtis Ex. 184 (Saxena Decl.), ¶ 7, D.I. 390. DeCurtis Exs. 21, 22, 24; 07/19/2023 Tr. 65:5-12 (Fournier); 07/18/2023 Tr. 237:21-24 (Learish). Together, DIPL, Blueed, Maxiru, and Level 11 are the "DeCurtis Subcontractors". The Debtors argue they own the code written by the DeCurtis Subcontractors pursuant to the written contracts between DeCurtis and each DeCurtis Subcontractor. *See, e.g.*, DeCurtis Ex. 21; DeCurtis Ex. 11 (Fournier Decl.), ¶ 53, D.I. 297; DeCurtis Ex. 23; 07/19/2023 Tr. 63:6-6512 (Fournier). Favendo also wrote code for some DXP software modules. 07/20/2023 Tr. 147:13-17 (Saxena).

[33] 07/18/2023 Tr. 136:9-24 (Padgett).

[34] 07/18/2023 Tr. 205:5-206:2 (Learish); DeCurtis Ex. 11 (Fournier Decl.), ¶ 12, D.I. 297.

a safety system that allows cruise ships to muster passengers safely and efficiently in

emergencies.[35]

Ownership of the 5 MAS modules is not in dispute.  Thus, the Court turns to the

remaining 63 modules of DXP (the "Remaining DXP Assets").

### iii.    *DeCurtis' Business*

Between 2009 and 2014, DeCurtis amassed experience in the cruise and hospitality

industries involving over 90 SOWs, including with Disney Cruise Line ("Disney"),[36] Walt

---

[35] 07/19/2023 Tr. 19:3-21 (Fournier); 07/18/2023 Tr. 185:5-19 (Padgett).

[36] As part of its SOWs with Disney from 2010 to 2016, DeCurtis created architecture designs for a holistic cruise experience and developed various software applications and prototypes for use in cruise and hospitality, including the "greeter" and "gangway" applications.  07/19/2023 Tr. 35:24-36:9 (Fournier); DeCurtis Ex. 166; 07/18/2023 Tr. 202:1-8 (Learish); DeCurtis Ex. 26 (Gangway); DeCurtis Ex. 27 (Greeter); DeCurtis Ex. 76 (Fournier Supp. Decl.), ¶ 29, D.I. 343; DeCurtis Ex. 83 (Learish Decl.), ¶ 10, D.I. 344.

In 2013, DeCurtis developed a set of software modules called the Onboard Activities Reservation System for Disney Cruise Line.  DeCurtis Ex. 11 (Fournier Decl.), ¶ 14, D.I. 297.  DeCurtis also developed a Food & Beverage module called "HERE & NOW" for Walt Disney Parks & Resorts.  *Id.* at ¶ 18; DeCurtis Ex. 31 (HERE & NOW).

Mr. Learish, the Debtors' COO, testified that DeCurtis' worked to create a Child Detection Agency ("CDA") for the children's activity center on the Disney Cruise Line Ships.  07/18/2023 Tr. 198:24-200:3 (Learish).  DeCurtis worked with Level 11 (a company discussed in more detail below) to create a location engine in which "the kids all have a wearable on and the location engine is able to tell you, not only which room, but which area of the room that the kids in in and you can see that through your Walt Disney application."  *Id.*; DeCurtis Ex. 76 ¶ 13.  Although Mr. Learish testified the CDA was similar to the OCEAN Platform, Mr. de la Iglesia, Carnival's expert, explained that the CDA location technology relies on triangulation, and the OCEAN Platform relies on trilateration.  07/19/2023 Tr. 184:12-20 (de la Iglesia).  *Compare* 07/19/2023 Tr. 178:7-9 (de la Igelsia) (The wearable bands used with the CDA "is not capable of the kind of . . . real time fidelity and location tracking that was actually built at Carnival.") *with* 07/19/2023 Tr. 23:25-6 (Fournier) (testifying "there were readers in the hallway that would allow the system that we built for them, the software that we built, to know that I was coming. That would let the youth activities staff know Mr. Fournier is coming, he has a reservation for his son . . . And so we could get that magical greeting that I think you heard referred to earlier.") *with* Florida Litigation 03/01/2023 Tr. 41:20-42:9 (Steele) (Mr. Steele, the project manager for the Disney Magic Band project, testified children were checked-in/checked-out of the CDA by tapping a Magic Band on a touch-point. Disney could then "count" the number of Magic Bands within a certain designated area, including knowing if a Magic Band left the designated area without checking out.).  The Court delves into this level of detail as it calls into question the credibility of Mr. Fournier's testimony regarding how the CDA location device operates, which relates directly to DeCurtis' claim that they had "GPS" level location services prior to working with Carnival.  The CDA location device requires a "check in/out" and can count the number of devices in a location *versus* the location services in OCEAN which can identify a person by name and location on a ship without the need to "check in/out."  The location technology in CDA, as confirmed by Mr. de la Iglesia, is not the same as the location technology in OCEAN.

Disney Parks & Resorts, Royal Caribbean Cruise Lines,[37] and Bags, Inc.[38]  Since at least 2011,

DeCurtis has been working on software architecture for use on cruise ships through its work with

Disney and others.[39]

Except for MAS, Debtors began developing the DXP software modules after entering

into a contract with Virgin Voyages on July 14, 2017.[40]  The modules described in DeCurtis's

July 14, 2017 contract with Virgin Voyages are very similar to the 68 DXP software modules

that are at issue in this proceeding.[41]

### iv.    *The Written Agreements Between Carnival and DeCurtis*

In 2014, Carnival hired John Padgett, formerly of Walt Disney Parks, as its Chief

Experience Innovation Officer.  Mr. Padgett testified that he began to spear-head a concierge

level experience for Carnival's cruise passengers which ultimately came to be known as

Carnival's OCEAN guest engagement system.[42]

---

[37] 07/18/2023 Tr. 193:2–21, 206:19-21 (Learish); 07/19/2023 Tr. 29:6-21 (Fournier); DeCurtis Ex. 83 (Learish Decl.), ¶ 10, D.I. 344; 07/18/2023 Tr. 71:21-72:16, 87:9-16 (Padgett).  Prior to 2014, DeCurtis worked with Royal Caribbean including work on software modules for embarkation that included terminal metrics, passenger-check-in, gangway, and greeter.  07/18/2023 Tr. 207:18-211:10 (Learish); DeCurtis Ex. 18 (Royal Caribbean Video); DeCurtis Ex. 30 (Guest Check-In); DeCurtis Ex. 29 (Gangway); DeCurtis Ex. 28 (Greeter).  In connection with its work for Royal Caribbean prior to 2014, DeCurtis created a number of cruise software application architecture designs (high level architecture), prototypes, and a video demonstrating DeCurtis's embarkation software.  DeCurtis Ex. 83 ¶ 10; DeCurtis Ex. 14.

[38] DeCurtis also worked with Norwegian Cruise Line ("NCL").  Testimony from NCL's Vice President of Guest Experiences and Innovation established that DeCurtis began a business relationship with NCL sometime in late 2016, including disclosing to NCL the fact that Carnival was working on a new guest engagement platform.  D.I. 320-2 at 40:20-41:01, 49:15-20, 54:11-12.  Shortly thereafter, Mr. DeCurtis delivered to NCL a Carnival Medallion prototype for analysis.  D.I. 320-7 at 59:1-6, 62:12-15; *see also* Florida Litigation Ex. P-771; P-772.  DeCurtis never mentioned to NCL that it entered into a contract with Carnival giving Carnival proprietary rights, trade secrets, and other confidential information concerning the DXP technology DeCurtis licensed to NCL.  7/19/23 Tr. 154:14-20 (Fournier).

[39] 07/19/2023 Tr. 29:6–21, 32:10-33:12 (Fournier).

[40] 07/19/2023 Tr. 58:2-59:7 (Fournier); DeCurtis Ex. 174.

[41] 07/19/2023 Tr. 60:3-24 (Fournier).  *Compare* DeCurtis Ex. 12 (Schedule A), *with* DeCurtis Ex. 174, at Ex. A.

[42] 07/18/2023 Tr. 53:9-54:19 (Padgett).

In June 2014, Mr. Padgett began discussing Carnival's vision for a new guest engagement system with Mr. DeCurtis, the former principal of DeCurtis Corporation.[43]  Mr. Padgett knew Mr. DeCurtis and his company because Mr. Padgett previously hired DeCurtis to create custom software applications for Walt Disney Parks.[44]  Mr. DeCurtis understood Carnival's vision to be revolutionary and confirmed, the overall experience platform architecture was "the thing that no one else can have, even by assembling components."[45]

On July 1, 2014, DeCurtis and Carnival executed the MNDA which was retroactive.[46] On July 24, 2014, DeCurtis and Carnival Corporation executed the MSA.[47]  Thereafter, Carnival and DeCurtis entered into SOWs, which defined each project, price, and other such terms.  The relationship between Carnival and DeCurtis was defined by the MNDA, the MSA, and each SOW.  The SOWs state that all code, work product, and deliverables generated by DeCurtis or its contractors were the property of Carnival.[48]

From July 2014 to May 2016, DeCurtis was one of the contactors Carnival engaged to work on prototype applications, studio shows, and requirements gathering for Carnival's Project Trident, the secret development project for the OCEAN Platform.[49]

---

[43] 07/18/2023 Tr. 139:9-18 (Padgett); Florida Litigation DTX-0554.

[44] 07/18/2023 Tr. 156:15-19 (Padgett); 71:21-72:23 (Padgett).

[45] Carnival Ex. 680.

[46] Florida Litigation Ex. P-90 ¶ 18; 07/18/2023 Tr. 142:21 (Padgett).

[47] Florida Litigation Ex. P-1.

[48] *E.g.*, Florida Litigation Ex. P-2 (SOW 1) at 2, Ex. P-816 (SOW 4 – Gangway) at 2; Florida Litigation 03/01/2023 Tr. 112:24-113:4 (Jungen).

[49] Florida Litigation 03/07/2023 Tr. 172:6-7 (Learish); P-1960.

13

The SOWs between Carnival and DeCurtis required that DeCurtis declare in writing any use of material that DeCurtis believed it owned or that predated the Carnival Deliverables (as defined below), and further required that Carnival approve in writing the use of any such material.[50]  Carnival paid DeCurtis for its work under those agreements.[51]

The MSA provides that, subject to exclusions, "<u>Confidential Information</u>" in Section 4.1 is:

> any information of any nature and in any form (whether oral, written, electromagnetic or otherwise) ***disclosed by Carnival, or which is otherwise learned by Company in connection with this Agreement,*** which relates in any way to Carnival's (and/or any member of Carnival Corporation & plc's) business or operations, whether tangible or intangible and in whatever form or medium, including without limitation their current or contemplated operations, finances, personnel matters, accounting data, markets, strategies, customers and customer information, expansion plans, pricing plans, market analyses, market projections, consulting and sales methods and techniques, the identity of suppliers of goods and/or services and competitors. software or hardware products, trade secrets, other non-public intellectual property, and the terms and existence of this Agreement.[52]

Confidential Information under the MSA does **not** include:

> (i) information that was already known to Company [DeCurtis] without obligation of confidentiality prior to disclosure of it to Company by Carnival; (ii) information that is disclosed to Company by a third party who does not have any legal fiduciary or contractual obligation of confidentiality to Carnival or any member of Carnival Corporation & plc; (iii) information that is in the public domain or hereafter enters the public domain through no fault of Company; or (iv) information that has been independently

---

[50] *E.g.*, Florida Litigation Ex. P-1960 at 2, 18; Florida Litigation 03/01/2023 Tr. 103:4-14 (Jungen).

