IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| DECURTIS HOLDINGS LLC, *et al.*,[1] | Case No. 23-10548 (JKS) |
| Debtors. | (Jointly Administered) |
| | **Related D.I. 317, 318, and 333** |

## MEMORANDUM ORDER REGARDING CARNIVAL CORPORATION'S STANDING MOTION AND CREDIT BID MOTION

Upon consideration of Carnival Corporation's ("Carnival") motions[2] seeking (i) standing

to commence an adversary complaint for recharacterization, equitable subordination, and breach

of fiduciary duty against Invictus Global Management, LLC ("Invictus"), Invictus Special

Situations Master I, L.P. (collectively, the "Invictus Parties"), Corbin Capital Partners LP

("Corbin"), and CEOF Holdings LP (collectively, the "Corbin Parties") (the "Standing Motion");

and (ii) denying or limiting Invictus' right to credit bid on behalf of itself and/or any other

prepetition senior secured lenders[3] (the "Credit Bid Motion") in connection with the sale of

assets contemplated by the DeCurtis Holdings LLC and DeCurtis LLC (together, "DeCurtis" or

the "Debtors"); and the oppositions and related supporting declarations filed by the Debtors[4] and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include: DeCurtis Holdings LLC (2384) and DeCurtis LLC (9241). The location of the Debtors' service address in these chapter 11 cases is 3208 East Colonial Drive, Suite C190, Orlando, FL 32803.

[2] D.I. 318 (sealed); D.I. 333 (redacted).

[3] D.I. 317 (sealed); D.I. 334 (redacted).

[4] D.I. 337; 338 (Atkinson Declaration sealed); D.I. 373 (Atkinson Declaration redacted); D.I. 339 (Carino Declaration sealed); D.I. 372 (Carino Declaration redacted).

Invictus;[5] and Carnival's reply and related declaration;[6] and the Court and having heard argument

and reviewed the evidence presented on the Standing Motion and the Credit Bid Motion as part

of trial on July 18, 19, and 20, 2023;[7] and the Court having considered the post-trial findings of

fact and conclusions of law filed by Carnival and DeCurtis;[8] and the post-trial briefs filed by

Carnival, Invictus, DeCurtis, and City Nation Bank ("CNB");[9] and the Court finding that it has

jurisdiction to hear and determine the Standing Motion and the Credit Bid Motion under 28

U.S.C. § 1334(b); venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409; and

this is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O); and upon the record and

proceedings before this Court; and after due deliberation and sufficient cause appearing therefor,

IT IS HEREBY FOUND AND ORDERED THAT:

---

[5] D.I. 340, 341 (Chen Delano Declaration).

[6] D.I. 359 (sealed); D.I. 360 (Trentin Declaration sealed).

[7] *See* Trial Transcripts D.I. 401 (7/17/2023, pre-trial conference), 402 (7/18/2023), 403 (7/19/2023), and 404 (7/20/2023). In addition to the written and video record submitted, the Court heard the testimony of the following witnesses:
- **DeCurtis**
  - Derek Fournier, DeCurtis' President and Chief Executive Officer
  - James Learish, DeCurtis' Chief Operating Officer
  - Michael Atkinson, Principal of Province, LLC, Debtors' Financial Advisor
  - Joseph Carino, DeCurtis' Chief Financial Officer
  - Apurva Saxena (rebuttal witness), International Director of DeCurtis, LLC
- **Carnival**
  - John Padgett, Chief Executive Officer of Princess Cruise Lines, a division of Carnival
  - Erik de la Iglesia, Carnival's Expert Witness
- **Invictus**
  - Cindy Chen Delano, Partner and Co-Founder of Invictus Global Management

[8] D.I. 421 (Carnival sealed); D.I. 451 (Carnival redacted); D.I. 425 (DeCurtis sealed); D.I. 436 (DeCurtis redacted); D.I. 444 (DeCurtis unsealed).

[9] D.I. 421 (Carnival sealed); D.I. 423 (Invictus); 424 (DeCurtis sealed); D.I. 435 (DeCurtis unsealed); D.I. 446 (Carnival redacted); D.I. 447 (CNB). Capitalized terms not defined herein shall have the meaning ascribed to them in the Standing Motion, the Credit Bid Motion, and the Credit Agreement.

A.    **The Standing Motion**

    i.    *Factual Background*

        a.    *The January 21, 2022 Credit Agreement*[10]

    1.      In 2021, the Florida Litigation[11] commenced and the Debtors were experiencing financial distress.  In September 2021, Invictus was introduced to the Debtors for a potential restructuring transaction.[12]  As part of that restructuring, the Debtors made accelerated prepayments of $7 million of its existing debt to CNB out of new money financing in return for which CNB agreed that Invictus would prime CNB and assume a first lien position on most of the Debtors' assets.[13]

    2.      This restructuring led to the Debtors and Invictus, through its administrative agent Cantor Fitzgerald Securities ("Cantor"), entering into a credit agreement (the "Credit Agreement"), dated January 21, 2022, pursuant to which Invictus and Corbin advanced $15 million to the Debtors.[14]  Debtor DeCurtis LLC is the borrower under the Credit Agreement[15]

---

[10] The parties submitted substantial briefing and presented evidence with respect to the Standing Motion.  The Court does not address all of the facts herein but rather provides this summary of the Credit Agreement and cites to evidence solely for purposes of ruling on the Standing Motion, not the merits of the draft complaint attached to the Standing Motion.  Additional factual background regarding the parties and the Florida Litigation is included in the Court's Opinion: *Carnival Corp. v. DeCurtis Holdings LLC (In re: DeCurtis Holdings LLC)*, No. 23-10548 (JKS), 2023 WL 5153645, at *1 (Bankr. D. Del. Aug. 9, 2023).

[11] *DeCurtis LLC v. Carnival Corporation*, Case No. 1-20-cv-22945 (hereafter the "Florida Litigation").

[12] DeCurtis Ex. 38 (Carino Decl.) at ¶9.

[13] Carnival Ex. 2015 (Summary of Terms and Conditions for Out-of-Court Restructuring); DeCurtis Ex. 38 (Carino Decl.); 7/20/2023 Tr. 94:24–95:25 (Chen Delano).

[14] *See* Invictus Ex. 5; 7/20/2023 Tr. 44:15–45:3 (Carino); Invictus Ex. 4 (Chen Delano Decl.) at ¶ 12.  Although not defined in the Credit Agreement, Invictus and Corbin are the lenders who advanced $15 million.

[15] Invictus Ex. 5.

and Debtor DeCurtis Holdings LLC ("Holdings") guarantees DeCurtis LLC's obligations under the Credit Agreement.[16]

3.  Certain actions under the Credit Agreement require the consent of the "Required Lenders."[17] Invictus acquired more than 50% of the Loans ($10 million of the total $15 million) and, thus, could act unilaterally in any situation requiring the consent of the Required Lenders.[18]

4.  The stated purposes for the loan were to fund the Debtors' business operations, payment of the accelerated CNB Loans, and/or payment of Florida Litigation expenses.[19] The loan was used to take care of the Debtors' monetary obligations.[20]

5.  According to the terms of the Credit Agreement, in the event of a "material adverse determination under the Florida Litigation with respect to the Intellectual Property rights of Holdings and its Subsidiaries, prohibiting, restricting or otherwise adversely affecting the ability of the Borrower to sell or license its products and services to the cruise-line industry that could reasonably be expected to result in a negative impact on the Borrower's gross revenue," Invictus, as the Required Lender, could direct Cantor to declare a default and declare all of the Debtors' obligations under the Credit Agreement immediately due and payable.[21]

---

[16] Carnival Ex. 2126.