[51] Florida Litigation 02/28/2023 Tr. 224:5-9 (Padgett); 03/07/2023 Tr. 122:14-21 (Learish); 07/18/2023 Tr. 117:17-19 (Padgett).

[52] Carnival Ex. 1, § 4.1 (emphasis added).

developed by Company without use, directly or indirectly, of the
Confidential Information.[53]

"Deliverables" under the MSA are defined as:

> ***all material prepared for Carnival under this Agreement***
> (including each SOW hereto), ***which may include*** but not be
> limited to inventions, business methods, programs, processes,
> discoveries, improvements, developments, designs, ***software
> programs***, systems, specifications, documents or abstracts, or
> summaries thereof or any other material, ***and any derivative works
> thereof, developed, prepared, produced or created by [DeCurtis],
> its employees or agents under or as a result of this Agreement***,
> including any works in progress, in whatever form or media, and
> all rights in patent, copyright, trademark, trade secret, that may
> subsist therein…[54]

In summary, the MSA provides that all Confidential Information and Deliverables

(collectively defined as "Carnival Information") created for Carnival, disclosed by Carnival, or

learned by DeCurtis "in connection with [the MSA]" shall "from the time of creation be and

remain the sole property of Carnival and be solely for Carnival's benefit, whether or not Carnival

uses such Deliverable(s)."[55]

"Derivative Works" are expressly identified in the MSA as belonging to Carnival.[56]

DeCurtis does not dispute that Carnival owns derivative works of Carnival's intellectual

property.[57]  The term "derivative works" was intended by the parties to include both the lay

---

[53] Carnival Ex. 1, § 4.1.

[54] Carnival Ex. 1, § 4.1 (emphasis added).

[55] Carnival Ex. 1, §. 4.1; Florida Litigation 02/28/2023 Tr. 97:18-98:2 (Padgett).

[56] Carnival Ex. 1, § 4.1; 07/18/2023 Tr. 79:1-9.

[57] D.I. 295 at 3, n.1.

business meaning of "anything that comes from" the work performed and is broader than the

concept of a "derivative work" under copyright law.[58]

Although Carnival used the template MSA with all of its contractors,[59] Carnival and

DeCurtis negotiated Section 4.4 which states:

> Right to Perform Services for Others.  Company [DeCurtis] shall
> have the unencumbered right to use the general knowledge, know
> how, experience or the skill (and for the avoidance of doubt
> without the aid of written materials of any type produced in
> connection herewith) gained while providing Services under this
> Agreement for the purpose of executing projects for other
> Company clients, subject to Company maintaining confidentiality
> of the Carnival Confidential Information.[60]

Further, the MSA specifies that upon termination or expiration of the MSA, or if required

by Carnival, "any Carnival Information in any form, in [DeCurtis's] possession, shall be either

(i) promptly returned to Carnival or its duly authorized representative, or (ii) . . . [DeCurtis] shall

destroy the Carnival Information under Carnival's supervision (or furnish Carnival with an

affidavit of such destruction sworn to be a representative of [DeCurtis]."[61]  The obligations under

Article 4 of the MSA, which governs ownership, use, and disclosure of Carnival Information,

survive termination.[62]

---

[58] 07/18/2023 Tr. at 147:21-148:2 (Padgett) ("My understanding of the term derivate is it's both, it is both a term that from a business standpoint means anything that comes from this, and whatever you and lawyers think about it from a copyright standpoint.").

[59] 07/18/2023 Tr. 213:10–16 (Learish); 150:21-25 (Padgett).

[60] Carnival Ex. 1, § 4.4.

[61] Carnival Ex. 1, § 4.1.

[62] Carnival Ex. 1, §§ 2.1, 4.6.

##### *v.* *The Show*

Under the MSA and related SOWs, DeCurtis created prototypes for Carnival for the "Show" in which Carnival conducted an interactive experience of what would become the OCEAN Platform to convince Carnival executives to fund development of the project.[63]

Included among Carnival's collection of guest engagement applications were several DeCurtis-built prototypes designed to showcase the impact of location services across different stages of the guest experience, such as guest greetings, photo displays, gangway arrival features, food and beverage delivery.[64]

Mr. Padgett testified that prototypes spanned from basic cardboard cutouts all the way through very functional prototypes that looked, felt, and acted like (based on actual technology) a thing that would be built to a production-level of quality.[65] Some of the prototypes relied on location awareness capabilities built by another Carnival contractor, Level 11.[66]

For its work on the "Show," DeCurtis was paid approximately $3.7 million out of the approximately $300 million spent on developing the technology.[67] Before DeCurtis left Carnival's Project Trident on May 23, 2016, Carnival and DeCurtis entered into almost 20 SOWs under the MSA.[68]

---

[63] Florida Litigation 02/28/2023 Tr. 223:3-6 (Padgett), 150:15-151:2 (Padgett); Florida Litigation Ex. P-1560. 07/18/2023 Tr. 215:6-25 (Learish); DeCurtis Ex. 76 (Fournier Supp. Decl.), ¶ 13, D.I. 343.

[64] Florida Litigation 03/01/2023 Tr. 99:23-100:10 (Jungen); Florida Litigation Ex. P-1679.

[65] 07/18/2023 Tr. 158:11-12 (Padgett); 07/19/2023 Tr. 50:15-189 (Fournier); *see* DeCurtis Ex. 76 (Fournier Supp. Decl.), ¶ 13, D.I. 343.  For the Show, DeCurtis created prototypes.  07/18/2023 Tr. 215:20-216:20 (Learish); DeCurtis Ex. 83 (Learish Decl.), ¶ 11, D.I. 344.  *See also* 07/18/2023 Tr. 69:23-70:19 (Padgett).

[66] Florida Litigation 03/01/2023 Tr. 99:23-100:10 (Jungen).

[67] 07/18/2023 Tr. 162:4-9 (Padgett).

[68] 07/18/2023 Tr. 107:6-7 (Padgett); Florida Litigation Ex. P-1960.

During its time working for Carnival's Project Trident, DeCurtis had access to everything created on the project, including work prepared by Carnival or Carnival's third-party contractors, by virtue of both DeCurtis's role as the lead coordinator of the studio and later as a member of the Architectural Review Board.[69]

### vi.   *Consumer Electronics Show*

Carnival debuted the OCEAN system at the January 2017 Consumer Electronics Show ("CES").[70]   Carnival announced that it was launching the platform on the first Princess cruise ship in the fall of 2017 and required installing thousands of sensors into its ships for OCEAN to work.[71]   Carnival disclosed various aspects of the OCEAN Platform, including that the OCEAN medallion would utilize BLE technology.[72]

Carnival timed its patent applications regarding the OCEAN Platform with its announcement at CES so that it did not lose potential patent rights.[73]

Carnival's announcement at CES was part of a coordinated public relations campaign about the OCEAN Platform, and as a result of CES, Carnival received approximately 60 billion media impressions.[74]

---

[69]   Florida Litigation Ex. P-1960; 07/18/2023 Tr. 94:5-7 (Padgett).

[70]   07/18/2023 Tr. 172:22-173:25 (Padgett); 07/19/2023 Tr. 59:16-60:2 (Fournier); DeCurtis Ex. 11 (Fournier Decl.), ¶ 32, D.I. 297.

[71]   07/18/2023 Tr. 174:1-8 (Padgett).

[72]   DeCurtis Ex. 32; 07/18/2023 Tr. 172:22-175:20, 174:9-14 (Padgett); DeCurtis Ex. 11 (Fournier Decl.), ¶¶ 32-47, D.I. 297; *see also* DeCurtis Exs. 12-34 (Schedules and Attachments to Fournier Decl.).

[73]   07/18/2023 Tr. 174:15-175:4 (Padgett).

[74]   07/18/2023 Tr. 175:5-14 (Padgett).   DeCurtis contends that Carnival publicly disclosed OCEAN at the CES and that "none of the software code in any of the sixty-three disputed DXP modules was written before Carnival's public announcement" of OCEAN at CES in January 2017. D.I. 377 at ¶ 89.   However, as Carnival points out, Carnival Information is not limited to "software code."   Furthermore, DeCurtis began talking with Virgin Voyages about the

### vii.    *Dispute Between Carnival and DeCurtis*

#### a.    *The DXP*

DeCurtis characterized the DXP as a single, albeit modular, system, describing it as "an

end-to-end, enterprise grade software solution for cruise lines that enables location and

proximity-based services to assist in operational efficiency, experience enhancement and

customer engagement.[75]   The DXP system covers, among other things, activity and voyage

reservations, free-flow embarkation and disembarkation modules, e-mustering, food and

beverage reservations and ordering, table management, way finding, cabin/housekeeping

notifications, and safety solutions.   The DXP system makes use of trackable devices that

communicate with sensors."[76]   Prior to filing for bankruptcy, DeCurtis never marketed, sold, or

even described the DXP as 68 "modules."[77]

---

DeCurtis "platform" before November 2015, when DeCurtis was still actively working with Carnival.  Florida Litigation P-664; 03/08/2023 Tr. 80:12-82:15 (Schwalb).

Prior to Carnival's public announcement of the OCEAN Platform at CES, no one, including DeCurtis, had implemented a full guest engagement system on cruise ships of the type DeCurtis eventually sold to Virgin as the DXP, including any that used a BLE-enabled wearable.  Florida Litigation 03/08/2023 Tr. 61:11-23 (Schwalb); 88:13-89:2 (Schwalb), 91:15-21 (Schwalb); P-498 (July 2016 emails between DeCurtis and Virgin regarding "Virgin Voyages Protype Proposal"); P-1090, P-1091; Florida Litigation 03/06/2023 Tr. 172:10-173:12 (de la Iglesia); 179:5-7 (de la Iglesia).

Andy Schwalb, the CTO of Virgin Voyages, testified in the Florida Litigation that location services are used by Virgin Voyages for "Shake for Champagne."  03/08/2023 Tr. 49:21-22 (Schwalb); 67:25-68:2 (Schwalb).  He also testified the DXP "Ship Eats" application for Virgin Voyages uses location services. Florida Litigation 03/08/2023 Tr. 96:1-7 (Schwalb).  Mr. Schwalb confirmed that DeCurtis provided wearable devices with BLE to Virgin Voyages. 03/08/2023 Tr. 67:19-24 (Schwalb).

[75]  Florida Litigation D.I. 87 (DeCurtis FAC) ¶¶ 37-38.

[76]  *E.g.*, Florida Litigation D.I. 87 (DeCurtis FAC) ¶¶ 37-38.

[77]  DeCurtis Ex. 12.  *See* 07/19/2023 Tr. 105:3-25 (Fournier).  *See also* DeCurtis Ex. 184 (Sexena Decl.), ¶ 8. D.I 390.

Mr. Saxena,[78] the most technically knowledgeable witness proffered by DeCurtis, at trial, testified that the division of modules was "more of a commercial naming instead of a logical thing."[79] Mr. Saxena and Mr. de la Iglesia, Carnival's expert, both testified that all of the modules, other than MAS, are not a standalone commercial product.[80] Every module requires integration with the DXP "Core Services" (as discussed in more detail below).[81]

The location and proximity services are the "backbone" of DXP.[82] The vast majority of modules identified in the list of 68 modules implicate location services and the use of the location engine.[83] To make DXP work, the location engine passes data to the location solution.[84] After processing the location data, the DXP provides location services to applications such as dynamic delivery.[85]

---

[78] Carnival objected to the testimony of Mr. Saxena on the basis that he could not provide expert testimony or rebuttal testimony to Carnival's expert, Mr. de la Iglesia. The Court finds that Mr. Saxena was not testifying as an expert and has accorded his testimony the weight it deserves.