[17] Invictus Ex. 5. "Required Lenders" is defined as the "Lenders with outstanding Loans having an unpaid principal balance of more than 50% of the sum of the unpaid principal balance of all Loans outstanding; provided that the Loans of any Defaulting Lender shall be disregarded in determining Required Lenders at any time." Id. at § 1.1 (Required Lenders).

[18] Carnival Ex. 2207 (7/14/2023 Chen Delano Depo. Tr. 204:16–19).

[19] Carnival Ex. 2015 (Summary of Terms and Conditions for Out-of-Court Restructuring); 7/20/2023 Tr. 98:7–10 (Chen Delano); Carnival Ex. 2207 (7/14/2023 Chen Delano Depo. Tr. 225:13-227:20); Invictus Ex. 5, § 3.14(b).

[20] 7/20/2023 Tr. 45:1-46:6 (Carino).

[21] Invictus Ex. 5, § 7.1(m); 7/20/2023 Tr. 99:2–7 (Chen Delano).

6.      Pursuant to the Credit Agreement, the Debtors "had the option to either pay interest in cash or payment in kind;"[22] at the applicable interest rate of 12% for payment in cash and 14% for payment in kind ("PIK").[23]  The Debtors have always elected to pay interest as payment in kind.[24]  The Debtors have never made any interest payments in cash under the agreement[25] and the agreement did not include a schedule of payments.[26]

7.      Section 2.3 of the Credit Agreement includes a "convertible loan," which has "an equity conversion feature that allowed Invictus to convert its investment into 30 percent equity in the [Debtors'] company."[27]  Section 2.3 also conferred on Invictus a right to exercise the equity conversion feature at its sole discretion to convert all of its loans into shares of common equity at any time at an initial conversion price at $1 per share.[28]

8.      Pursuant to Section 4.1(e) of the Credit Agreement, one of the conditions precedent to closing was the receipt by Cantor of an executed Fourth Amended and Restated Limited Liability Company Agreement for Holdings.[29]

---

[22] Invictus Ex. 5, §§ 1.1 (Cash Applicable Rate and PIK Applicable Rate), 2.10(c); 7/20/2023 Tr. 47:9-14 (Carino).

[23] Invictus Ex. 5, §§ 1.1 (PIK Applicable Rate), 2.10(c); 7/20/2023 Tr. 47:19-21 (Carino).

[24] 7/20/2023 Tr. 47:25-48:2, 48:12-14 (Carino).

[25] 7/20/2023 Tr. 48:3-5 (Carino).

[26] 7/20/2023 Tr. 48:15-20 (Carino).

[27] 7/20/2023 Tr. 86:20-87:7, 99:13- 22 (Chen Delano).

[28] Carnival Ex. 2007; 7/20/2023 Tr. 46:20-23 (Carino); 7/20/2023 Tr. 98:14-20 (Chen Delano). The funding Invictus provided to the Debtors "is the only convertible loan in [Invictus'] current portfolio" and the only investment Invictus has provided among its 30 or more "discrete investment opportunities" that involve an equity conversion feature.  7/20/2023 Tr. 78:8-19, 87:3-4, 87:13-14 (Chen Delano).

[29] Carnival Ex. 2126; Carnival. Ex. 2207 (7/14/2023 Chen Delano Depo. Tr. 279:19–280:2).

9.    Under Section 7.1(m) of the Credit Agreement, an event of default included a "material adverse determination under the [Florida] Litigation."[30]

10.    Section 8.02(b)(iii) of Holdings' Fourth Amended and Restated LLC Agreement (the "Holdings A&R LLCA") authorized Invictus to appoint a representative to Holdings' Board of Managers (the "Board").[31]

### b.  The Sale Motion

11.    On May 3, 2023, Debtors filed a motion to sell substantially all of their assets free and clear of all encumbrances pursuant to section 363 of the Bankruptcy Code ("Sale Motion").[32]

12.    The Debtors filed an executed Asset Purchase Agreement between the Debtors and Invictus' affiliate, Invictus Special Situations Master I, L.P. (or its designees or assignees)[33] as the stalking horse bidder (the "Stalking Horse Bid").[34]  The Stalking Horse Bid provides for a credit bid pursuant to section 363(k) of the Bankruptcy Code in the "aggregate amount equal to one hundred percent (100%) of the Purchaser Secured Claims. . . ."[35]

13.    In addition, prior to trial, the Debtors announced certain bid enhancements (collectively, the "Invictus Bid Enhancements") by Invictus, subject to documentation and the closing of the sale to Invictus Special Situations Master I, L.P. as successful bidder, including: providing (i) $250,000 in cash to facilitate an orderly wind-down of the chapter 11 estates;

---

[30] Invictus Ex. 5, § 7.1(m); 7/20/2023 Tr. 99:23-100:7 (Chen Delano).

[31] Carnival Ex. 2126; Invictus Ex. 4 (Chen Delano Decl.) at ¶ 14; 7/20/2023 Tr. 103:1–5 (Chen Delano); Carnival Ex. 2207 (7/14/2023 Chen Delano Depo. Tr. 257:8–17).

[32] D.I. 73.

[33] D.I. 88.

[34] D.I. 73, ¶¶ 7 and 88.

[35] D.I. 88 at § 4.1.

(ii) 10% percent of the common equity of the purchaser to be distributed pro rata to creditors

holding allowed unsecured claims; and (iii) 25% of the net cash proceeds of certain specified

estate causes of action to be distributed pro rata to creditors holding unsecured claims.[36]

### ii.    *Legal Standard*

14.    In *Cybergenics*, the Third Circuit recognized that the Bankruptcy Court, as a court

of equity, has the power to authorize a creditor's committee to sue derivatively to recover

property for the benefit of the estate.[37]  Courts have held that although the *Cybergenics* decision

discussed creditor's committees specifically, it applies to granting a single creditor standing.[38]

15.    Derivative standing requires the moving party to demonstrate that: (a) the debtor

in possession has unjustifiably refused to pursue the claim or refused to consent to the moving

party's pursuit of the claim on behalf of the debtor in possession; (b) the moving party has

alleged a colorable claim or cause of action; and (c) the moving party has received leave to sue

from the bankruptcy court.[39]

16.    "In deciding whether there is a colorable claim, the court should undertake the

same analysis as when a defendant moves to dismiss a complaint for failure to state a claim."[40]

The motion to dismiss standard is well known: "[to] survive a motion to dismiss, a complaint

---

[36] 7/17/2023 Tr. 4:13-21; 7/20/2023 Tr. 38:20-30:3 (Atkinson).  To date, no definitive documentation has been filed reflecting the Invictus Bid Enhancements.

[37] *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548 (3d Cir. 2003).

[38] *Infinity Investors Ltd. v. Kingsborough (In re Yes! Entm't Corp.)*, 316 B.R. 141, 145 (D. Del. 2004); *Hyundai Translead, Inc. v. Jackson Truck & Trailer Repair, Inc. (In re Trailer Source, Inc.)*, 555 F.3d 231, 243 (6th Cir. 2009).

[39] *In re Cybergenic Corp.*, 330 F.3d 548.

[40] *In re Centaur, LLC,* No. 10-10799 (KJC), 2010 WL 4624910, at *4 (Bankr. D. Del. Nov. 5, 2010) (citations omitted).

must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[41] "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." [42]

17.    The Third Circuit has expressed that granting derivative standing is uncommon and "is the exception rather than the rule." [43]

18.    The burden is on Carnival to demonstrate that it has satisfied the prerequisites for derivative standing to pursue claims on behalf of the estate.[44]

### iii.    Analysis

19.    The Debtors have released all claims against Invictus under the *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral on a Limited Basis, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief,*[45] and oppose the Standing Motion,[46] thus the first prong is satisfied.