[79] 07/20/2023 Tr. 192:4-9 (Saxena); 07/19/2023 Tr. 105:3-25 (Fournier).

[80] D.I. 374-8 ¶ 93; 07/20/2023 Tr. 197:3-198:3 (Saxena). However, the Court's understands Disney only uses 20 modules of the DXP; thus, there are segments of the DXP that can "stand-alone." 07/18/2023 Tr. 219:21-23 (Learish).

[81] 07/19/2023 Tr. 207:2-4 (de la Iglesia); 07/20/2023 Tr. 229:3-13 (Saxena).

[82] 07/14/2023 Fournier Depo. Tr. 133:6-134:12. The location engine Level 11 created for the DXP system is included in entry 57 of DeCurtis's 68 module list. 07/18/2023 Tr. 226:3-10 (Learish). Mr. Saxena testified that the location engine passes data to the location solution which is part of the DXP core services package. 07/20/2023 Tr. 181:14-16 (Saxena). According to Mr. Saxena "any application which uses location services have to use DXP Core service because DXP Core service is required for all the applications to run." 07/20/2023 Tr. 229:23-25 (Saxena).

[83] 07/19/2023 Tr. 174:18-19 (de la Iglesia); July 14, 2023 de la Iglesia Declaration ¶¶ 10, 46.

[84] 07/19/2023 Tr. 174:18-19 (de la Iglesia); July 14, 2023 de la Iglesia Declaration ¶¶ 10, 46.

[85] 07/19/2023 Tr. 115:19-23 (Fournier).

Prior to working for Carnival, DeCurtis did not have any high-level architecture designs for integrating all systems of record into a single platform revolving around location data, particularly data generated by BLE-enabled wearables.[86]

Before Carnival, BLE had not been used in any guest engagement system.[87] Carnival alleges that DeCurtis leveraged Carnival's research and development of a BLE-enabled guest engagement system to create the DXP guest engagement system. For example, DeCurtis developed a BLE reader to be used with the DXP system, and Mr. Fournier was quoted in a 2018 article about that project as saying that "going from concept to reality was remarkably quick" made possible by "leveraging" years of previous experience in R&D and BLE projects.[88]

The only commercial product DeCurtis had prior to engagement with Carnival was MAS.[89] It was not until after DeCurtis commenced its work for Carnival, that the "light went on" and it started to build a single platform revolving around location data.[90]

As part of Project Trident, DeCurtis created a high-level architecture ("HLA") in June 2014 "for Carnival." The HLA was branded for Carnival.[91]

---

[86] D.I. 374-8, ¶¶ 84-87, 89; *Compare* 07/19/2023 Tr. 40:16-19 (architecture document prepared for Carnival was "a high-level architecture, a large high-level architecture. Imagine zooming out from an individual function like say gangway or check-in to a more higher – a higher level, and that's what this is."); *with* 41:7-8 ("So we probably had built more narrow-case architectures around embarkation.").

[87] Florida Litigation 03/01/2023 Tr. 214:11-15 (Steele).

[88] 07/19/2023 Tr. 130:5-131:24 (Fournier); Carnival Ex. 2196.

[89] 07/18/2023 Tr. 206:3-10 (Learish); 07/20/2023 Tr. 145:11-146:2 (Padgett); Florida Litigation 03/01/2023 Tr. 45:11-46:3 (Padgett).

[90] Florida Litigation Ex. P-774.

[91] Florida Litigation 03/08/2023 Tr. 241:11-243:21 (DeCurtis).

While DeCurtis was still involved with Project Trident, DeCurtis started work on a

precursor to DXP known as the "DeCurtis Cruise Management System" ("DCMS").[92]  Carnival

alleges that DeCurtis based its development of DCMS on Carnival deliverables.[93]  On March 17,

2016, DeCurtis held a DCMS development kick off meeting in which DeCurtis resolved to:

(i) "replicate the core entity services in Java;"[94] and (ii) "re-brand" Carnival's "HLA."[95]

The DCMS High-Level Architecture specifies the use of Core Services.[96]  DXP "Core

Services" is a layer that stores all the data, communicates with databases, and includes

application data interfaces related to all DXP modules.  Without Core Services, none of the DXP

modules can run.[97]

Pursuant to Section 3.4 of the MSA,[98] Carnival asserted its audit rights to investigate

whether DeCurtis was using Carnival Information.  DeCurtis refused.[99]

*viii.    April 2020 Litigation in the Southern District of Florida*

Carnival Corporation filed suit against DeCurtis Corporation and DeCurtis LLC in the

Federal District Court for the Southern District of Florida (the "Florida District Court") on April

10, 2020 for breach of contract, violations of the Defend Trade Secrets Act, 18 U.S.C. § 1832 *et*

*seq.*, violations of the Florida Uniform Trade Secret Act, Fla. Stat. § 688.001 *et seq.*, and patent

---

[92] 07/19/2023 Tr. 124:21-23 (Fournier); 202:24-203:13 (de la Iglesia); Florida Litigation Ex. P-888.

[93] Florida Litigation Ex. P-888.

[94] P-890.

[95] P-890; 07/19/2023 Tr. 124:19-125:25 (Fournier); 204:2-4 (de la Iglesia); Florida Litigation Ex. P-750.

[96] Florida Litigation Ex. P-888.

[97] 07/20/2023 Tr. 229:3-13 (Saxena).

[98] Carnival Ex. 1, § 3.4 (Audit).

[99] Florida Litigation, 03/09/2023 Tr. 25:17-22 (DeCurtis).

infringement of certain patents.[100]  The Florida District Court held an eight–day jury trial from February 27 to March 10, 2023.

On March 10, 2023, the jury found that DeCurtis breached the MSA with Carnival and the DXP directly and indirectly infringed Carnival's patented OCEAN Platform technology.[101] Carnival obtained judgment on the jury's verdict.[102]  Shortly after the jury trial ended, DeCurtis and Carnival were set to commence post–trial briefing.

### b.  DeCurtis' Bankruptcy

Debtors initiated these bankruptcy proceedings on Sunday, April 30, 2023, the day before Carnival was scheduled to file a motion for permanent injunction in the Florida Litigation pursuant to an agreed-to post–trial briefing schedule.[103]  The Debtors maintain they were "compelled" to file for Chapter 11 protection because they "lack[ed] the liquidity to satisfy the judgment, post a supersedeas bond to halt execution of judgment, or pay the associated legal expenses necessary to quickly challenge the judgment."[104]

Through these bankruptcy proceedings Debtors seek to sell the DXP, MAS, and the Non–DXP Assets to the Stalking Horse Bidder, or to another suitable purchaser.  The Stalking Horse Bidder has placed certain conditions on the sale of Debtors' assets, which includes a declaration

---

[100]  DeCurtis also filed suit against Carnival.  The Florida District Court dismissed DeCurtis' affirmative claims against Carnival (antitrust violations, tortious interferences, and unfair trade practice claims) on summary judgment. See D.I. 105, ¶ 2.

[101]  *DeCurtis LLC v. Carnival Corporation*, Case No. 1-20-cv-22945 (hereafter the "Florida Litigation" or "SDFL"), SDFL D.I. 563.

[102]  SDFL D.I. 575.

[103]  D.I. 1, 105; SDFL D.I. 605.

[104]  D.I. 13 (Atkinson First Day Declaration) ¶ 9.

that Debtors own the assets they seek to sell, that the assets can be sold free and clear of Carnival's claims, and that the Stalking Horse Bidder can credit bid.

Carnival claims it owns undefined portions of Debtors' assets. DeCurtis claims that Carnival's claims have created a chilling effect on Debtors' efforts to sell their assets, preventing Debtors from gaining the benefits of the fresh start that the Bankruptcy Code is intended to provide.

With this backdrop, Debtors moved for a declaration from the Court finding that Debtors own the assets they seek to sell, and that Carnival has no ownership interest in those assets. Carnival, on the other hand, initiated the Adversary Proceeding seeking a declaratory judgment (i) that the Purchased Assets (as defined in the Asset Purchase Agreement) and DXP Assets include specified assets comprised of or derived from Carnival Information that is the sole property of Carnival and (ii) that the Purchased Assets and DXP Assets include Carnival Information which is the sole property of Carnival and may not be used or disclosed by DeCurtis, its successor, or any purchaser of any asset comprised of or derived from Carnival Information; and a permanent injunction prohibiting DeCurtis and all those in concert therewith from asserting ownership over, using, or disclosing Carnival Information, including assets of the Debtors' Estate that comprise or are derived from Carnival Information.

## ANALYSIS[105]

### A.   Ownership of the Remaining DXP Assets

#### i.   *Burden of Proof*

DeCurtis bears the burden of proof on the instant Sale Motion.[106]  As a threshold matter, DeCurtis must identify, through admissible evidence, what exactly it seeks to sell.[107]  Only then can the Court determine whether that material is property of the estate, and if so, whether it can be sold free and clear of any interests.[108]

The Debtors claim that they own the DXP in their possession, inclusive of the 68 software modules that make up the DXP and related documents.  The source code in those modules that reside on GitHub repositories belongs to Debtors, including by virtue of their agreements with the DeCurtis Subcontractors.  Debtors' possession of the Remaining DXP Assets creates a rebuttable presumption of ownership.[109]

---

[105] The parties agree that Florida law applies.

[106] *In re Abbotts Dairies*, 788 F.2d 143, 150 (3d Cir. 1986) (discussing required findings); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983) ("While a debtor applying under § 363(b) carries the burden of demonstrating that a use, sale or lease out of the ordinary course of business will aid the debtor's reorganization, an objectant, . . . is required to produce some evidence respecting its objections.").

[107] *See, e.g., DeHart v. Eckert (In re Eckert)*, 485 B.R. 77, 81 (Bankr. M.D. Pa. 2013) (adjudicative facts must be "determined by the consideration of admissible evidence.").

[108] 11 U.S.C. § 363.

[109] *In re Cogswell*, 622 B.R. 109, 116 (Bankr. M.D. Fla. 2020) (holdings that possession of property created a presumption of ownership that can be overcome); *see also Adams v. Bd. of Trs. of Internal Imp. Fund*, 37 Fla. 266, 299 (1896) ("The possession of personal property raises a presumption of title in and ownership of the property by the possessor."); *Russell v. Stickney*, 56 So. 691, 693 (Fla. 1911) ("[P]ossession of personal property is prima facie evidence of ownership; but such presumption is rebuttable, and may be overcome."). "Generally, the author of a work, including a computer program, is the owner of that work." *In re TLFO, LLC*, 572 B.R. 391, 436 (Bankr. S.D. Fla. 2016).

However, possession is "the lowest species of evidence" and is easily "overcome by any evidence showing the character of possession, and that it is not necessarily as owner."[110] The record establishes comingling of Carnival's intellectual property in the Remaining DXP Assets. The record reflects that Carnival has rebutted the presumption of DeCurtis' ownership in the Remaining DXP Assets.[111]

### ii.  *Florida Contract Law*

Under Florida law, the "best evidence" regarding the relationship between the parties . . . is apparent from the language of the contract."[112] Contracts are "construed in order to give effect to the intentions of the parties."[113] "If a contract is clear, complete and unambiguous, there is no need for judicial construction."[114] "In the absence of ambiguity, the language itself is the best evidence of the parties' intent and its plain meaning controls."[115] Additionally, whether an ambiguity exists in a contract is a question of law.[116]

---

[110] *Cogswell,* 622 B.R. at 116 (*citing Adams v. Bd. of Trustees of Internal Imp. Fund*, 37 Fla. 266 (Possession "is the lowest species of evidence, and liable to be overcome by any evidence showing the character of the possession, and that it is not necessarily as owner, or that it is equally consistent with an outstanding ownership in a third person")).