---

[41] *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).

[42] *In re Optim Energy, LLC*, No. 14-10262 (BLS), 2014 WL 1924908, at *6 (Bankr. D. Del. May 13, 2014), *aff'd,* 527 B.R. 169 (D. Del. 2015) (quoting *Iqbal,* 556 U.S. at 678, 129 S. Ct. 1937).

[43] *Merritt v. Cheshire Land Preservation Trust (In re Merritt)*, 711 F. App'x 83, 86 (3d Cir. 2017); *Airocare, Inc. v. Chambers (In re Airocare, Inc.),* No. 10-14519-RGM, 2011 WL 2133526, at *1 (Bankr. E.D. Va. May 24, 2011) ("The Bankruptcy Code does not expressly permit such parties to initiate adversary proceedings. Derivative standing is thus an implicit exception to the 'general rule' whereby the Bankruptcy Code assigns to the trustee or debtor-in-possession 'the privilege of prosecuting' various actions on behalf of the estate.") (internal citations omitted).

[44] *G-I Holdings, Inc. v. Those Parties Listed On Exhibit A (In re G-I Holdings, Inc.)*, 313 B.R. 612, 628 (Bankr. D. N.J. 2004).

[45] D.I. 285 (the "Final DIP Order") at ¶ H.

[46] D.I. 337.

20.     With respect to the second prong, whether Carnival has alleged a colorable claim

or cause of action for (i) recharacterization, (ii) equitable subordination, or (iii) breach of

fiduciary duty, the Court finds as follows:

### a.     Adversary Complaint

#### 1.  Recharacterization

21.     Count One of the complaint seeks recharacterization of the Convertible Notes as

equity, and corresponding declaratory relief (Count Two), deeming the Invictus Parties' and the

Corbin Parties' asserted secured claims are disallowed in their entirety, that the asserted security

interests and liens are void, and that such security interests and liens are preserved for the benefit

of the Debtors' estates pursuant to 11 U.S.C. §§ 506(d) and 551.[47]

22.     To show a colorable claim for recharacterization, plaintiff must allege facts

showing that defendant's claims are not secured debt obligations but instead an "equity

interest."[48] "Recharacterization of debt as equity is a recognized but challenging cause of

action."[49] "The Third Circuit has held that the overarching inquiry with respect to

recharacterizing debt as equity is whether the parties to the transaction in question intended the

loan to be a disguised equity contribution."[50] While "[n]o mechanistic scorecard suffices," the

parties' intent "may be inferred from what the parties say in their contracts, from what they do

---

[47] D.I. 318 at Ex. B (Compl.) at ¶¶ 105-134.

[48] *Elswick Co., LLC v. Comm2013 CCRE12 Crossing Mall Rd. LLC (In re Tara Retail Grp., LLC)*, 595 B.R. 215, 222 (N.D. W.Va. Bankr. Ct. 2018).

[49] *In re Optim Energy, LLC*, No. 14-10262 (BLS), 2014 WL 1924908 at *7 (footnote omitted).

[50] *Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders North Am., Inc.)*, 405 B.R. 527, 554 (Bankr. D. Del. 2009) (citing *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron)*, 432 F.3d 448, 455–56 (3d Cir. 2006)).

through their actions, and from the economic reality of the surrounding circumstance."[51]  "No
one factor is dispositive of either the intent of the parties or whether a loan should be
recharacterized as equity.  And a court can find recharacterization to be appropriate even if less
than all of the factors weigh in favor of a capital contribution."[52]  Furthermore "in characterizing
an instrument as debt or equity, a court must focus its inquiry to a point at the very beginning of
the parties' relationship."[53]

    23.    To distinguish between debt and equity, courts often consider the following eleven
factors set forth by the Sixth Circuit in *In re Autostyle Plastics, Inc.*: (1) the names given to the
instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity
date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest
payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the
identity of interest between the creditor and the stockholder; (7) the security, if any, for the
advances; (8) the corporation's ability to obtain financing from outside lending institutions;
(9) the extent to which the advances were subordinated to the claims of outside creditors;
(10) the extent to which the advances were used to acquire capital assets; and (11) the presence
or absence of a sinking fund to provide repayments.[54]  The Court considers each factor in turn.

---

[51] *SubMicron,* 432 F.3d at 456; *In re Optim Energy, LLC*, No. 14–10262 (BLS), 2014 WL 1924908, at *7.

[52] *Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*, 544 B.R. 75, 94 (Bankr. S.D.N.Y. 2016) (footnotes and citations omitted).

[53] *United States v. State St. Bank & Tr. Co.*, 520 B.R. 29, 74 (Bankr. D. Del. 2014) (citations omitted).

[54] *Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726, 750 (6th Cir. 2001); *see also Off. Comm. of Unsecured Creditors v. Comvest Group Holdings, LLC (In re HH Liquidation, LLC)*, 590 B.R. 211 (Bankr. D. Del. 2018).

### 1) *Names Given to the Instruments, if any, Evidencing the Indebtedness*

24.    "The absence of notes or other instruments of indebtedness is a strong indication

that the advances were capital contributions and not loans."[55]  The name of the instrument,

"Credit Agreement" evidences a loan.[56]  This factor weighs against recharacterization.

### 2) *Presence or Absence of a Fixed Maturity Date and a Schedule of Payments*

25.    "The lack of a fixed maturity date or a fixed obligation to repay suggests the

advances were not loans but equity contributions."[57]  The Credit Agreement has a maturity date

of January 21, 2026.[58]  Every fiscal year, 50% of Excess Cash Flow is required to be paid to the

lenders in satisfaction of the loans.[59]  However, there is not a schedule of payments.  On balance,

this factor weighs against recharacterization.

### 3) *Presence of Absence of a Fixed Rate of Interest and Interest Payments*

26.    The absence of a fixed rate of interest and interest payments "is a strong

indication the investment was a capital contribution, rather than a loan."[60]  The Credit Agreement

specifies that interest was required to be paid in cash (at a rate of 12%) or PIK (at a rate of

14%),[61] at the option of the Debtors.  The "Interest Payment Date" is "the last Business Day of

each calendar quarter to occur while any such Loan is outstanding; and (b) the day on which any

---

[55] *In re AutoStyle Plastics, Inc.*, 269 F.3d at 750 (*citing Roth Steel Tube Co. v. Comm'r*, 800 F.2d 625, 631 (6th Cir. 1986)) (further citation omitted).

[56] Invictus Ex. 5 at p. 1.

[57] *Miller v. ANConnect, LLC (In re Our Alchemy, LLC)*, No. 16-11596 (KG), 2019 WL 4447535, at *7 (Bankr. D. Del. Sept. 16, 2019) (citations omitted).

[58] Invictus Ex. 5, §1.1 (Maturity Date).

[59] Invictus Ex. 5, § 2.7(e).

[60] *Friedman's Liquidating Tr. v. Goldman Sachs Credit Partners, L.P. (In re Friedman's Inc.)*, 452 B.R. 512, 521 (Bankr. D. Del. 2011) (footnote and citations omitted).