[111] *Cogswell,* 622 B.R. at 116.

[112] *Com. Repairs & Sales, LLC v. Signet Jewelers Ltd.*, No. 817CV02439T60JSS, 2019 WL 6251342, at *4 (M.D. Fla. Nov. 22, 2019).

[113] *Burns v. Barfield*, 732 So. 2d 1202, 1205 (Fla. Dist. Ct. App. 1999) (*citing Misala, Inc. v. Eagles*, 662 So. 2d 1389, 1389 (Fla. Dist. Ct. App. 1995)); *see also Gold Crown Resort Mktg. v. Phillpotts*, 272 So. 3d 789, 792 (Fla. Dist. Ct. App. 2019); *Tuna Fam. Mgmt Inc. v. All Tr. Mgmt. Inc.*, No. 20-14017-CIV-SMM, 2022 WL 2257008, at *15 (S.D. Fla. June 22, 2022).

[114] *Antoniazzi v. Wardak*, 259 So. 3d 206, 211 (Fla. Dist. Ct. App. 2018) (citations omitted).

[115] *Gold Crown Resort Mktg. Inc. v. Phillpotts*, 272 So. 3d at 792 (*quoting Burns v. Barfield*, 732 So. 2d at 1205).

[116] *Summitbridge Credit Invs. III, Ltd. Liab. Co. v. Carlyle Beach, Ltd. Liab. Co.*, 218 So. 3d 486, 488 (Fla. Dist. Ct. App. 2017).

The Court finds that the MSA is unambiguous[117] and, as a result, the plain meaning of the MSA controls.[118]

### iii.    *Use of Carnival Information in the DXP*

#### a.    *Prototypes and Code*

Mr. DeCurtis testified that the prototypes delivered to Carnival were "our prototypes" such that DeCurtis could reuse them after stripping out "theatrical data" and "logos."[119]  Mr. Learish testified that he understood repurposing "written materials prepared for Carnival" or use of same as a "guidepost for work done for other customers" was not improper, and he, therefore, permitted and encouraged such repurposing.[120]

DeCurtis created a "Prototype Reusability Matrix" that served as a framework for creating the compilation of applications and services that would be developed for the DXP.[121] The Prototype Reusability Matrix shows a large number of Carnival modules that were reusable (and reused) for the DXP.[122]  These Carnival Studio Prototype ("CSP") modules include, for example, Sailor App Framework, Online Check-In, and Book Activities, Excursion, Dining, and Spa.[123]

---

[117]  DeCurtis concedes there are no ambiguities in §4.4 of the MSA. D.I. 295 ¶ 11 n.2 ("The Debtors negotiated for and insisted on this provision to avoid any ambiguity because the core of the Debtors' business is to provide software to various clients in the cruise industry.").

[118]  *E.g., Gold Crown*, 272 So. 3d at 792.

[119]  Florida Litigation 03/08/2023 Tr. 205:9-206:15 (DeCurtis).

[120]  Florida Litigation 03/07/2023 Tr. 129:23-130:2 (Learish).

[121]  Florida Litigation Exs. P-897, P-898 (Carnival "Prototype Reusability Matrix").

[122]  DeCurtis suggests that the Show was cardboard, pipe, and drapes; and that is belied by the 20 SOWs and the $3.7 million Carnival paid to DeCurtis for its work. *Compare* 07/19/2023 Tr. 49:22-25 (Fournier) *with* 07/18/2023 Tr. 162:4–9 (Padgett).

[123]  Florida Litigation Ex. P-898 at 3-4.

When performing work for new clients, DeCurtis factored into their bids a percentage cut based on DeCurtis's plan to reuse prior work for Carnival.[124] Mr. de la Iglesia testified that any and all code from a given application could be valuable to a competitor interested in trying to build a system to emulate Carnival's OCEAN.[125]

The record reflects numerous instances of DeCurtis "having access to" and "using" Carnival Information, including:

- In March 2016, DeCurtis set up a Carnival "wiki" for DeCurtis personnel to use during DXP development.[126]

- The Carnival Studio Prototype application guide was stored on DeCurtis's SharePoint which was accessible to DeCurtis employees.[127]

- DeCurtis used Carnival applications as a "blueprint" for the DXP and imported into the DXP ideas and application features derived from Carnival's software.[128]

- DeCurtis used and referenced both Carnival's Confidential Information and Deliverables in creating its DXP system.[129]

- DeCurtis employees were instructed to compare ongoing work for DeCurtis's DXP customers with work DeCurtis previously performed for Carnival under the MSA.[130]

- DeCurtis employee Megha Agrawal testified it was DeCurtis's regular practice to rely on past work product, including work product prepared for Carnival under the

---

[124] Florida Litigation 03/07/2023 Tr. 167:18-169:19 (Learish); Ex. P-766. D.I. 320, Ex K, Depo. Tr. 103:4-18 (Agrawal) ("[Q.] Ms. Sharma is explaining that she is going to remove the reference for [sic] Carnival in the F&B Guest app and remove the reference to Carnival from the F&B Crew app as well. Do you see that? A. Yes, I do. Q. And those were not -- material that was being removed so that these applications could be demo'd for a new potential customer for DeCurtis, correct? A. Yes, so that these prototypes could be repurposed or -- could be now used and made brand specific for a new potential client. I -- yes, you're correct. That's right.").

[125] 07/19/2023 Tr. 193:6-15 (de la Iglesia).

[126] D.I. 320, Ex K, Depo. Tr. 123:14-126:6 (Agrawal); Florida Litigation Ex. P-889.

[127] 07/19/2023 Tr. 137:25-138:7 (Fournier).

[128] Carnival Ex. 690; Florida Litigation Ex. P-756.

[129] 07/19/2023 Tr. 133:22-136:7 (Fournier).

[130] D.I. 320, Ex K, Depo. Tr. 159:21-161:14 (Agrawal).

MSA, rather than to start work for new customers from scratch.[131]

- In October 2016, DeCurtis employees asked to run Carnival prototypes to compare MI6 modules (i.e., modules made for Virgin Voyages).[132]

- DeCurtis personnel renamed services and programs that had been made for Carnival.[133]

- DeCurtis engineers spent hours "scrubbing" Carnival references and copyright notices from MSA Deliverables.[134]

- In 2019, Mr. Fournier asked a DIPL employee to upload Carnival and DXP videos to the same location on a Google drive.[135] This Google drive has a directory path including "MI6," the Virgin Voyages project.[136]

- Materials like Carnival's code and documents are comingled with those of DXP.[137]

- **Back-End Software:** "Back-end" software is important to the functionality of an operational product, such as the OCEAN system or the DXP.[138]

    o DeCurtis "convert[ed]" the "back-end" from Carnival prototypes to create high-fidelity prototypes for Virgin Voyages and DXP "as much as we can."[139]

    o In "converting" Carnival prototypes and "back-end" to create DXP applications, DeCurtis was using and referencing Carnival Information to create the DXP applications.[140]

---

[131] D.I. 320, Ex. K, Depo. Tr. 83:16-84:11 (Agrawal).

[132] Florida Litigation Ex. P-767.

[133] 07/19/2023 Tr. 204:21-205:7 (de la Iglesia).

[134] Florida Litigation 03/06/2023 Tr. 139:19-140:6 (de la Iglesia); Florida Litigation Exs. P-751, P-565, P-349, P-886.

[135] 07/19/2023 Tr. 103:9-104:4 (Fournier); Carnival Ex. 773.

[136] Carnival Ex. 773; 07/19/2023 Tr. 101:23-104 (Fournier), 138:8-19 (Fournier).

[137] *See, e.g.*, 07/19/2023 Tr. 138:8-19 (Fournier), 143:13-146:12 (Fournier).

[138] Florida Litigation 03/01/2023 Tr. 23:18-24:21 (Padgett); 07/19/2023 Tr. 57:6-23 (Fournier), 134:16-135:4 (Fournier).

[139] 07/19/2023 Tr. 132:10-135:4 (Fournier); Carnival Ex. 754.

[140] 07/19/2023 Tr. 135:5-24 (Fournier).

- o  DeCurtis executives, including Mr. DeCurtis,
  explicitly instructed DeCurtis's development team,
  DIPL, to reference Carnival Information to create
  the DXP.[141]

- **Gangway:** Gangway is an application that allows crew
  members to see who is coming on board and who is
  expected to do so.[142]

  - o  DeCurtis entered into an SOW to provide Carnival
    with a gangway application.[143] SeaNtry is the name
    of the custom gangway solution DeCurtis built for
    Carnival Cruise Lines ("CCL").[144] DeCurtis
    brought no preexisting work to the CCL gangway
    project.[145] DeCurtis was paid for its CCL gangway
    work.[146] Carnival did not authorize DeCurtis to use
    deliverables prepared for Carnival under the CCL
    gangway SOW for any other DeCurtis client.[147]

  - o  DeCurtis employees took an idea from the Carnival
    gangway app to develop the gangway app for
    Virgin Voyages.[148]

  - o  In an email titled "Gangway!!!!!!" Mr. DeCurtis
    directed his employees to "[t]ake the CCL code and
    replicate it."[149] He testified that he told his

---

[141] 07/19/2023 Tr. 132:10-136:7 (Fournier); Carnival Ex. 754.

[142] 07/19/2023 Tr. 17:19-18:3 (Fournier).

[143] 07/18/2023 Tr. 115:21-116:2 (Padgett); Carnival Ex. 816.  Carnival owns the gangway application.  07/19/2023 Tr. 96:7-17 (Fournier).

[144] 07/19/2023 Tr. 55:17-19 (Fournier).

[145] 07/18/2023 Tr. 116:21-117:8 (Padgett).

[146] 07/18/2023 Tr. 117:13-19 (Padgett).

[147] 07/18/2023 Tr. 117:9-12 (Padgett).

[148] Florida Litigation Ex. P-756 at 5.

[149] The record reflects that Mr. DeCurtis was instructing his employees to copy Carnival Information:

> I got a demo of Gangway and I may have to cancel the demo to VV.  It is
> embarrassing.  I don't know where to start.  It is an absolutely an AWFUL
> gangway app.  It does NOTHING that a gangway needs to do.  Searching for a
> guest takes me to GREETER which has no ability to onboard/ashore the guest.
> It does not show the party members, gangway history, authorization, recent
> transactions, etc.  IT HAS VIRTUALLY NONE OF THE CAPABILITIES OF

employees to "refer" to the CCL gangway in
creating the Virgin Voyage gangway.[150]

o   DeCurtis continues to possess the custom
    application code developed for Carnival (like
    SeaNtry) under the MSA.[151]  Gangway is part of
    Welcome Center (entry and exits) on DeCurtis'
    Schedule of 68 modules.[152]

- **Food & Beverage:** The food and beverage ("F&B") app
  enables the crew to provide a great food and beverage
  experience to guests, for example, to have food or beverage
  delivered to a guest wherever the guest may be on the
  ship.[153]

    o   DeCurtis provided an F&B prototype under SOW
        No. 1.[154]  In 2015, while DeCurtis was still part of
        Project Trident, it was developing its version of
        F&B by removing Carnival references.[155]

    o   The DXP Studio Plan presentation, dated 2017,
        showed the only change to the CSP was to "Change
        Colors" under "F&B."[156]

    o   A DeCurtis-internal email in July 2018 circulated
        47 pages of CSP F&B crew mock-ups to give the
        team an example.[157]

---

CCL GANGWAY which is what I told you guys to use as your blueprint over a
year ago.