[61] Invictus Ex. 5, § 2.10; 7/20/2023 Tr. at 47:7-24 (Carino).

such Loan becomes due and payable in full or is paid or prepaid in full."[62]  Debtors elected the

PIK interest and have not made any interest payments under the Credit Agreement.[63]  "Deferral

of interest payments does not by itself mean that the parties converted a debt transaction to

equity since the defendants still expected to be repaid."[64]  This factor weighs against

recharacterization.

### 4)  *Source of Repayment*

27.     "If the expectation of repayment depends solely on the success of the borrower's

business, the transaction has the appearance of a capital contribution."[65]  Courts look to the

"underlying economic reality and the general tie between the loan's repayment and the success of

the business;" so that a second source of repayment, such as a security interest, would mitigate

against finding that the repayment depended on the success of the business.[66]

28.     Debtors have never made any principal payments under the Credit Agreement.[67]

However, the Debtors' financial projections that were prepared when the loan was executed

showed $22.8 million in remaining cash in the fourth quarter of 2025 and that junior secured and

---

[62] Invictus Ex. 5, §1.1 ("Interest Payment Date").

[63] 7/20/2023 Tr. 47:25-48:14 (Carino).

[64] *AutoStyle*, 269 F.3d at 751; *Off. Unsecured Creditors Comm. of Broadstripe, LLC v. Highland Cap. Mgmt, L.P. (In re Broadstripe, LLC)*, 444 B.R., 51, 96 (Bankr. D. Del. 2010) ("presence of PIK interest is not decisive" of the recharacterization analysis "especially in a distressed investment context."). *See also State Street Bank*, 520 B.R. at 79 ("The Junior PIK Notes reflect all indicia of indebtedness, including the issuance of notes with payment at a fixed interest rate (although payment of interest was deferred). . . .").

[65] *In re Friedman's Inc.*, 452 B.R. at 521 (citations and footnote omitted).

[66] *Autobacs Strauss, Inc. v. Autobacs Seven Co. (In re Autobacs Strauss, Inc.)*, 473 B.R. 525, 575 (Bankr. D. Del. 2012).

[67] 7/20/2023 Tr. 48:23-25 (Carino).

unsecured debt would be paid on a current basis, evidencing a likelihood of repayment from the

Debtors' operations.[68]  This factor weighs against recharacterization.

### 5)  *The Adequacy or Inadequacy of Capitalization*

29.    "Thin or inadequate capitalization is strong evidence that the advances are capital

contributions rather than loans."[69]  "Capitalization is assessed both at the times of initial

capitalization and subsequent transactions."[70]  "Courts should not put too much emphasis on this

factor, in any event, because all companies in bankruptcy are in some sense undercapitalized."[71]

30.    "Cash was an issue from early on" for the Debtors, and the Debtors continued to

have liquidity problems throughout 2020 and 2021.[72]  "DeCurtis was experiencing distress" in

September 2021 and "facing severe liquidity constraints."[73]  In September of 2021, CNB sent

Debtors a notice of default under the CNB facility and MSLP loan.[74]  Invictus was aware that

DeCurtis was in default on loans totaling $20 million from CNB and that CNB was threatening

to foreclose.[75]  Invictus knew that the Debtors were insolvent or nearly insolvent when they

reached out to Invictus.[76]  When DeCurtis was introduced to Invictus in September 2021, one of

---

[68] DeCurtis Exs. 43 (Q421 Board Meeting dec), 44 (DeCurtis financial projections); 7/20/2023 Tr. 68:10–15 (Carino).

[69] *In re Autobacs Strauss, Inc.*, 473 B.R. at 576 (citations, footnotes and internal quotations marks omitted).

[70] *Id.* (citations, footnotes and internal quotations marks omitted).

[71] *Off. Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S & B Holdings LLC)*, 420 B.R. 112, 159 (Bankr. S.D.N.Y. 2009), *aff'd as modified*, 807 F.Supp.2d 199 (S.D.N.Y. 2011) (*citing In re Lifschultz Fast Freight*, 132 F.3d 339, 345 (7th Cir. 1997)); *see also In re Phase I Molecular Toxicology, Inc.*, 287 B.R. 571, 578 (Bankr. D.N.M. 2002) (finding that "[w]hether the Debtor was undercapitalized at the time of the transaction, though relevant, is not determinative.").

[72] 7/20/2023 Tr. 41:6-13 (Carino).

[73] 7/20/2023 Tr. 88:22-89:2 (Chen Delano).

[74] 7/20/2023 Tr. 41:14-17 (Carino).

[75] Carnival Ex 2207 (7/14/2023 Chen Delano Depo. Tr. 164:1-165:25, 175:24-177:2).

[76] 7/20/2023 Tr. 80:8-11 (Chen Delano).

the reasons DeCurtis was planning to file for bankruptcy was to get relief from the financial

burdens of the Florida Litigation "by facilitating an expedited litigation and/or funding a

litigation trust."[77]  However, the Debtors' projections showed a continued cash burn as a result of

the Florida Litigation overhang.[78]  This factor weights in favor of recharacterization.

### 6)  *Identity of Interest Between Creditor and Stockholder*

31.      Under this factor, the Court examines the identity of interest between the

proposed defendants and the Debtors' shareholders. "If stockholders make advances in

proportion to their respective stock ownership, an equity contribution is indicated.  On the other

hand, a sharply disproportionate ratio between a stockholder's percentage interest in stock and

debt is indicative of bona fide debt."[79]  Invictus did not hold equity in the Debtors;[80] however,

Invictus had a unilateral conversion option to acquire up to 30% of the outstanding equity in

Holdings.[81]

32.      While, at first blush, this equity conversion option signals an identity of interest,

section 101(16)(C) of the Bankruptcy Code states that a "right to convert" is not an "equity

security."[82]  Even though Invictus had the right to convert at its sole discretion, because Invictus

---

[77] 7/20/2023 Tr. 90:9-20 (Chen Delano); Carnival Ex. 2207 (7/14/2023 Chen Delano Depo. Tr. 146-23-151:14).

[78] 7/20/2023 Tr. 88:22-89:8 (Chen Delano) (Ms. Chen Delano "understood . . . that the overhang of the Carnival litigation at the time had impact on its ability to win new businesses." *Id.* at 89:14-16. *See also* 7/20/2023 Tr. 64:7-11 (Carino) (a negative result in the Florida Litigation could trigger a default under the Credit Agreement).

[79] *In re Autobacs Strauss, Inc.*, 473 B.R. at 577–78 (referring to *In re AutoStyle Plastics, Inc.*, 269 F.3d at 751) (citations, footnote, and quotation marks omitted).

[80] DeCurtis Ex. 38 (Carino Decl.).

[81] D.I. 318, Ex. B (Compl.) at ¶ 4; 7/20/2023 Tr. 64:7-11, 65:9-13, 70:13-71:9; 132:1-9 (Carino).

[82] 11 U.S.C. §101(16). *See In re Am. W. Airlines, Inc.*, 179 B.R. 893, 897 (Bankr. D. Ariz. 1995) (*citing* Rep. No. 989, 95th Cong.2d Sess. (1978), 1978 U.S. Code Cong. & Admin. News 5787; Collier on Bankruptcy 101.16 (15th ed. 1993) ("The legislative history reveals that only a right to convert is not included in the definition of 'equity security.'").

did not exercised that right, there is no identity of interest between the Debtors and Invictus.[83]
Additionally, Invictus did not have any voting rights in the Debtors.  This factor weighs against
recharacterization.