. . .

Fix this!!!

David

Carnival Ex. 690 (Email from D. DeCurtis to J. Kumar, dated June 21, 2017).

[150]  Florida Litigation 03/08/2023 Tr. 207:5-208:24 (DeCurtis).

[151]  07/20/2023 Tr. 225:13-226:2 (Saxena).

[152]  DeCurtis Exhibit 12; D.I. 232 at 34.

[153]  07/18/2023 Tr. 100:8-101:15 (Padgett).

[154]  Carnival Ex. 2 at 2-3.

[155]  Florida Litigation Ex. P-886 at 2.

[156]  Florida Litigation Ex. P-1157 at 15 ("Notes . . . Possibly use all CSP Demos . . . F&B . . CSP Code – Change
Colors").

[157]  Florida Litigation Ex. P-519.

- o F&B is part of Dynamic Delivery (enabling employees to fulfill all guests' needs) on DeCurtis's schedule of 69 modules.[158]

- **User Interface ("UI")**: UI makes an application or a capability usable and pleasant for a user.[159] UI is an important part of applications.[160]

  - o DeCurtis delivered UI under the MSA.[161]

  - o DeCurtis copied Carnival's UI designs into the DXP.[162]

  - o As recently as 2019, DeCurtis circulated a document containing a compilation of all Carnival user interfaces (in the form of screenshots, for example) developed during Project Trident.[163]

  - o In April 2018, the DXP UI used a bouncing medallion to show a detected guest.[164]

  - o As of April 2018, cabin TV UI also used Carnival's medallion code.[165]

  - o The cabin TV UI is part of Media Suite on DeCurtis's schedule of 68 modules.[166]

- **Greeter:** Greeter is an application that enables the crew to greet guests by name using guest profiles.[167] Greeter may

---

[158] DeCurtis Exhibit 12; D.I. 232 at 34.

[159] 07/19/2023 Tr. 193:25-194:6.

[160] *Id.* 57:12-14.

[161] 07/18/2023 Tr. 97:20-98:16 (Padgett).

[162] Carnival Ex. 1325 (Email from S. Nair to M. Agrawal, dated Oct. 20, 2016: "All future reviews of wireframes and mockups will have a side-by-side comparison with CSP [Carnival] (for all module that we did during CSP) – we can prepare a static excel/list with links to all CSP work, that can be accessed by everyone, anytime").

[163] Carnival Ex. 773 (Email from D. Fournier to M. Agrawal, dated May 5, 2019, asking Ms. Agrawal to upload all "CSP/EIC Videos" and screenshots of all CSP Applications to a google drive).

[164] Carnival Ex. 752; 07/19/2023 Tr. 139:18-141:13 (Fournier).

[165] Florida Litigation Ex. P-753.

[166] DeCurtis Ex. 12; D.I. 232 at 34.

[167] 07/18/2023 Tr. 98:17-24 (Padgett), 201:5-14 (Learish).

32

be used in many places on a cruise operation, including in the port, on the ship, during embarkation, etc.[168]

- o DeCurtis worked on Greeter under the MSA and delivered a product requirements document, among others.[169]

- o DeCurtis used the Greeter prototype it delivered to Carnival for Virgin.[170]

- o In 2015, while DeCurtis was still part of Project Trident, it was developing a version of Greeter by removing Carnival references.[171]

- o Greeter is used in conjunction with other modules, such as Welcome Center, Table Management, Dynamic Delivery, Embarkation Suite, Housekeeping, and Aware Care on DeCurtis's schedule of 68 modules.[172]

- **Wayfinding:** Wayfinding provides a navigation ability for guests on a cruise ship to travel from point A to point B or to navigate toward another guest who is also on the move.[173]

  - o The parties agree DeCurtis did not have a navigation product before it started working for Carnival.[174]

  - o DeCurtis provided Wayfinding under SOW No. 1.[175]

  - o In the DXP, Wayfinding is integrated with the Location module.[176] Wayfinding is listed as a product on DeCurtis's schedule of 68 modules.[177]

---

[168] *Id.* 98:17-24 (Padgett).

[169] Florida Litigation Ex. P-749.

[170] Florida Litigation Ex. P-349 at 3.

[171] Florida Litigation Ex. P-886 at 4, P-887 ("It should not look similar to the CCL [Carnival Cruise Line] HLA. We can think about new layout, follow bottom up approach . . . Use better colours scheme . . Rebrand the document . . Rename services and platforms, names should be generic and no Carnival reference should be there. Remove terminologies like xlC [Carnival], [OCEAN] Experience, etc.")

[172] DeCurtis Ex. 12; D.I. 232 at 34.

[173] 07/18/2023 Tr. 102:13-103:10 (Padgett), 143:5-8 (Padgett).

[174] 07/18/2023 Tr. 74:3-10 (Padgett); 07/19/2023 Tr. 142:15-21 (Fournier).

[175] 07/18/2023 Tr. 103:11-12 (Padgett).

[176] D.I. 232 at 34.

[177] DeCurtis Ex 12. D.I. 232 at 34.

- o In a July 2019 DeCurtis "integration guide" describing DeCurtis's wayfinding application, prepared by DeCurtis's "product owner" employee for Wayfinding, there are references to "Regal Princess," a Carnival ship that uses the OCEAN Platform; Mr. Fournier could not explain why Regal Princess was referenced in the document. This document was prepared after DeCurtis claims to have begun writing the code for the Wayfinding application.[178]

- **CCL Code:**

  - o Contrary to DeCurtis's argument that it could not reuse code it wrote for Carnival because Carnival prototypes and DXP use two different programming languages, Messrs. de la Iglesia and Saxena testified that it can be done.[179] Further, a DXP document contains code snippet for Regal Princess, a Carnival ship.[180]

  - o DeCurtis frequently uses prototypes as it develops its code.[181] When DeCurtis employees planned to reuse CCL Lab prototypes, Mr. DeCurtis said they were to convert the CCL prototypes and the prototype back-end.[182] Use of such code was helpful to DeCurtis and accelerated its development timeline.[183]

### b. *Level 11 and the Location Engine*

In addition, the record reflects, the location engine used in the DXP is a replica of

Carnival's location engine.[184]

---

[178] 07/19/2023 Tr. 142:6-146:12 (Fournier); Carnival Ex. 2149.

[179] 07/19/2023 Tr. 184:24-186:3 (de la Iglesia); 07/20/2023 Tr. 215:2-16 (Saxena).

[180] Florida Litigation Ex. P-448 at 34.

[181] 07/19/2023 Tr. 100:24-101:1 (Fournier).

[182] Carnival Ex. 754.

[183] 07/19/2023 Tr. 193:6-15 (de la Iglesia).

[184] 07/19/2023 Tr. 248:1-24 (de la Iglesia).

Level 11, another contractor that worked on Project Trident, wrote code for the location engine, Lok8, used in Carnival's OCEAN project.[185]  According to Mr. Padgett, Lok8 was a sophisticated product as it was used in Project Trident and OCEAN.[186]  Mr. Padgett testified that from the outset of Project Trident that executing on his vision required creating new technology that would enable greater personalized attention through a guest interaction and connection ecosystem.[187]  Location awareness integration was the "fundamental enabler" of Mr. Padgett's guest and crew experience vision.[188]  One key enabling technology for delivering the OCEAN Platform was a new type of wearable and sensor technology.[189]

### 1. Carnival's Location Engine

Carnival signed a master services agreement with Level 11 in August 2014 (the "Carnival-Level 11 MSA").[190]  The goal between Carnival and Level 11 was to develop "bespoke code that [would] be proprietary and owned by Carnival" while allowing Level 11 to retain the rights to Lok8.[191]  Carnival and Level 11 signed over one hundred SOWs over three years to develop, test, refine, and implement Carnival's location engine.[192]  Carnival paid Level 11 over $3.5 million dollars to develop Carnival's location engine.[193]

---

[185] 07/18/2023 Tr. 113:22–24 (Padgett), 114:20-24 (Padgett), 164:11–12 (Padgett); DeCurtis Ex. 104 at 29:8–17 (Florida Litigation 1/12/2022 Glenn Curtis Dep. Tr.).

[186] 07/18/2023 Tr. 165:11-16 (Padgett).

[187] Florida Litigation D.I. 120 at 2-3.

[188] Florida Litigation 03/01/2023 Tr. 101:7-18 (Jungen).

[189] 07/18/2023 Tr. 53:11-54 (Padgett); Florida Litigation Ex. P-15.

[190] P-137; 07/18/2023 Tr. 70:23-71:17 (Padgett). Prior to working with Carnival, Level 11 had a product named Korl8. 07/18/2023 Tr. 114:16-19 (Padgett).

[191] P-125.

[192] P-1961; Florida Litigation 03/01/2023 Tr. 202:19-203:5 (Steele); 03/06/2023 Tr. 118:23-124:7 (de la Iglesia); 211:2-213:1 (de la Iglesia).

[193] P-1961 at CARNIVAL000007446.

Level 11 also created a specific Kalman filter, which was not a standard solution, and three main location algorithms under a SOW for Carnival.[194]  Through trial and error, Carnival discovered a collection of three algorithms that were most suitable for a cruise ship environment: the strongest signal, trilateration, and centroid.[195]  The settings and configurations of the location engine code prepared by Level 11 for Carnival constituted proprietary and secret Carnival Information.[196]

### 2. *Carnival Licensee Agreement with Level 11 and DeCurtis' Relationship with Level 11*

On February 26, 2016, in conjunction with the development of the Carnival location engine under the Carnival-Level 11 MSA, Carnival and Level 11 entered into a license agreement whereby Level 11 granted Carnival a five–year field–exclusive license to use Level 11's location engine "Lok8" in Carnival's OCEAN Platform.[197]

The Carnival–Level 11 license agreement provides, in part, that Level 11's creation of derivative works could not be based upon Carnival's "confidential information, or deliverables directly resulting from Carn[ival] engagements under the MSA."[198]

---

[194]  Florida Litigation 03/01/2023 Tr. 205:6-210:11 (Steele); Florida Litigation Ex. P-581. 07/18/2023 Tr. 113:22-24 (Padgett).

[195]  Florida Litigation 03/06/2023 Tr. 147:3-148:14 (de la Iglesia); 03/01/2023 Tr. 206:22-207:14 (Steele).

[196]  07/18/2023 Tr. 115:1-8 (Padgett).

[197]  DeCurtis Ex. 91 § 2.11; 07/18/2023 Tr. 166:5-14; 169:18–20 (Padgett); 07/28/2023 Tr. 260:25-261:14 (de la Iglesia).  That five-year exclusive license ended on February 26, 2021.  DeCurtis Ex. 91; 07/18/2023 Tr. 170:8-14 (Padgett).

[198]  DeCurtis Ex. 91, § 2.9. Aspects of Level 11's work with Carnival were shared publicly at the 2017 Consumer Electronics Show where Carnival announced the OCEAN Platform. DeCurtis Ex. 104 at 117:13-118:3 (Florida Litigation 1/12/2022 Glenn Curtis Dep. Tr.); DeCurtis Ex. 11 (Fournier Decl.), ¶ 45, D.I. 297. DeCurtis Ex. 91 §§ 2.8, 1.16 (emphasis added) (defining "System Component" as "all Software and other products necessary to enable the LEVEL 11 **Lok8** product (as defined in the attached <u>Exhibit A-2</u>) to operate in accordance with the Performance Specifications and the terms and conditions of this Agreement) (emphases in original).