### 7)  *Security, if any, for the Advances*

33.     "The absence of a security for an advance is a strong indication that the advances
were capital contributions rather than loans."  The Credit Agreement is secured by a first lien on
substantially all of Debtors' assets and UCC-1 financing statements were filed.[84]  The Credit
Agreement is secured by substantially all assets of the Debtors pursuant to the Guarantee and
Security Agreement, dated as of January 21, 2022, and the Patent Security Agreement, dated as
of January 22, 2022.[85]  This factor weighs against recharacterization.

### 8)  *Ability to Obtain Outside Financing from Outside Lending Institutions*

34.     "When there is no evidence of other outside financing, the fact that no reasonable
creditor would have acted in the same manner is strong evidence that the advances were capital
contributions rather than loans."[86]  Mr. Carino and Ms. Chen Delano testified the Debtors
attempted to find financing from other sources but were unable to secure funding from sources
other than Invictus.[87]  This factor weights in favor of recharacterization.

---

[83]  *Beaufort Capital Partners, LLC v. Oxysure Sys.*, Case No. 16-CV-5176, 2017 WL 913791, *3 (S.D.N.Y 2017)
("The conversion feature allowed [the lender] to redeem the Notes for equity at a discounted price after the maturity
date. . . . though the initial transaction took the form of a loan, upon conversion to equity, the loans likely have the
character of an equity investment.").

[84]  DeCurtis Exs. 41 (Guarantee and Security Agreement), 42 (UCC-1).

[85]  DeCurtis Ex. 41 (Guarantee and Security Agreement) at § 1.01 (defining "Collateral"); DeCurtis Ex. 41 (Patent
Security Agreement) at § 2.

[86]  *In re Autobacs Strauss, Inc.*, 473 B.R. at 579 (citations and quotations marks omitted).

[87]  7/20/2023 Tr. 43:13-44:22 (Carino), 80:12-15 (Chen Delano).

15

### 9) *Extent to Which Advances Were Subordinated to the Claims of Outside Creditors*

35.    "Subordination of advances to claims of all other creditors indicates that the advances were capital contributions, not loans." [88]  Despite Invictus' validly perfected first-lien security interests in the Debtors' assets,[89] the loan is subordinated under the Intercreditor Agreement as to specific sources of collateral, including the proceeds of any Florida Litigation settlement or favorable judgment, to CNB.[90]  This factor weighs in favor of recharacterization.

### 10) *Extent to Which Advances Were Used to Acquire Capital Assets*

36.    "Use of advances to meet the daily operating needs of the corporation, rather than to purchase capital assets, is indicative of bona fide indebtedness." [91]  The Credit Agreement states that "[t]he proceeds of the Loans shall be used by the Borrower (i) to finance the Initial CNB Payment, (ii) for general corporate purposes, including among other things, funding working capital and/or payment of litigation expenses and (iii) for the payment of Transaction Costs."[92]  Ms. Chen Delano's testified that one of the purposes of the credit facility was to fund working capital and/or payment of Florida Litigation expenses.[93]  This factor weighs against recharacterization.

---

[88] *In re Friedman's Inc.*, 452 B.R. at 523 (quotation marks omitted, *quoting In re AutoStyle Plastics, Inc.*, 269 F.3d at 752).

[89] *But see In re BH S & B Holdings LLC*, 420 B.R. at 160 ("The Finco Loan was junior to the Abelco Loan, but was senior to the claims of other creditors. This weighs in favor of a finding of indebtedness.").

[90] Carnival Ex. 2126 (Intercompany Agreement).

[91] *In re Friedman's Inc.*, 452 B.R. at 523 (quotation marks omitted; *quoting In re AutoStyle Plastics, Inc.*, 269 F.3d at 752).

[92] Invictus Ex. 5, § 3.14.

[93] 7/20/2023 Tr. 88:5-90:20 (Chen Delano). Ms. Chen Delano testified that in developing a proposal for an out-of-court restructuring of the Debtors, Invictus negotiated with CNB to pay down $7 million of CNB's existing debt, in return for which CNB agreed that Invictus' would prime CNB and assume a first lien position on most of the Debtors' assets. 7/20/2023 Tr. 92:15-24 (Chen Delano).

*11) Presence or Absence of a Sinking Fund to Provide Repayments*

37.     "The failure to establish a sinking fund for repayment is evidence that the
advances were capital contributions[.]"[94] Because the Credit Agreement is secured by
substantially all of the Debtors' assets, the need for a sinking fund is obviated.[95] This factor
weighs against recharacterization.

*12) Other Considerations*

38.     In addition to the *Autostyle* factors, Delaware courts have also considered the
presence or absence of voting rights and a party's participation in management, among others, as
additional factors to weigh when analyzing recharacterization.

39.     Voting Rights.  Invictus did not have voting rights because it did not hold equity
in DeCurtis. The Debtors' equity was held by Shamrock Capital, DeCurtis Investments, LLC,
and DeCurtis employees.[96] Under Section 2.3 of the Credit Agreement, Invictus' voting rights
would only be effective in the event Invictus elected to convert its debt into equity, but Invictus
never exercised the equity conversion option.[97] This factor weighs against recharacterization.

40.     Participation in Management.  The Credit Agreement provided the right for
Invictus to appoint a representative to the DeCurtis Board.[98] After the Debtors failed to place an

---

[94] *In re Our Alchemy, LLC*, No. 16-11596 (KG), 2019 WL 4447535 at *9 (*quoting In re AutoStyle Plastics, Inc.*, 269 F.3d at 753 ("The bankruptcy court noted the absence of a sinking fund and concluded that this factor weighed toward equity.") (further citations omitted)).

[95] Courts have recognized that, where a loan is "secured with liens," the "need for any sinking fund" is "obviated" and this factor will not weigh in favor of recharacterization. *In re AutoStyle Plastics, Inc.*, 269 F.3d at 753.

[96] DeCurtis Ex. 1 (Voluntary Petition for Non-Individuals Filing for Bankruptcy; List of Equity Security Holders); DeCurtis Ex. 38 (Carino Decl.) at ¶ 21.

[97] Invictus Ex. 5, §2.3.

[98] 7/20/2023 Tr. 61:1-17 (Carino).

independent director on the Board, Ms. Chen Delano agreed to serve on the Board.[99]  Ms. Chen

Delano was one member of the Debtors' six-member Board, her service on the Board post-dates

the execution of the Credit Agreement and the operative inquiry is what the parties intended "at

the time of transaction."[100]  Ms. Chen Delano testified that she did not exercise day-to-day

control over the Debtors' business.[101]  Similarly, Mr. Carino testified the Board authorized Ms.

Chen Delano "to negotiate and enter into a settlement agreement with Carnival."[102]  The Board

was controlled by a supermajority of directors unaffiliated with Invictus.[103]  Mr. Carino

explained that the Board, with the input of counsel, in the exercise of its business judgment set

forth negotiation guidelines to govern Ms. Chen Delano's settlement discussions with Carnival,

which she only undertook at the Board's direction.[104]  This factor weighs against

recharacterization.

---

[99]  DeCurtis Ex. 38 (Carino Decl.) at ¶¶ 19-21.

[100]  *In re SubMicron Sys. Corp.*, 432 F.3d at 457.

[101]  DeCurtis Ex. 38 (Carino Decl.) at ¶ 22; 7/20/2023 Tr. at 86:12–14 (Chen Delano) ("Invictus took a board seat. We had a board designee as part of the senior secured loan. Having a board designee is not unusual."); 7/20/2023 Tr. at 110:7–11; 07/18/2023 Tr. 37:15–38:9. (Chen Delano) ("I was not involved in anything day to day related to the company or its operations, yes.").

[102]  7/20/2023 Tr. 61:18-62:4 (Carino); The Debtors' "board authorized Cindy to act on its behalf to try to settle" the Florida Litigation. 7/20/2023 Tr. 63:23 (Carino).