### 3. DeCurtis' Location Engine

At trial in the Florida Litigation, Mr. DeCurtis admitted that DeCurtis was not capable of building its own location engine, despite that being the most critical piece of the guest engagement system.[199]  In 2016, DeCurtis sought Level 11's help developing a location engine for the DXP.[200]  Two years after Level 11 insisted on undertaking a "clean room" exercise to build DeCurtis a location engine, it changed course and agreed to work with DeCurtis.[201]  In March 2018, Level 11 and DeCurtis met to discuss development of a location engine, and Level 11 personnel forwarded DeCurtis information about Carnival's location engine architecture.[202]

Thereafter, in 2018, Level 11 developed a location engine in the DXP.[203]  Level 11 delivered the location engine to DeCurtis as contemplated by an agreement between the parties, dated April 30, 2018.[204]  Level 11 agreed to develop the location engine within four months of starting[205] for $120,000.[206]  The SOW between DeCurtis and Level 11 to create a location engine

---

[199]  Florida Litigation 03/08/2023 Tr. 211:6-14 (DeCurtis) ("It was a struggle for sure. I mean, that is not our core competency. We build solutions that make -- use location engines. We don't build -- we didn't have a strong expertise at the time in building location engines.").  Florida Litigation 03/08/2023 Tr. 254:23-255:5 (DeCurtis).

[200]  Level 11 informed DeCurtis that it was contractually forbidden from providing DeCurtis the support it requested regarding a location engine (pursuant to the exclusive license to Carnival which would not expire until 2021). 07/19/2023 Tr. 223:18 (de la Iglesia); PTX-704.  Level 11 informed DeCurtis that if it wanted Level 11 to create a location engine for it, Level 11 would have to undertake a "clean room" exercise to ensure the resulting product would avoid claims of misappropriation or breach of contract. 07/19/2023 Tr. 223:19-225:7 (de la Iglesia). Undertaking a "clean room" exercise can be expensive. 07/19/2023 Tr. 225:8-12 (de la Iglesia).

[201]  P-465; 07/19/2023 Tr. 242:20-243:9 (de la Iglesia).

[202]  P-346.

[203]  07/19/2023 Tr. 81:10-13 (Fournier); 07/18/2023 Tr. 81:23-82:3; 222:16-25 (Learish); 07/20/2023 Tr. 147:16–17 (Saxena); see 07/19/2023 Tr. 268:23-269:4 (de la Iglesia); DeCurtis Ex. 23.

[204]  DeCurtis Ex. 23.  07/19/2023 Tr. 85:3-23 (Fournier); DeCurtis Ex. 11 (Fournier Decl.), ¶ 126. D.I. 297. In the Level 11–DeCurtis Agreement, Level 11 warranted to DeCurtis several assurances that the deliverables were not copied in whole or part from other works. DeCurtis Ex. 23, § 4. DeCurtis understood this warranty from Level 11 to be an assurance that Level 11 would not copy anyone else's code for the location engine used in DXP. 07/19/2023 Tr. 83:9-19 (Fournier); DeCurtis Ex. 11 (Fournier Decl.), ¶ 53. D.I. 297.

[205]  Florida Litigation Ex. DTX-578.

[206]  Florida Litigation Ex. DTX-578.

was magnitudes of time and expense less than the work contracted for, and performed by, Level

11 to create a location engine for Carnival.[207]

Mr. de la Iglesia determined that the DXP system features Carnival's location engine

technology.[208] Source code analysis conducted during discovery in the Florida Litigation

revealed that the DXP contains Carnival's location engine, its architecture, and even included

approximately 200 lines of code copied verbatim from Carnival's source code.[209] DeCurtis's

expert in the Florida Litigation, Dr. Shoemake, agreed that the 200 lines of code in the Location

Engine were copied virtually verbatim from Carnival.[210]

DeCurtis advances two arguments regarding the location engine. First, it argues Level 11

warranted that the code was not copied. The Court is skeptical of this argument. DeCurtis was

told by Level 11 that a "clean room" was required.[211] DeCurtis, a software developer, was

familiar with the time and skill required to develop this sort of technology. In fact, the record

---

[207] 07/19/2023 Tr. 243:24-244:20 (de la Iglesia). *See supra* n. 192-193 (Carnival and Level 11 entered into over 100 SOWs and Carnival paid Level 11 approximately $3.5 million for the Carnival location engine).

[208] 07/18/2023 Tr. 225:25-226:10 (Learish).

[209] Florida Litigation 03/06/2023 Tr. 210:10-213:1 (de la Iglesia). 07/19/2023 Tr. 197:7-8; 255:2-4 (de la Iglesia).

[210] Florida Litigation 03/09/2023 Tr. 136:10-19 (Padgett), 138:12-15 (Padgett). Mr. de la Iglesia's analysis revealed that DeCurtis copied Carnival's proprietary location engine, including (1) Carnival's particular selection of specialized location algorithms and filtering mechanism and the processing flow through which they are implemented; (2) the sequence, structure, and organization of Carnival's location engine, the graphical user interface elements of Carnival's location engine; and (3) technical requirements lifted from Carnival's development. Declaration of Erik de la Iglesia Regarding Debtors' Opening Brief in Support of Their Motion for a Declaration That Debtors Own Their Assets at ¶ 61. Mr. de la Iglesia's analysis further exposed that DeCurtis attempted to obfuscate its use of Carnival's materials by, for example, removing Carnival copyright notices from name spaces within Carnival Deliverable code. *Id.*

[211] As mentioned, the Carnival-Level 11 exclusive license related to the cruise industry. Testimony reflects that DeCurtis contacted Level 11 on the premise that DeCurtis needed a location engine for a "hotel project." 07/19/2023 Tr. 264:22-266:9 (de la Iglesia).

reflects that DeCurtis attempted to create its own location engine without success.[212] In addition

(compared to the cost charged to Carnival), the contract price of the Level 11 location engine

was too low for novel source code. Second, *even if* the Carnival-Level 11 location engine was

licensed (which it was not, as the code was a "Carnival Deliverable"[213]), DeCurtis asserts that the

Carnival-Level 11 exclusive license expired in 2021, and the code was available to other users.

In 2018, the 5-year license exclusivity period had not expired, and, therefore, use of the location

engine by DeCurtis was prohibited. Neither of these arguments are persuasive. The Carnival-

Level 11 MSA provided: "Carn[ival] shall be the sole and exclusive owner of Derivative Works"

under such MSA. Carnival owns the 200 lines of OCEAN location code in the DXP.

Thus, in addition to the compelling evidence that DeCurtis used Carnival Information to

create the DXP, the Location Engine is also the same architecture as Carnival and, consequently,

Carnival Information.[214]

### iv.    *The Record Supports DeCurtis' Use of Carnival Information*

As discussed above, under the MAS, Carnival Information includes both (1) tangible and

intangible non-public information learned by DeCurtis "in connection" with the MSA (i.e.

Confidential Information); and (2) all work product created under or as a result of the MSA (i.e.

---

[212] Florida Litigation 03/08/2023 Tr. 211:6-14 (DeCurtis) ("It was a struggle for sure. I mean, that is not our core competency. We build solutions that make -- use location engines. We don't build -- we didn't have a strong expertise at the time in building location engines."). Florida Litigation 03/08/2023 Tr. 254:23-255:5 (DeCurtis).

[213] DeCurtis Ex. 91, § 2.9 (emphasis added). Section 2.8 defines "Derivative Works" as a license to "use, copy, modify, enhance and maintain the System Component (in source code and object code form), which specifically includes the right to create derivative works." *Id.* at § 2.8.

[214] 07/19/2023 Tr. 248:1-24 (de la Iglesia). "The files are not identical, but they do the same thing in the same way, same order. And one of the files, even the Kalman filter that we've heard so much about, is a verbatim copy from the from the Carnival code. But I think at a high level, the important thing here is that the location engine in the DXP system is the Carnival location engine." *Id.* at 248:18-24.

Deliverables).[215]  Confidential Information includes "information and material which is not

generally available to third parties and which Carnival considers confidential," specifically "any

information of any nature and in any form … disclosed by Carnival, or which is otherwise

learned by [DeCurtis] in connection with [the MSA], which relates in any way to Carnival's …

business or operations … including … strategies … the identity of suppliers of goods and/or

services and competitors, software and hardware products, trade secrets, other non-public

intellectual property, and the terms and existence of [the MSA]."[216]

Carnival and DeCurtis negotiated the "right to perform services for others" into the

MSA.[217]  The provision expressly excludes written materials from being used to perform services

for other clients.  This provision allowed DeCurtis to continue to work for other customers in the

cruise industry and protected the experience and skill a DeCurtis employee gained while working

on Carnival projects – but prevented the use of Carnival Information being used for by DeCurtis

on projects for other customers.[218]

DeCurtis asserts that the "MSA expressly permits DeCurtis to utilize the work developed

under the MSA so long as it was not based on written materials."[219]  The Court does not agree.

---

[215]  Carnival Ex. 1, § 4.1.

[216]  Carnival Ex. 1, § 4.1.

[217]  Carnival Ex. 1, § 4.4 ("[DeCurtis] shall have the unencumbered right to use the general knowledge, know how, experience or skill (and for the avoidance of doubt without the aid of written materials of any type produced in connection herewith) gained while providing Services under this Agreement for the purpose of executing projects for other Company clients, subject to the Company maintaining the confidentiality of the Carnival Confidential Information.").

[218]  Carnival Ex. 1, § 4.4.  07/18/2023 Tr. 86:13-87:8 (Padgett).

[219]  D.I. 342 at n. 7.

"In construing a contract, the legal effect of its provisions should be determined from the words of the entire contract, and that construction must give effect to all of the provisions of the contract."[220]  The phrase "any information of any nature **and** in any form" in Section 4.1 of the MSA is not meaningless.  When the word "and" is placed between two conditions in a contract it "shows that the two conditions are linked, and both must occur."[221]  Any other interpretation of "of any nature and in any form" would disregard the "plain meaning" of the MSA.[222]  The evidence detailed above demonstrates that DeCurtis made use of non-public Carnival written material to develop the DXP.

"Deliverables" are also broadly defined under the MSA.[223]  DeCurtis argues that because the term "derivative work" is "a term that has legal meaning in copyright law," the Court should import that meaning into the MSA.[224]

Here, the Court agrees with Carnival.  First, the plain text of the MSA refers to "derivative works thereof."  "Thereof" is a clear reference to the list of "all material prepared for Carnival," which is not limited to copyright material.  "The actual language used in the contract is the best evidence of the intent of the parties, and the plain meaning of that language controls."[225]

---

[220] *Summitbridge*, 218 So. 3d at 489 (citations omitted). *See also Fla. Inv. Grp. 100, LLC v. Lafont*, 271 So. 3d 1, 4 (Fla. Dist. Ct. App. 2019) (citation omitted); *Sugar Cane Growers Co-op. of Fla., Inc. v. Pinnock*, 735 So. 2d 530, 535 (Fla. Dist. Ct. App. 1999) (citation omitted)).

[221] *McDonald v. Browne-McDonald*, 125 So. 3d 833, 835 (Fla. Dist. Ct. App. 2013); *see also Buie v. Bluebird Landing Owner's Ass'n, Inc.*, 172 So. 3d 519, 521 (Fla. Dist. Ct. App. 2015) ("'And' is conjunctive and means that both conditions apply . . .").