[103]  DeCurtis Ex. 38 (Carino Decl.) at ¶¶ 19-24.

[104]  DeCurtis Ex. 38 (Carino Decl.) at ¶¶ 19-24.

41.    <u>Intent of the Parties.</u>  The Debtors only ever viewed their transaction with Invictus as a commercial loan and debt.[105]  Likewise, Invictus also viewed the $15 million lent to DeCurtis as a loan.[106]  This factor weighs against recharacterization.

42.    <u>Financial Statements and Accounting Records.</u>  With respect to "how the parties accounted for the advance on their financial statements and accounting records,"[107] contrary to arguments regarding mislabeling, certain documents referred to equity:

- After the Credit Agreement was executed, Invictus prepared a report titled "DeCurtis Corp. Investment Memo, January 24th, 2022" (the "<u>Investment Memo</u>") for Corbin to explain Invictus' evaluation of the DeCurtis "investment opportunity" so that Corbin's investment committee could review and formally approve Corbin's co-investment.[108]  The Investment Memo refers to, among other things, the "Investment Idea," "Investment Thesis," "Competing investment Merits," "DeCurtis Investments," and "Invested Capital."

- In a January 18, 2022 email from Invictus to the Debtors, titled "DeCurtis board approved budget," Invictus attached a cash projection pro forma and the attachment reflects: "[T]here's an entry for equity and it shows $6 million in January of 2022" from Invictus.[109]  The document also reflects that Invictus "[a]ssumes fifteen-million-dollar investment made [to] stabiliz[e DeCurtis'] base and funding" and "a portion of that would fund liquidity to the company."[110]

- A January 21, 2022 email from Invictus to the Debtors, attached a document with the Debtors' cash projection.[111]  In that attachment, under the heading

---

[105] "At all relevant times, the proposed transaction with Invictus was intended to be, and was, a commercial loan and debt transaction that paid off an existing security facility.  At no time did the Debtors view the Invictus transaction as an equity infusion."  DeCurtis Ex. 38 at ¶ 13; *see also* 7/20/2023 Tr. 46:15–18 (Carino).

[106] *See* Invictus Ex. 4 (Chen Delano Decl.) at ¶ 11 ("It was always Invictus' intent for its funding to be in the form of a loan, and it is my understanding that DeCurtis shared that intention.").

[107] *In re HH Liquidation, LLC*, 590 B.R. at 296.

[108] Carnival Ex. 2069 (Invictus DeCurtis Corp. Investment Memo, dated Jan. 24, 2022); Carnival Ex. 2207 (7/14/2023 Chen Delano Depo. Tr. 286:4–287:14); 7/20/2023 Tr. 111:12–22 (Chen Delano).

[109] 7/20/2023 Tr. 51:20-52:22 (Carino); Carnival Ex. 1999 (FY 22 Cash Projections, dated Jan. 14, 2022).

[110] 7/20/2023 Tr. 52:10-19 (Carino); Carnival Ex. 1999 (FY 22 Cash Projections, dated Jan. 14, 2022).

[111] 7/20/23 Tr. 54:4-7 (Carino); DeCurtis Ex. 38 (Carino Decl.) at Ex. 6 (sealed).

"Sources of Cash," there's an entry for equity.  And, again, in January 2022, there's a $6 million "equity" amount under the Credit Agreement.[112]

- Other documents exchanged between the Debtors and Invictus also reflect that the Debtors recorded the loan as "equity," not as "debt."[113]

This factor weighs in favor of recharacterization.

### 13) Conclusion

43.    After considering the arguments made and evidence presented at trial, and weighing the factors above and considering the intent of the parties, the Court finds that four factors weigh in favor or recharacterization: (i) inadequacy of the Debtors' capitalization (factor 5), (ii) ability to obtain outside financing (factor 8), (iii) subordination to CNB (factor 9), and (iv) the Debtors' financial statements and accounting records (other considerations-financial statements and accounting records).[114]  The Court, however, affords these four factors limited weight because, as to factors 5 and 8, the Credit Agreement was entered into in a distressed lending context; as to factor 9, Invictus was senior to all creditors except CNB; and, with respect to financial records labeled as equity, there are also documents labeled as debt.[115]  There is ample evidence, as shown by the remaining factors, to show that the parties intended the Credit Agreement to be debt and not equity.  As a result, Carnival has not alleged a plausible claim for recharacterization.

44.    The Standing Motion is denied as to recharacterization.

---

[112] 7/20/23 Tr. 54:8-15 (Carino).

[113] 7/20/2023 Tr. 59:10-19 (Carino); DeCurtis Ex. 38 (Carino Decl.) at Ex. 6 (sealed).

[114] *In re Our Alchemy, LLC*, No. 16-11596 (KG), 2019 WL 4447535 at *10 (finding only four factors weighed in favor of recharacterization and thus finding that the plaintiff has failed to plead a claim to recharacterize).

[115] *See* Carnival Ex. 2015 (reference to "Loan Documents," "loans under the Invictus Facility"), Invictus Ex. 5 ("Lenders," "Acquired Debt," "Loan," "Loan Documents," "Loan Parties").

### 2. *Equitable Subordination*

45.     Count three seeks equitable subordination of Invictus' claims pursuant to 11 U.S.C. § 510(c).[116]

46.     Section 510(c)(1) of the Bankruptcy Code provides that a court may "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest."[117] Courts in this district have held that equitable subordination is a "'drastic' and 'unusual' remedy."[118] The Third Circuit Court of Appeals has stated: "Before ordering equitable subordination, most courts require a showing involving three elements: (1) the claimant must have engaged in some type of inequitable conduct, (2) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant, and (3) equitable subordination of the claim must not be inconsistent with the provisions of the bankruptcy code."[119]

47.     "Courts differentiate between insiders and outsiders when analyzing whether a claimant's conduct was inequitable. An insider's conduct is rigorously scrutinized, and the plaintiff bears the burden of presenting material evidence of unfair conduct that the insider claimant then must rebut by proving the fairness of his transactions with the debtor."[120]

---

[116] D.I. 319, Ex. B (Compl.) at ¶¶ 135-145.

[117] 11 U.S.C. 510(c)(1).

[118] *Off. Comm. of Unsecured Creditors v. Tennenbaum Cap. Partners, LLC (In re Radnor Holdings Corp.)*, 353 B.R. 820, 840 (Bankr. D. Del. 2006) (quoting *In re SubMicron*, 291 B.R. at 327-29).

[119] *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 986-87 (3d Cir. 1998) (citing *U.S. v. Noland*, 517 U.S. 535, 116 S. Ct. 1524, 134 L. Ed. 2d 748 (1996)).

[120] *In re Broadstripe, LLC*, 444 B.R. at 79.

48.    For the purposes of a claim for equitable subordination, a party is an insider if it "(i) meets the statutory definition of insider,[121] or (ii) is in a close relationship with the debtor to such an extent as to suggest transactions were not conducted at arm's length."[122]

49.    In determining inequitable conduct, courts in this district recognize three general categories of behavior: "1) fraud, illegality, or breach of fiduciary duties; 2) undercapitalization; and 3) claimant's use of the debtors as a mere instrumentality or alter ego."[123]

50.    First, Carnival alleges that Invictus is an insider of the Debtors as a result of the appointment of Invictus' co-founder, Ms. Chen Delano, as one member of DeCurtis' six-member Board and her alleged "control" of the Florida Litigation strategy and access "to review, analyze, and effect DeCurtis' strategies, operations, and inner workings, including insider financial information, litigation strategy and assessments."[124]  Carnival asserts Invictus, through Ms. Chen Delano, engaged in inequitable conduct and acted in its own self-interest and against the Debtors, their creditors, and their shareholders.[125]

---

[121]  The statutory definition of an insider under the Bankruptcy Code includes an "affiliate, or insider of an affiliate as if such affiliate were the debtor." 11 U.S.C. § 101(31)(E).  An affiliate includes a "corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor." 11 U.S.C. § 101(2)(B).