[222] *Summitbridge Credit Invs. III, LLC*, 218 So. 3d at 489.

[223] Carnival Ex. 1, § 4.1.

[224] D.I. 342 at ¶ 33.

[225] *Acceleration Nat'l Serv. Corp. v. Brickell Fin. Servs. Motor Club, Inc.*, 541 So. 2d 738, 739 (Fla. 3d DCA 1989).

Second, DeCurtis's attempt to limit the concept of derivative works violates the rule that the MSA must be construed "to give effect to all of the provisions of the contract."[226]  The word "and" links the concept of "derivative works" to the preceding list of materials, and each of the words in this sentence must be given effect.[227]  Florida law requires the Court give "effect to conjunctions used in phrases."[228]  Mr. Padgett testified that the term "derivative works" was intended to include both the lay business meaning of "anything that comes from" the work performed and the concept of a "derivative work" under copyright law.[229]  By its express terms, the MSA defines "derivative works" to include material that are beyond the scope of copyright protection, such as "inventions," "business methods," "processes," and "discoveries."[230]

### v.    *Conclusion*

The evidence establishes that Carnival Information is incorporated into DXP.  Based on the plain language of the MSA, Carnival owns all Carnival Information, including any derivative works thereof, such as architecture, user interfaces, algorithms, applications, and inventions incorporated into the DXP.[231]  Consequently, the Court finds that Carnival has an ownership interest in the Remaining DXP Assets.

---

[226] *Summitbridge*, 218 So. 3d at 489.

[227] *McDonald*, 125 So. 3d at 835; *see also Buie*, 172 So. 3d at 521.

[228] *Id.*

[229] 07/18/2023 Tr. at 147:21-148:2 (Padgett).

[230] *See, e.g., Franklin Mint Corp. v. Nat'l Wildlife Art Exch., Inc.*, 575 F.2d 62, 64 (3d Cir. 1978) (Unlike a patent, a copyright protects originality rather than novelty or invention). "Congress has excluded any idea, procedure, process, system, method of operation, concept, principle, or discovery from copyright protection." *Silvertop Assocs. v. Kangaroo Mfg.*, 931 F.3d 215, 222 (3d Cir. 2019).

[231] Carnival Ex. 1, § 4.1.

The Court next evaluates whether monetary damages would compensate Carnival for its ownership interest, whereby, DeCurtis could sell the DXP free and clear of Carnival's ownership interest or whether an injunction is necessary to stop irreparable harm to Carnival from the use and sale of the DXP.

## B. Injunction

"[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."[232] "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court...."[233]

Irreparable harm is harm that "cannot be reversed or repaired."[234] Harm that is solely monetary does not qualify as irreparable.[235] Courts have found that impaired goodwill and competitive position qualifies as irreparable harm.[236] Importantly, misuse of highly sensitive,

---

[232] *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, (2006).

[233] *eBay Inc.*, 547 U.S. at 391.

[234] *See The Hurry Fam. Revocable Trust v. Frankel*, Case No. 8:18-cv-2869, 2023 WL 23805, at *16 (M.D. Fla. Jan 3, 2023) (collecting cases).

[235] *See Boggs Contracting, Inc. v. Freismuth*, No. 6:21-CV-2088-CEM-EJK, 2021 WL 6755466, at *3-4 (M.D. Fla. Dec. 27, 2021), appeal dismissed, No. 22-10296-JJ, 2022 WL 1299092 (11th Cir. Mar. 28, 2022) (finding that injury that "cannot be undone through monetary remedies" is irreparable).

[236] *See Tex. Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc.*, 895 F.3d 1304, 1331 (Fed. Cir. 2018).

confidential, and competitively valuable information impairs a company's competitive position, and therefore qualifies as irreparable.[237]

Whether remedies available at law, such as monetary damages, can adequately compensate for the harm suffered, is closely tied to whether the harm is found to be irreparable: if the harm is irreparable, remedies available at law are generally inadequate to compensate for such harm.[238] Similarly, when the harm suffered is unquantifiable, remedies at law are generally inadequate to compensate for it.[239] For example, "there is no amount of money that will make [] information confidential again...[g]enerally, this has been found sufficient to establish the inadequacy of remedies at law."[240] Plaintiffs may establish "that they were injured by damages that are incapable of calculation, such that damages at law are inadequate."[241]

The balance of hardships between the plaintiff and defendant favors the plaintiff where the injunction will do no more than require the defendant's compliance with the obligations to which it has already agreed.[242]

Courts have found that there is a public interest in protecting against unethical business behavior, including the misappropriation of confidential information,[243] and in upholding

---

[237] *See Boggs Contracting, Inc. v. Friesmuth,* No. 6:21-CV-2088-CEM-EJK, 2021 WL 6755466, at *4.

[238] *See eBay,* 547 U.S. at 395.

[239] *See Sionyx LLC v. Hamamatsu Photonics K.K.,* 981 F.3d 1339, 1350 (Fed. Cir. 2020).

[240] *Frankel,* Case No. 8:18-cv-2869, 2023 WL 23805, at *18.

[241] *See id.* at *56 (declaring that "Plaintiffs have not established that they were injured by damages that are incapable of calculation, such that damages at law are inadequate.").

[242] *See id.* at *57 (citing *Edwards Moving & Rigging, Inc. v. Jenkins,* No. 8:19-CV-1004-T-36SPF, 2020 WL 7707025, at *19 (M.D. Fla. Dec. 29, 2020).

[243] *See Boggs Contracting, Inc. v. Freismuth,* No. 6:21-CV-2088-CEM-EJK, 2021 WL 6755466, at *5.

contracts as written.[244]  Courts further consider contractual provisions providing for injunctive

relief, such as Section 4.2 of the MSA, when issuing permanent injunctions where breach has

been found.[245]

Under Florida law, misappropriation of "confidential business information" can cause

"irreparable harm."[246]  Carnival's rights to its confidential business information includes the

right to possession and exclusive use of that information.

The legal principles underlying Florida's special protections for confidential business

information are consistent with federal law, which recognizes that "confidential business

information" is "property,"[247] and that "a person who acquires special knowledge or information

by virtue of a confidential or fiduciary relationship with another is not free to exploit that

knowledge or information for his own personal benefit."[248]

In *SI Handling*,[249] the Third Circuit reviewed an injunction against disclosure and use of

trade secrets.  There, the property at issue was technology underlying a materials handling

---

[244] *See Frankel*, No. 8:18-CV-2869-CEH-CPT, 2023 WL 23805 at *19 (citations omitted).

[245] *Nike Inc. v. Variety Wholesalers, Inc.*, 274 F. Supp. 2d 1352, 1371–72 (S.D. Ga. 2003), *aff'd*, 107 F. App'x 183 (11th Cir. 2004).

[246] *Kupscznk v. Blasters, Inc.*, 647 So. 2d 888, 890 (Fla. Dist. Ct. App. 1994) (in the context of noncompetition agreement) (enforcing company's exclusive right to exploit "trade secret or, at a minimum, confidential business information" taken by former employee in breach of contract); *Variable Annuity Life Ins. Co. v. Hausinger*, 927 So. 2d 243, 245 (Fla. Dist. Ct. App. 2006) (discussing right to statutory injunctive relief to protect sensitive business information); *Envtl. Servs. v. Carter*, 9 So. 3d 1258, 1266 & n.6 (Fla. Dist. Ct. App. 2009) (Florida recognizes "legitimate business interest" in the protection of "confidential business information"); *see also Fla. Soc'y of Newspaper Editors, Inc. v. Fla. Pub. Serv. Com.*, 543 So. 2d 1262, 1265 (Fla. Dist. Ct. App. 1989) (discussing different statutory protections for "proprietary confidential business information."); *All Star Recruiting Locums, LLC v. Ivy Staffing Sols., LLC*, Case No. 21-CV-62221, 2022 WL 2340997, at *19 (S.D. Fla. Apr. 8, 2022) (ordering return of confidential information and enjoining use).

[247] *Belt v. United States*, 868 F.2d 1208, 1212 (11th Cir. 1989).

[248] *Carpenter v. United States*, 484 U.S. 19, 27-28, 108 S. Ct. 316, 321 (1987).

[249] *SI Handling Sys. v. Heisley*, 753 F.2d 1244, 1259 (3d Cir. 1985) (approving district court's finding that because defendants developed concept by "misappropriating the unmatured development effort paid for by SI. . . . [the] concept developed by defendants...is deemed to be the property of SI"); *CommScope, Inc. v. Rosenberger Tech.*

45

system that used a distinct method to propel a carrier along a track.[250]  The patented SI system

contained accumulation abilities such that carriers could line up between various stations in an

operation to deliver materials.[251]  The senior management team responsible for developing the

original system left to form a separate company and began marketing a competing car-on-track

system to SI's potential customers.[252]  The new system used the same propulsion method, and

also included two-way accumulation capabilities, but was priced lower.[253]  Shortly after the new

company was formed to sell the new system, the new system was marketed to a previous

customer of SI at its desired price point.[254]  On the same day, SI offered a similar bid on two-way

accumulation systems.[255]  Until the formation of the new company, there were no other systems

using the same propulsion method on the market, so SI's system had no competition from

comparable systems.[256]  The district court found that the new system could only have been

offered at the customer's desired price point so soon after company formation if it relied on the

---

(Kunshan) Co., Ltd., Civ. Action No. 19-15962, 2021 WL 1560717, at *7 (D.N.J. Apr. 20, 2021) ("The manufacture or sale of materials 'substantially derived' from a trade secret constitutes 'use' of that trade secret") (collecting cases); Penalty Kick Mgmt. v. Coca Cola Co., 318 F.3d 1284, 1293 (11th Cir. 2003) ("an actor is liable for using the trade secret with independently created improvements…"); Dun & Bradstreet Software Servs. v. Grace Consulting, Inc., 307 F.3d 197, 212 (3d Cir. 2002) (finding ownership as a matter of copyright: "Grace's W-2 program using Copy and Call commands copies Geac's computer copyrighted code.  Thus, it is a derivative work.").

[250] SI Handling Sys., 753 F.2d at 1249.

[251] Id. at 1248-50.

[252] Id. at 1251.

[253] Id.

[254] Id. at 1259.

[255] Id. at 1251.

[256] Id. at 1251.

development efforts that were funded by SI.[257]  On appeal, the Third Circuit affirmed the district

court's finding that the new system was SI's property.[258]

DeCurtis argues that *SI Handling* does not apply because "the MSA expressly permits

DeCurtis to utilize the work developed under the MSA so long as it was not based on written

material." [259]  As discussed above, this argument is incorrect as a matter of contract

interpretation.  Moreover, DeCurtis *did* use Carnival's confidential written materials to develop

the DXP.  Just like the Defendants in *SI Handling*, DeCurtis misappropriated "development

effort paid for by [Carnival]," and as a result, the "concept developed by [DeCurtis]…is deemed

to be the property of [Carnival]."[260]

DeCurtis's attempt to distinguish *SI Handling* on the basis that the information at issue

involved trade secrets is also unpersuasive.  Although the opinion analyzes the likelihood of

success on the merits issue from the framework of trade secrets, the opinion did so merely to

assess the strength and viability of the injunction in movant's case.[261]

The *Dun & Bradstreet* decision is also instructive.  In that case, the plaintiff owned

"certain proprietary, copyrighted software" that "contain[ed] highly confidential information and

trade secrets that were designed and developed …at great effort and expense."[262]  Defendant, a

consultant who induced plaintiff's customers to provide defendant with plaintiff's software in

---

[257] *Id.* at 1259.