[122]  *In re Autobacs Strauss, Inc.*, 473 B.R. at 582-83.

[123]  *Bank of N.Y. v. Epic Resorts-Palm Springs Marquis Villas, LLC (In re Epic Capital Corp.)*, 290 B.R. 514, 524 (Bankr. D. Del. 2003); *see also Burtch v. Owlstone, Inc. (In re Advance Nanotech, Inc.)*, Adv. Pro. No. 13-51215 (MFW), 2014 WL 1320145, at *8 (Bankr. D. Del. 2014).

[124]  D.I. 318, Ex. B (Compl.) at ¶ 139.

[125]  D.I. 318, Ex. B (Compl.) at ¶141.

51.    Under the Credit Agreement, Invictus had the right to appoint a representative to the DeCurtis Board.[126] This allegation is insufficient to support a finding of insider status.[127] The evidence indicates that Invictus did not have day-to-day control over the Debtors.[128] Mr. Carino testified that as one of the six members of the Board, the Board authorized Ms. Chen Delano "to negotiate and enter into a settlement agreement with Carnival."[129] He said that at all times, the Board was controlled by a supermajority of directors unaffiliated with Invictus. The Board, with input from counsel and in the exercise of its business judgment, set forth negotiation guidelines to govern Ms. Chen Delano's settlement discussions, which she only undertook at the Board's direction.[130]

52.    The evidence further indicates that Invictus did not exercise any operational control over the Debtors. Rather, Ms. Chen Delano testified "I was not involved in anything day to day related to the company or its operations."[131] When appropriate, and based on the Board's reasonable business judgment, Ms. Chen Delano was authorized to seek a value-maximizing

---

[126] 7/20/2023 Tr. 61:1-17 (Carino). According to Mr. Carino, Invictus initially proposed an independent director to serve as its Board designee, but DeCurtis was unsuccessful securing an independent director because it did not have funds available to pay the costs associated with hiring an independent director. Ms. Chen Delano agreed to serve at the Board's request and at no cost to the company, effective April 21, 2022. This is consistent with Ms. Chen Delano uncontroverted testimony that the company was unable to provide compensation for a third party designee so she volunteered as the Invictus designee. 7/20/2023 Tr. 104:19-105:4 (Chen Delano).

[127] *See In re Radnor Holdings Corp.*, 353 B.R. at 841 (Bankr. D. Del. 2006) (lender's appointment of one of four members of debtors' prepetition board of directors did not make the lender an 'insider' for equitable subordination purposes because the plaintiff "failed to prove [the lender] exercised 'day-to-day control' over Radnor's business affairs and dictated Radnor's business.") (citing *Shubert v. Lucent Techs. Inc. (In re Winstar Communs., Inc.),* 348 B.R. 234, 279 (Bankr. D. Del. 2005) ("there must be day-today control, rather than some monitoring or exertion of influence regarding financial transactions in which the creditor has a direct stake,").

[128] *See, e.g.*, DeCurtis Ex. 38 (Carino Decl.) at ¶ 24; 07/18/2023 Tr. 38:6-8.

[129] 7/20/2023 Tr. 61:18-62:4 (Carino). The "board authorized Cindy to act on its behalf to try to settle" the Florida Litigation. 7/20/2023 Tr. 63:23-24 (Carino).

[130] DeCurtis Ex. 38 (Carino Decl.) at ¶¶ 19-24.

[131] 7/20/23 Tr. 110:10-11 (Chen Delano).

consensual resolution to the Florida Litigation.[132]  Additionally, Invictus never held any equity or

voting interests in DeCurtis.[133]  These facts weigh against Invictus being an insider of DeCurtis.

53.     Second, Carnival has not presented sufficient evidence to show injury to creditors

as a result of Invictus' conduct.  The evidence shows that Invictus' funding and support benefited

DeCurtis and its creditors.  Invictus provided benefits to DeCurtis through, among other things,

(i) the $15 million senior secured credit facility; (ii) the $2.78 million emergency bridge loan;

(iii) a debtor-in-possession financing facility; and (iv) a stalking horse bid by an Invictus affiliate

(by, among other things, agreeing to extend the sale process, reducing the amount of its

minimum overbid, and agreeing to enhance its bid to provide an opportunity for recoveries to

unsecured creditors on top of the assumption of contracts and associated liabilities).[134]

54.     Carnival has not met its burden of showing a colorable equitable subordination

claim because there are no plausible allegations that Invictus is an insider or plausible allegations

of inequitable conduct by Invictus.

55.     The Standing Motion is denied as to equitable subordination.

### 3.  Breach of Fiduciary Duty

56.     Count Four of the Complaint requests judgment entered against Invictus for

breach of fiduciary duty.[135]

---

[132] *See* 7/20/2023 Tr. 110:16-25 (Chen Delano); *see also* DeCurtis Ex. 38 (Carino Decl.) at ¶ 22 ("[A]t no point did Ms. Chen Delano exercise control over the Debtors' litigation strategy, and all such decisions about litigation strategy remained with the board.").

[133] DeCurtis Ex. 38 (Carino Decl.) at ¶ 21.

[134] DeCurtis Ex. 38 (Carino Decl.) at ¶¶ 9-11; *id.* ¶ 27; DeCurtis Ex. 36 (Atkinson Decl.) at ¶¶ 11, 14; *see also* 7/17/2023 Tr. 4:6-5:2; 7/20/2023 Tr. 19:14-20:8 (Atkinson).

[135] D.I. 318, Ex. B (Compl.) at ¶¶ 146-153.

57.     To show breach of fiduciary duty, a party must allege that "the defendant (i) owed

a duty, (ii) breached that duty, and (iii) the breach of that duty resulted in injury to the

plaintiff."[136]  Carnival alleges Invictus owed a duty of loyalty to the Debtors by virtue of its

principal, Ms. Chen Delano, serving on the Debtors' Board of Directors and receiving privileged

information regarding the Debtors' financial, strategic, and legal situations.

58.     Carnival's breach of fiduciary duty claim is not colorable because, as set forth

above, Invictus was not an insider and Invictus did not exercise control over DeCurtis; as a

result, no fiduciary relationship between Invictus and the Debtors exists.

59.     The Standing Motion is denied as to breach of fiduciary duty.

### iv.     *Conclusion Regarding Standing Motion*

60.     The Court need not reach the third prong of derivative standing (moving party has

received leave to sue from the court), since Carnival has not asserted plausible allegations to

support its claims for recharacterization, equitable subordination, or breach of fiduciary duty.

Therefore, the Standing Motion is denied.

## B.     **Credit Bid Motion**

### i.     *Legal Standard*

61.     Section 363(k) of the Bankruptcy Code provides:

> At a sale under subsection (b) of this section of property that is
> subject to a lien that secures ***an allowed claim,*** unless the court for
> cause orders otherwise the ***holder of such claim may bid*** at such
> sale, and, if the holder of such claim purchases such property, such
> holder may offset such claim against the purchase price of such
> property.