[258] *Id.*

[259] D.I. 342 at 18 n. 7.

[260] *SI Handling,* 753 F.2d at 1259.

[261] *See generally id.* at 1256.

[262] 307 F.3d at 200.

violation of their customer agreements, copied plaintiff's proprietary materials.  In the context of

resolving the plaintiff's copyright claim, the Third Circuit found that the relevant contractual

agreements did not permit defendant to use plaintiff's "copyrighted property for its own

commercial and competitive purposes."[263]  The Third Circuit concluded that "[h]aving copied

the critical source code, it is no defense" that "more of the system was not copied or that the

plagiarist's system may have some dissimilarities from the original system."[264]  Because the

defendant created its competing software application by copying plaintiff's computer code, the

Third Circuit concluded that defendant's program constituted a "derivative work" under the

Copyright Act.

Similarly, in *In re The Clark Entertainment Group, Inc.*,[265] the plaintiff (Sony) had rights

under copyright law to recordings on tapes held by the debtor.  The bankruptcy court held that

the debtor/defendant was owner of the tapes, but it was "well settled that intellectual property

rights are separate and distinct from the material objects in which the work was embodied . . ."[266]

The court held that Sony would suffer commercial injury if the debtor was permitted to copy and

distribute the sound recordings on the tapes.[267]  In issuing a permanent injunction against the

debtor from copying or distributing the tapes the bankruptcy court held: "[s]hould debtor copy

and distribute the tapes, Sony would risk the loss of its reputation and a loss of the reputation of

---

[263] *Id.* at 197.

[264] *Id.* at 214.

[265] *Sony Music Entertainment, Inc. v. The Clark Entertainment Grp, Inc. (In re The Clark Entertainment Grp., Inc.)*, 183 B.R. 73 (Bankr. D. N.J. 1995).

[266] *In re Clark Ent. Grp., Inc.*, 183 B.R. at 79.

[267] *Id.* at 80.

the artists who entered into the exclusive arrangements with Sony. It would also face the loss of good will and revenue. Each of these injuries is irreparable and could not be adequately compensated by money damages awarded sometime in the future."[268] Although under copyright law, the same principles apply here. *Even if* the Debtors had full ownership of the Remaining DXP Assets by virtue of the custody of the GitHub server, every use and distribution of the Remaining DXP Assets would irreparably harm Carnival.

Under Florida law, violation of a restrictive covenant creates a presumption of irreparable injury.[269] Injury that "cannot be undone through monetary remedies" is irreparable.[270] Hard to measure harms, such as loss of goodwill and competitive position can justify an injunction.[271] An award of money damages does not preclude a finding of irreparable harm.[272]

As Carnival argues, the harm caused by permitting DeCurtis to continue to market, sell, and install its DXP system cannot readily be quantified, because it is not possible to compute in monetary terms the value of the competitive harm to Carnival caused by DeCurtis' ability to leverage Carnival's technology going forward, rather than creating its own.[273] Carnival cannot

---

[268] *Id.* at 81.

[269] Fla. Stat. Ann. § 542.335.

[270] *Boggs Contracting, Inc. v. Freismuth*, No. 6:21-CV-2088-CEM-EJK, 2021 WL 6755466 at *3 (citations omitted), *appeal dismissed*, No. 22-10296-JJ, 2022 WL 1299092 (11th Cir. Mar. 28, 2022).

[271] *Tex. Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc.*, 895 F.3d 1304, 1331 (Fed. Cir. 2018).

[272] *Broad. Music, Inc. v. Cool Hand Ent., LLC*, No. 8:15-CV-289-T-36TBM, 2017 WL 3706704, at *6 (M.D. Fla. Mar. 29, 2017) ("Although Plaintiffs are entitled to monetary relief, that remedy alone would be insufficient. Money damages for past violations of a plaintiff's rights under copyright law do not provide an "adequate remedy" to prevent damage from further infringement"); *Tiramisu Int'l LLC v. Clever Imports LLC*, 741 F. Supp. 2d 1279, 1288 (S.D. Fla. 2010) (awarding permanent injunction in addition to money damages in trademark infringement case); *Island Fund Mgmt., Inc. v. RWS, Inc.*, No. 18-21065-CIV, 2019 WL 1466707, at *6 (S.D. Fla. Feb. 11, 2019), report and recommendation adopted *sub nom. Island Fund Mgmt., Inc. v. RWS, Inc.*, No. 18-21065-CIV, 2019 WL 1468540 (S.D. Fla. Mar. 12, 2019) (same).

[273] *See, e.g.*, *Sionyx LLC*, 981 F.3d at 1350.

predict how much business it lost or future business it will lose because of DXP.[274]  DeCurtis'

competition undercuts Carnival's distinctiveness and market appeal, damaging Carnival's

reputation as an innovator within the marketplace.  Loss of control over reputation and loss of

goodwill are unquantifiable harms.[275]

There are several public policy issues that the Court must balance.  On one hand, the

public interest is served by (i) injunctions that protect intellectual property;[276] (ii) "protecting

against the misappropriation of confidential information and otherwise unethical business

behavior"[277] and (iii) upholding parties' contractual expectations, such as the expectation that an

injunction would be available for breaches of the MSA.[278]

On the other hand, according to Mr. Fournier, separating MAS from the location

functionality in Module Nos. 57 and 58 would impair the safety of passengers and crew.[279]  Mr.

Fournier testified that it is possible to remove location services from MAS functionality as it is

[274] *See, e.g., All Leisure Holidays Ltd. v. Novello*, No. 12-62328-CIV, 2012 WL 5932364, at *5 (S.D. Fla. Nov. 27, 2012) (collecting cases) ("Irreparable injury includes loss of control of reputation, loss of trade, and loss of goodwill").

[275] *Vital Pharms., Inc. v. Monster Energy Co.*, Case No. 19-60809, 2020 WL 3314724, at *9 (S.D. Fla. Jan. 24, 2020).

[276] *FMC Corp. v. Control Sols., Inc.*, 369 F. Supp. 2d 539, 578 (E.D. Pa. 2005) ("Protecting a company's rights to its intellectual property is in the public interest."); *accord Kenzo S.A. v. ariefstore*, Case No. 19-60198, 2019 WL 2008982, at *3 (S.D. Fla. Feb. 19, 2019) ("The public interest favors issuance of the preliminary injunction to protect Plaintiff's intellectual property interests[.]").

[277] *Boggs Contracting, Inc.*, No. 6:21-CV-2088-CEM-EJK, 2021 WL 6755466 at *5.

[278] *Sexual MD Sols., LLC v. Wolff*, Case No. 20-20824, 2020 WL 2197868, at *25 (S.D. Fla. 2020); *AutoNation, Inc. v. O'Brien*, 347 F. Supp. 2d 1299, 1308 (S.D. Fla. 2004)); *Woodard-CM, LLC v. Sunlord Leisure Prod., Inc.*, Case No. 20-cv-23104-KMW, 2020 WL 5547876, at *3 (S.D. Fla. 2020) (courts "uphold contracts as written.").

[279] 07/19/2023 Tr. 89:6-14 (Fournier); DeCurtis Ex. 76 (Fournier Supp. Decl.) ¶ 26, D.I. 343.

currently deployed on ships and "MAS would still operate," but the "safety teams would have less data, it would be less safe."[280]

Moreover, MAS as it is implemented for certain cruise lines cannot be easily decoupled from the DXP platform without significant cost.[281]

The Court finds that Carnival is entitled to injunctive relief against the sale, use, or disclosure of Carnival Information contained in the DXP.  The Court is, however, concerned about the potential consequences that an injunction would have on those cruise lines that utilize the DXP, including possible disruption of guest services, impairment of operations and system functioning, and safety risks, as well as related collateral business issues.  The Court is without a record to determine what advance precautions are needed, if any, in the short term to ensure the operations and safety of vessels using DXP.

Carnival submitted a proposed injunction order specifying the scope of the injunction requested,[282] however, the Court delays entry of a proposed order until the parties confer to address the scope and timing of the injunction in light of the concerns expressed herein.  Until such time, the Debtors may not disclose or sell any Carnival Information.

---

[280] 07/19/2023 Tr. 88:9-21 and 89:6-14 (Fournier).

[281] DeCurtis Ex. 76 (Fournier Supp. Decl.), ¶¶ 25–26, D.I. 343; 07/19/2023 Tr. 21:22-22:2, 88:9-89:5 (Fournier).

[282] Adv. D.I. 47.

## C. The DXP Order

As set forth above the DXP Order contains various requirements including:

    (i)      "That the DXP Assets do not infringe on Carnival's intellectual property

rights."[283]

The jury in the Florida District Court issued a verdict that DXP does infringe on

Carnival's intellectual property rights.[284]

    (ii)     "That the DXP Assets are not subject to any outstanding injunction in favor of

Carnival or that could reasonably restrict or impair ownership." [285]

As set forth above, the Court finds that Carnival has an ownership interest in the

Remaining DXP Assets and will enjoin against the sale, disclosure, or use of the Remaining

DXP Assets.

---

[283] D.I. 15 at 185 (emphasis added).

[284] In the Florida Litigation, the jury found that DeCurtis directly and indirectly infringed the Carnival's '184 patent. Carnival asserts that the Florida judgment is entitled to preclusive effect. *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 106 F. Supp. 3d 506, 521 (M.D. Pa. 2015) ("When a party seeks collateral estoppel based on a jury verdict, the court must determine 'whether a rational jury could have grounded its verdict upon an issue other than' the issue sought to be precluded."); *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1100 (3d Cir. 1995) (citations omitted) (Holding that when "the jury returned a general verdict" . . . [t]he law 'presumes the existence of fact findings implied from the jury's having reached that verdict.'"); *Smith v. Katz*, No. CV 2010-39, 2014 WL 7004995, at *3 (D.V.I. Dec. 11, 2014), *aff'd*, 696 F. App'x 582 (3d Cir. 2017) ("Disrupting the prior jury's factual determinations would be an affront to the Seventh Amendment right to a jury trial."). DeCurtis asserts that the Florida District Court entered a non-final judgment on the verdict in conformance with the jury verdict. A non-final judgment may be revised at any time before the entry of a final judgment. *See* Fed.R.Civ.P. 54(b); *Transamerica Life Ins. Co. v. Lincoln Nat. Life Ins. Co.*, No. C 06-110-MWB, 2009 WL 1783496, at *4 (N.D. Iowa June 19, 2009). Here, DeCurtis's bankruptcy prevented the Florida District Court from final adjudication of the litigation between DeCurtis and Carnival.

This Court cannot make the jury verdict final, nor can this Court sit as an appellate court to review the findings in the Florida Litigation with respect to the jury verdict. This Court also cannot issue the DXP Order that there is no infringement. Upon renewed motion, the Court will modify the automatic stay to allow the Florida Litigation to proceed to completion. However, as this Court is enjoining the sale, use, and disclosure of the Remaining DXP Assets, further litigation in the Florida District Court may be unnecessary.

[285] D.I. 15 at 185 (emphasis added).

In light of the foregoing, the DXP Conditions in the proposed DXP Order cannot be satisfied.

## CONCLUSION

As set forth above, the Court finds that Carnival has ownership rights in the Remaining DXP Assets and that DeCurtis will be permanently enjoined from using, selling, or disclosing Carnival Information that is incorporated into the Remaining DXP Assets. As a result, the Debtors will not be allowed to sell the Remaining DXP Assets free and clear, nor can the Court enter the DXP Order containing the DXP Conditions.

An injunction order will issue.

Dated: August 9, 2023

J. Kate Stickles
United States Bankruptcy Judge