---

[136] *Miller v. Nelson (In re Art Inst. of Phila. LLC)*, No. 18-11535, 2022 WL 18401591, at *7 (Bankr. D. Del. Jan. 12, 2022).

11 U.S.C. § 363(k) (emphasis added).  Only an allowed claim under section 502 is entitled to credit bid at a section 363 sale.

62.    "Section 363(k) provides the holder of an allowed secured claim with two rights: (1) it 'may bid at such sale' . . . and (2) if it is the purchaser at such sale, it 'may offset [its] claim against the purchase price'. . . ."[137]  A court may deny or limit the right of a secured party to credit bid for "cause" under section 363(k).  "[T]he right to credit bid is not absolute," and the Bankruptcy Code "plainly contemplates situations in which estate assets encumbered by liens are sold without affording secured lenders the right to credit bid."[138]

63.    "The term 'cause' is not defined in the Bankruptcy Code and is left to the courts to determine on a case-by-case basis."[139]  "Cause" has been found in "situations in which a secured creditor has engaged in inequitable conduct,"[140] or where "a sufficient dispute exists regarding the validity of the lien forming the basis for the credit bid."[141]  A court may deny credit bidding "in the interest of any policy advanced by the Code, such as to ensure the success of the reorganization or to foster a competitive bidding environment."[142]

---

[137] *In re RML Development, Inc.,* 528 B.R. 150, 154 (Bankr. W.D. Tenn. 2014) (*quoting* 11 U.S.C. § 363(k); footnote omitted).

[138] *In re Philadelphia Newspapers, LLC,* 599 F.3d 298, 315 (3d Cir. 2010) (citing 11 U.S.C. § 363(k)), *as amended* (May 7, 2010).

[139] *In re Olde Prairie Block Owner, LLC*, 464 B.R. 337, 348 (Bankr. N.D. Ill. 2011) (*citing In re NJ Affordable Homes Corp.*, 05-60442 (DHS), 2006 WL 2128642, at *16 (Bankr. D.N.J. 2006) (limiting credit bid rights "for cause" is a flexible concept to be considered on a case-by-case basis)).

[140] *In re Phila. Newspapers,* 599 F.3d at 316 n.14.

[141] *In re L.L. Murphrey Co.*, No. 12-03837, 2013 WL 2451368, at *1 n.1 (Bankr, E.D.N.C. June 6, 2013) (citations omitted); *see also In re Olde Prairie*, 464 B.R. at 348 (stating that "[c]ourts have found 'cause' under § 363(k) to bar a secured creditor from credit bidding when the creditor's lien is in question or otherwise in dispute.").

[142] *In re Phila. Newspapers,* 599 F.3d at 315-16 n. 14; *In re Fisker Automotive Holdings, Inc.*, 510 B.R. 55, 60 (Bankr. D. Del. 2014).

64.     Here, as discussed above, Carnival's recharacterization claim, equitable

subordination claim, and breach of fiduciary duty claim are not supported by the allegations in

the proposed adversary complaint and the evidence presented at trial.  As a result, the allegations

in the Standing Motion do not support Carnival's request to deny or limit Invictus' right to credit

bid.

### *ii.    Cause to Limit Credit Bid*

65.     Carnival argues that "cause" exists to limit Invictus' right to credit bid in order to

facilitate a competitive bidding environment.  Carnival argues that the lack of prepetition

marketing, excessive financing fees, Invictus' failure to commit to supporting a plan, and lack of

recovery to general unsecured creditors are cause to deny a credit bid.

66.     With respect to the marketing process and competitive bidding environment, the

uncontroverted testimony of Michael Atkinson establishes that Debtors have been marketing

their assets since May 5, 2023.[143]  He opined that "the Debtors' marketing process for the sale of

substantially all of their assets was designed to maximize the value of the Debtors' assets and

was reasonable in both time and manner."  He also opined "that Invictus' ability to credit bid is

not unjustifiably chilling bidding and that the reluctance of potential buyers to submit bids is

based upon the Debtors' historical operations, and the various risks attendant to their go-forward

business."[144]

---

[143] DeCurtis Ex. 36 (Atkinson Decl.) at ¶ 13.

[144] DeCurtis Ex. 36 (Atkinson Decl.) at ¶¶ 14, 16; ("On or about June 16, 2023, I re-contacted approximately 50 prospective buyers and informed them . . . Invictus [had] agreed to reduce the minimum overbid to approximately $28.5 million (which consists of roughly $27.5 million of secured DIP claims and a $1 million overbid) and that the auction had been postponed to July 13. Despite the approximately 50% reduction in the initial overbid amount on account of removing a $4.5 million backstop, $7.5 million exit fee and $3 million stalking horse protection, and the further extended auction date, to date no party besides Invictus has expressed an interest in submitting a bid for the Debtors' assets.").

67.    Carnival asserts that Invictus should not be able to credit bid Corbin's $5 million in prepetition secured debt which will ride through the bankruptcy and become an obligation of the purchaser if Invictus is successful at the auction.[145]   Here, Invictus is not the "holder" of the Corbin's secured claim[146] and as agreed in the Final DP Order, Invictus is not entitled to credit bid Corbin's secured claim.[147]

### iii.    Conclusion on Credit Bid Motion

68.    As set forth above, the Court finds that Invictus may assert the full amount of its claims as a credit bid but cannot include Corbin's $5 million secured claim as part of that credit bid.

---

[145] *See* Final DIP Order at ¶ 59 ("[T]he Prepetition Loans held by Corbin . . . , which comprise a portion of the Prepetition Roll-Up, shall not be credit bid by the DIP Agent and shall instead be assumed liabilities of the Purchaser . . . ").

[146] 11 U.S.C. § 363(k) (The "**holder** of such claim may bid at such sale . . . such **holder** may offset such claim against the purchase price of such property" (emphasis added)). *In re Philadelphia Newspapers, LLC*, 599 F.3d at 304 ("It is the cardinal canon of statutory interpretation that a court must begin with the statutory language. '[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then this first canon is also the last: judicial inquiry is complete.'" (citations omitted)).

[147] *In re The Free Lance-Star Publ'g Co. of Fredericksburg, VA*, 512 B.R. 798, 804–05 (Bankr. E.D. Va. 2014) ("Credit bidding 'allows the secured creditor to bid for its collateral using the debt it is owed to offset the purchase price[,]' which "ensures that, if the bidding at the sale is less than the amount of the claim the collateral secures, the secured creditor can, if it chooses, bid up the price to as high as the amount of its claim.") (*quoting Quality Props. Asset Mgmt. Co. v. Trump Va. Acquisitions, LLC*, No. 3:11–CV–00053, 2012 WL 3542527, at *7 n. 13 (W.D. Va. Aug. 16, 2012); *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 n.2 (2012) ("The ability to credit-bid helps to protect a creditor against the risk that its collateral will be sold at a depressed price [ ]" by enabling the secured "creditor to purchase the collateral for what it considers the fair market price (up to the amount of its security interest) without committing additional cash to protect the loan."); *In re Couture Hotel Corp.*, No. 14-34874-BJH-11, 2016 WL 91949, at *28 (Bankr. N.D. Tex. Jan. 5, 2016) (holding that "nothing herein allows Mansa to credit bid at such sale unless or until the Ability lien has been paid in full.").

**C.**    **Conclusion**

69.    The Standing Motion is DENIED.

70.    The Credit Bid Motion is GRANTED, in part, and DENIED, in part.

71.    The Court shall retain jurisdiction over any matter or dispute arising from or relating to the implementation of this Order.

Dated: August 14, 2023

J. Kate Stickles
United States Bankruptcy Judge