**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 7 |
| DECURTIS HOLDINGS LLC, *et al.*,[1] | ) Case No. 23-10548 (JKS) |
| Debtors. | ) (Jointly Administered) |
| | ) Re: Docket No. 635 |

**CARNIVAL CORPORATION'S REPLY BRIEF IN FURTHER
SUPPORT OF MOTION FOR 11 U.S.C. § 105 RELIEF**

**Introduction**

1. Invictus's and UnumX's Objection to Carnival Corporation's Motion for 11 U.S.C. §105 Relief ("Objection") [D.I. 659] can and will be disposed here in short order, as the arguments presented therein were anticipated and already addressed in Carnival's § 105 Motion ("Motion") [D.I. 635] or can be responded to more thoroughly next week, if necessary, following discovery, with evidence and argument at the October 6, 2023 hearing.

2. Invictus and UnumX try to side-step the focus of Carnival's Motion, rather than addressing it head on. Carnival does not seek to "avoid the DIP Agent's *legitimate* post-default exercise of remedies," or to attack the Chapter 11 system, or to "wreak havoc" on U.S. financing markets. Objection at 1-2 (emphasis added). Carnival is the victim of theft and seeks to recover and safeguard its misappropriated property through enforcement of this Court's orders and injunction as well as governing provisions of the Bankruptcy Code and Delaware UCC. Carnival is entitled to the relief requested in its Motion precisely because Invictus, aided by UnumX, the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include: DeCurtis Holdings LLC (2384) and DeCurtis LLC (9241). The location of the Debtors' service address in these chapter 11 cases is 3208 East Colonial Drive, Suite C190, Orlando, FL 32803.

10684035.v2

Cayman Island shell company it created for the purpose, have engaged in *illegitimate* conduct aimed at gaining leverage that they could use to extract maximum payments from Carnival, Virgin Voyages, and Disney for the access those companies need to software Invictus should never have been allowed to control in the first place.

3. To an unfortunate extent, Invictus's invalid foreclosure scheme has succeeded, at least for now. Using UnumX and its control over the Remaining DXP Assets and MAS seized via an invalid foreclosure, Invictus negotiated deals with Disney and Virgin that will put millions of dollars in the pockets of Invictus's principals, and it made multi-million dollar demands for CCL's continued use of MAS that were not dropped until after Carnival filed its Motion and made clear that it would not capitulate to such demands. A key to the Invictus scheme was getting the Remaining DXP Assets and MAS outside the Court's jurisdiction and away from the supervision of a Chapter 7 Trustee, and to do that Invictus rushed forward its strict foreclosure on the evening of August 24, while the Court was considering proposals for an injunction, despite its counsel's representations only hours earlier that a foreclosure would not occur that day. The scheme thus bought Invictus time to cement its sole and unsupervised control over the Remaining DXP Assets and MAS, to use that control to its advantage, and to preserve the argument it sheepishly clings to in its Opposition that it "makes no sense" to "contend[] that the foreclosure violated the Court's Permanent Injunction" because "the Permanent Injunction was entered after the foreclosure was consummated." Opposition at 4 n. 4. That Invictus *later* elected to disclose that it wholly owned and controlled UnumX and to bring UnumX before the Court does not mitigate the contemptuous nature of Invictus's conduct on August 24 and since. Invictus acted to circumvent the Court's authority both by defying Court orders given before August 24, by its complete lack of candor on

that date, and by its ongoing exercise of control over the Remaining DXP Assets and MAS since entry of the August 25 Injunction.

4. With respect to the Bankruptcy Code and UCC arguments presented in the Motion, Invictus and UnumX largely seek to play to what they perceive as a "home court advantage" by extolling what they claim are "sacred secured creditor post-default remedies" and the role of DIP financing as "the lifeblood of Chapter 11." Opposition at 1. But the Opposition does not back up those self-serving platitudes with law; in fact, as demonstrated in the Motion, the conduct of Invictus and UnumX have been in violation of the Bankruptcy Code and the Delaware UCC. While the Court certainly owes respect to DIP lenders (and even to their Cayman Islands instrumentalities), as it does to all parties before the Court, the Court need not and should not tolerate misrepresentations and misconduct from any party, regardless of the party believes it enjoys a special and protected status to disregard or circumvent the Court's orders. Indeed, to the extent the Court were to countenance the type of sharp practices and disrespect of the Court and other parties exhibited by Invictus and UnumX in this case, it would be rewarding and encouraging further such conduct in this and future cases.

**Further Factual Background Disclosed Since Filing of the Motion**

5. The Opposition papers reveal that Invictus's and UnumX's misappropriation of Carnival Information has been worse than even Carnival imagined. During the September 11, 2023 status conference, UnumX told the Court that "there has been no transfer of property…the source code is in exactly the same place as it was before." 9/11/2023 Hearing Tr. at 14:5-14. UnumX made it a point to "stress, again, that the code has not been moved, that *it is on the same server*." *Id.* at 21:11-18 (emphasis added). UnumX further represented that "there's no danger here that the code is going to be moved." *Id*. Similarly, during the September 13 hearing, UnumX's CTO,

10684035.v2

Babak Aghevli, testified only about one GitHub environment, creating the misimpression that no other DXP code existed outside that environment. Not only did these representations ignore the fact that Invictus and UnumX had removed the assets in question from the control and supervision of the Court, but they were also false.

6. As we learned from the September 28, 2023 declaration of Apurva Saxena. According to Mr. Saxena, he and potentially others created several copies from DeCurtis's source code repository and shuffled those copies amongst multiple new GitHub environments. Today, there are copies of DXP source code (and by extension, Carnival Information) in at least *five different locations* according to Mr. Saxena:

| Source Code Account | Contents | Known Dates |
|---|---|---|
| "DeCurtis" Original | "231 active code repositories, which include DXP and non-DXP Assets"<br><br>"DeCurtis-Archived" | Presumably created during 2021 BitBucket-to-GitHub migration |
| "DeCurtis-Support" | 236 code repositories: the 231 repositories from the "DeCurtis" organization and five repositories from the "DeCurtis-Archived" organization.<br><br>The five additional repositories from the "DeCurtis-Archived" organization are for MAS: mobileassembly, mobile-assembly-app, bluetooth-library, auto-upgrader-service, and card-readers. | Allegedly created at 10:30am ET on August 25, 2023<br><br>Updated on September 18, 2023 with MAS code |
| "Sentioza" GitHub | "non-DXP technology[2] such as Icebreaker, MAS, AwareCare, Shield, and critical support scripts identified in the | Created at unspecified time "after the foreclosure" |

---

[2] UnumX's characterization of Icebreaker, MAS, AwareCare, and shield as "non-DXP technology" is contrary to prior representations to the Court about these applications. For example, according to DeCurtis's Schedule of Assets, D.E. 232 at 34: (1) "AwareCare" "provid[es] increased situational awareness" by providing "key situational data" like "where is the emergency, who is present & where are they," which clearly implicates location services; (2) "Shield" is *actually* named "Shield DXP™" and

4

10684035.v2

| | | |
|---|---|---|
| | foreclosure papers for DevOps, QA, and SRE" "repositories for Disney's services that predated and are unrelated to DXP, including the Child Detection Application and Online Activities Reservation System" | |
| "Sentioza" Bitbucket | "a "Sentioza" organization in BitBucket …contains the same repositories included in the "Sentioza" organization in the GitHub Enterprise server" | Creation date unknown Access restricted on 9/25 |
| Escrow London Account | Unknown | "Prior to this dispute" |

7. Invictus, UnumX, and its agents have copied and moved DXP source code multiple times *after* the Court ordered them not to. Each time they copied and moved Carnival Information, Carnival suffered further irreparable injury. *E.g.* D.E. 459 (Ownership Opinion) at 49 ("every use and distribution of the Remaining DXP Assets would irreparably harm Carnival."). After repeatedly violating the Court's orders, Invictus and UnumX then attempted to cover up their unlawful conduct, *which is ongoing*. And they continue to withhold Carnival Information and critical MAS source code from Carnival (and the trustee), depriving Carnival of its right to control its own property (id. at as well as its rights under §365(n). D.E. 514.

## Argument

8. Invictus's and UnumX's procedural arguments are meritless. *Of course* Carnival has the right to seek §105 relief and enforcement of the injunction, and of course the Court has

---

"becomes aware of actual location through the ability to receive events from the DeCurtis Location Solution," and (3) Icebreaker is not even an independent piece of software. It is undisputed that Icebreaker, MAS, AwareCare, and Shield are all integrated with the DXP, and Mr. Saxena previously testified that no module of MAS is independently compliable or functional without core services.

10684035.v2

authority to issues all orders necessary to protect Carnival and the bankruptcy estate. *See, e.g.*, D.E. 635 at 13-14; 23-27 (collecting cases). Equally meritless are Invictus's and UnumX's policy arguments. The unlawful conduct at issue in this case is not a necessary evil that somehow props up "the DIP financing markets throughout the United States," Opposition at 1—on the contrary, unless the Court makes clear that conduct like Invictus's and UnumX will not be tolerated, schemes like the late-night August 24 strict foreclosure and off-shore transfer of assets could spread like a virus through the bankruptcy courts.[3]

## I.    UnumX's and Invictus's Contempt of Court is Ongoing

9.      Invictus's and UnumX's Objection rests entirely on the fiction that foreclosure on "the GitHub Enterprise Server" did "not affect Carnival's ownership interest" in Carnival Information. This argument defies all law, logic, and evidence, including expert evidence that Carnival submitted in support of the Motion and that it expects to expand on, if necessary, at the October 6 hearing. There is no physical "GitHub Enterprise Server"—what Invictus seized were the access codes to the electronic "storage unit" where Carnival's Information is stored, which is the same thing as seizing the Carnival Information itself. One of the most important "ownership

---

[3] Invictus has been the driving force behind the last three years of litigation, from its speculative litigation financing in Miami to its surreptitious attempt to sell Carnival IP through a §363 sale. The same result obtained in this Court (a clear win for Carnival enjoining further use of Carnival Information) would have been achieved quickly and for a fraction of the cost in Florida had Invictus simply allowed that litigation to reach its conclusion. Instead, Invictus forced DeCurtis into bankruptcy knowing full well that doing so would result in substantial additional litigation and cost for all. The Strict Foreclosure scheme is perhaps the clearest example of how Invictus and its various counsel have unnecessarily multiplied these proceedings. Had Invictus honored the UCC and moved forward with a public foreclosure upon receipt of Carnival's objection, it would already have been able to fully exercise its foreclosure rights. Instead, they chose the path of self-help, knowing that doing so would entail additional significant expense. The strict foreclosure has spawned numerous emergency motions and status conferences that would have been unnecessary had Invictus simply complied with the UCC and respected the Court's authority. Calling this case a "success" story is an insult to the bankruptcy process. The only thing successful about this proceeding has been Invictus's scheme to delay justice and unjustly enrich itself and its cohorts, draining the estate of millions of dollars in pursuit of meritless claims.

10684035.v2

interests" Carnival has is the right to exclusive possession of the Carnival Information that UnumX is monetizing and exercising control over. With respect to the technology at issue in this case, "Sole control of passwords with simultaneous access to the storage system accessible via those passwords means you 'have the code.'" 9/22/2023 de la Iglesia Declaration at ¶¶ 75-77.

10. UnumX—the Caymans entity created August 24 to take control of the electronic systems containing Carnival Information—cannot dispute that it has exercised dominion over Carnival's intellectual property. It has refused to give Carnival access to Carnival Information—not even the source code that indisputably belongs entirely to Carnival, like the CSP prototype materials contained in the "archive" section of the DeCurtis GitHub. 9/22/2023 de la Iglesia Declaration at ¶ 33. UnumX is holding this and other Carnival Information hostage, attempting to squeeze out more value before Invictus and UnumX ultimately do what they know they must: respect the Court's orders and return Carnival Information.

11. UnumX and Invictus's suggestion that the DIP Order granted Invictus and Debtors carte blanche to generate a default and then do whatever they wanted to with assets of the estate fails on its own terms. The text of the documents, the Bankruptcy Code, and the Court's and parties' remarks in the hearings preceding and following the foreclosure establish that there was no agreement to permit Invictus to do what it did. Given the history of this litigation and the Florida litigation, Carnival's successful prosecution of its objection to a §363 sale, and all the time and money Carnival has put in to protecting its IP over the past few years, does anyone really believe that Carnival agreed to an order giving Invictus and DeCurtis the ability, after an adverse §363 ruling, to simply transfer the property unilaterally and without court supervision?

12. It also seems unlikely that the Court would simply relinquish all authority under §363, including (according to Invictus and UnumX) its authority to amend its own orders. *See,*

7

*e.g., Shubert v. Premier Paper Prods., LLC;* 06-50929(KG), 2006 Bankr. LEXIS 3266, at *10 (Bankr. D. Del. 2006) ("In the bankruptcy setting, the Court should be especially sensitive to situations which could result in the dissipation of estate assets, and the Court's responsibility to prevent a wrongful taking of the bankrupt's assets provides it with a broader equitable power.") (citations omitted); *Armenia Coffee Corp. v. Meisel (In re Hudson's Coffee, Inc.)*, 2009 U.S. Dist. LEXIS 52239, at *6-7 (D.N.J. June 22, 2009) ("the Bankruptcy Court has a responsibility to determine whether the settlement is fair and equitable and in the best interests of the estate.")

13. It is true that the DIP Orders modify the stay "to the extent necessary…"—but what that means is that Invictus could initiate a strict foreclosure where the stay would otherwise not permit such action. *See, e.g., Comer v. John Hancock Mut. Life Ins. Co.*, 80 F.2d 413, 415 (8th Cir. 1935) (Relief from the automatic stay is required before a secured creditor can initiate strict foreclosure). The language "to the extent necessary" is *limiting*—it does not mean that Invictus could compel DeCurtis to disregard the Code and its fiduciary duties to help Invictus achieve its own aims. *See, e.g., Interbusiness Bank, N.A. v. First Nat'l Bank,* 328 F. Supp. 2d 522, 528-29 (M.D. Pa. 2004) (stay exceptions narrowly construed); *see also Apple, Inc. v. Spansion, Inc. (In re Spansion Inc.)*, 2011 U.S. Dist. LEXIS 82829, at *16 (D. Del. 2011) (rejecting a party's attempt to inject its undisclosed intent into the meaning of a court order the party had drafted). Neither Carnival nor the Court consented to such an arrangement, as this history of this litigation makes clear.

**II.    The Strict Foreclosure Violated § 363 And is Thus Void**

14. A strict foreclosure agreement, "outside the 'ordinary course'" and consummated without prior notice to creditors, is void or at least voidable." *Sportsman's Warehouse, Inc. v. McGillis/Eckman Invs.-Billings, LLC (In re Sportsman's Warehouse, Inc.),* 457 B.R. 372, 400

8

(Bankr. D. Del. 2011) ("Shrager shall have the option to decide whether it wishes to void the sale of the premises, due to its failure to receive notice"). Thus, even assuming *Invictus* did not violate the automatic stay by seizing DeCurtis's assets without Court approval, that does would not save the purported strict foreclosure. Debtors-in-possession were not authorized to agree to the strict foreclosure agreement without Court approval, and Invictus and UnumX make no credible attempt to argue otherwise. Their Objection does not even address the arguments and case cites contained in Carnival's motion.

15. The silence on §363 from Invictus and UnumX speaks volumes. They offer no citations or reasoned analysis to justify the conduct of the debtors-in-possession. That the DIP orders contemplated commercially reasonable cooperation is besides the point. Since the Debtors conduct was manifestly not commercially reasonable. Cooperation does not mean capitulation. At the time of the strict foreclosure, Debtors still owed a duty to the estate and creditors like Carnival to (1) obtain maximum value for any assets sold; and (2) avoid creating administrative or other liabilities for the estate. They did neither. At a minimum, a good faith debtor-in-possession faced with competing arguments by creditors about whether a foreclosure was illegal would have sought or obtained court guidance before shipping all its assets off to the Cayman Islands. *See, e.g., Mason v. Bade (In re Mason)*, 2021 U.S. Dist.LEXIS 62972, at *22 (D.N.J. 2021) (trustee breached duty by releasing funds "without conducting adequate due diligence regarding the legitimacy of the transaction and the credibility of the participants in said transaction").

16. The fact that the Debtors claim to have relied on advice of counsel is of no moment. Debtors counsel owed the estate fiduciary duties too, and because the purported advice apparently involved counseling violations of the Bankruptcy Code, such advice will be an issue for discovery by Carnival if this case proceeds. *Transcon. Refrigerated Lines, Inc. v. New Prime, Inc.*, 2014 U.S.

Dist. LEXIS 75320, at *39-41 (M.D. Pa. June 3, 2014) ("A jury reviewing them could readily conclude that Hrobuchak sought counsel and services from HTD in order to defraud Transcontinental's creditors. Consequently, the crime-fraud exception applies to vitiate protections otherwise applicable to these communications."). The trustee has a right and vital interest in reviewing such communications as well. *In re Old BPSUSH Inc.*, 2019 Bankr. LEXIS 1867, at *12-13 (Bankr. D. Del. 2019) (trustee is the holder of attorney-client privilege, debtor's counsel and employees cannot withhold materials from trustee based on a claim of privilege).

### III. Invictus's and UnumX's UCC Argument Fails to Address the Full Scope of Carnival's Interest

17. Other than a stray reference to Carnival's perpetual license rights, the Objection makes no attempt to confront the fact that Carnival has a protectable interest in the MAS software (including source code and documentation) and is a party entitled to UCC notice on that basis alone. UCC § 9-621. Secured parties, like Invictus, seeking to strictly foreclose upon their secured must provide notice to "any person from which the secured party has received, before the debtor consented to acceptance, an authenticated notification of a claim of an interest in the collateral." UCC § 9-621(a)(1). At the time of the purported strict foreclosure, Carnival had already filed its rule § 365(n) motion, establishing its claim to and interest in MAS source code—separate and apart from Carnival's sole ownership of Carnival Information. Thus, Carnival's rights to MAS and its objection based thereon prevented a valid strict foreclosure.

18. Invictus's failure to comply with the UCC invalidates the foreclosure and entitles Carnival to relief. Under UCC § 9-625(a), "[i]f it is established that a secured party is not proceeding in accordance with this article, a court may order or restrain collection, enforcement, or disposition of collateral on appropriate terms and conditions." Moreover, UCC § 1-305 provides

that remedies under the UCC "must be liberally administered to the end that the aggrieved party [Carnival] may be put in as good a position as if the other party had fully performed...."

### IV.  Invictus and UnumX's Procedural Arguments Lack Merit

19. In light of the ongoing irreparable injury to Carnival and the cloud cast over these proceedings by violations of the Court's orders, UnumX's procedural arguments are meritless. Indeed, in arguing that Carnival lacks standing, for example, Invictus and UnumX mischaracterize the basis for Carnival's relief.

20. Carnival does not rely solely on § 105(a) of the Code. Rather, as its Motion plainly makes clear, Carnival has sought to avoid the strict foreclosure under (i) this Court's opinion and injunction order in the Adversary Proceeding; (ii) sections 362 and 363 of the Bankruptcy Code; and (iii) the Final DIP Order which incorporates non-bankruptcy law (including the Delaware UCC).  Pursuant to § 105(a), this Court can craft a remedy, including an injunction and/or sanctions, that is "necessary" and "appropriate" to enforce this Court's orders and the applicable Bankruptcy Code provisions.  *See* 11 U.S.C. 105(a); *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003) (bankruptcy courts are "able to craft flexible remedies that, while not expressly authorized by the Code, effect the result the Code was designed to obtain.").  Furthermore, Carnival does not purport to rely on section 549 of the Bankruptcy Code. Nor is section 549 the sole authority to avoid the foreclosure under these facts and circumstances.  Thus, the Supreme Court's decision in *Hartford Underwriters Inc. v. v. Union Panders Bank, N.A.*, 530 U.S. 1 (2000) is distinguishable.  There the Court held that an insurer who was owed premiums could not rely on section 506(c) to surcharge a lenders' collateral because such right is reserved for the trustee. Here, Carnival obviously is not seeking to surcharge the lenders' collateral, which the Court identified as "a specifically narrowed"

concept. But even if an analogy could be drawn between the language in section 506(c) and section 549, such that only a trustee could bring a section 549 action, Carnival is not relying on section 549 to invalidate the foreclosure. Nor would Carnival seek to rely on section 549 to address its specific injury here. Section 549 deals with a trustee's recovery of transferred property for the benefit of all creditors of the estates. Carnival is not seeking to recover property for the benefit of all creditors generally. Rather, it is seeking to avoid a transfer of *its property interests* in violation of the injunction opinion and order, the automatic stay, §§ 363(b), §365(n), and the Delaware UCC. Carnival's prayer for relief derives from these authorities, not § 549. In seeking this relief, Carnival is in no way supplanting or superseding the rights of the trustee under section 549.

21.     At bottom, Carnival is a party in interest under § 1109(b) that has standing to invalidate the foreclosure under this Court's orders and the Bankruptcy Code sections relied upon in the Motion: *First*, Carnival clearly has standing to asks this Court to interpret and enforce the opinion and injunction that Carnival obtained as a plaintiff in the Adversary Proceeding,

22.     *Second*, Carnival has standing to enforce the automatic stay as a party who is being directly harmed by Invictus and UnumX's unlawful transfer of its property. *See In re Ring*, 178 B.R. 570, 581 (Bankr. S.D. Ga. 1995) (holding "that a holder of a lien in property which has been transferred in violation of the automatic stay has standing to seek a declaratory judgment that such transfer is void ab initio . . ."); 11 U.S.C. §365(n).

23.     Furthermore, "an act entered in violation of the stay is void whether or not a party makes a motion to declare it so." *In re Killmer*, 501 B.R. 208, 212 (Bankr. S.D.N.Y. 2013) (creditor had standing to enforce the automatic stay). *Third*, as explained in the Motion, Carnival is a requisite notice party under the UCC and therefore has standing to object to the Strict Foreclosure. Although the Final DIP Order permitted Invictus to exercise remedies, such remedies

10684035.v2

must be carried out in accordance with "applicable law," which no doubt includes the Delaware Uniform Commercial Code. *See* Final DIP Order, ¶ 35. Carnival, as both a creditor and party whose property is being directly affected by the foreclosure, clearly has standing to ask the Court to determine whether Invictus' exercise of its remedies was lawful under the DIP Order.

24. Notably, Invictus and UnumX do not contend—nor can they–that Carnival does not have constitutional or prudential standing in the traditional sense to seek this relief. *See In re Glob. Indus. Techs.*, Inc., 645 F.3d 201, 211–12 (3d Cir. 2011) (the question for standing is whether a party 'ha[s] demonstrated some injury-in-fact, i.e., some 'specific, 'identifiable trifle' of injury,' [] or "personal stake in the outcome of [the] litigation[.]") (internal citation omitted). Carnival has unquestionably established that it has suffered a specific injury – the transfer of its intellectual property to UnumX – resulting from Invictus and UnumX's unlawful conduct. Carnival has standing, and this Court has authority, to issue an appropriate remedy.

25. Invictus's and UnumX's argument about the "constitutionally-required process" attendant to contempt findings is also meritless. "Due process is satisfied under our case law when a potential contemnor is given 'notice' and a hearing that provides 'an opportunity to explain the conduct deemed deficient before the fine is imposed [so] that a record will be available to facilitate appellate review." *Marks Law Offices, LLC v. Mireskandari*, 704 F. App'x 171, 178 (3d Cir. 2017).

26. There appears to be very little daylight between the interests of the individuals responsible for the strict foreclosure and the interests of the companies for whom the strict foreclosure was carried out, so it is unclear why UnumX and Invictus suggest that the individuals need their own counsel for contempt proceedings. However, to the extent independent counsel is required due to conflicts of interests and/or counseling violations of law, those issues became

apparent weeks ago, and the individuals in question have had adequate time to seek independent counsel if needed since then.

## Conclusion

For the foregoing reasons Carnival respectfully submits that its motion should be granted in its entirety.

| | |
|---|---|
| Dated:  September 29, 2023<br>Wilmington, Delaware | */s/ Sally E. Veghte*<br>Domenic E. Pacitti (DE Bar No. 3989)<br>Richard M. Beck (DE Bar No. 3370)<br>Sally E. Veghte (DE Bar No. 4762)<br>**KLEHR HARRISON HARVEY BRANZBURG LLP**<br>919 Market Street, Suite 1000<br>Wilmington, Delaware, 19801-3062<br>Telephone:  (302) 426-1189<br>Email:  rbeck@klehr.com, dpacitti@klehr.com<br>       sveghte@klehr.com<br><br>-and-<br><br>Raniero D'Aversa, Esq. (admitted *pro hac vice*)<br>Michael Trentin, Esq. (admitted *pro hac vice*)<br>**ORRICK, HERRINGTON & SUTCLIFFE LLP**<br>51 West 52nd Street<br>New York, New York  10019-6142<br>Telephone:  (212) 506-5000<br>Email:  rdaversa@orrick.com<br>       mtrentin@orrick.com<br><br>-and-<br><br>Sheryl K. Garko, Esq. (admitted *pro hac vice*)<br>**ORRICK, HERRINGTON & SUTCLIFFE LLP**<br>222 Berkeley Street, Suite 2000<br>Boston, Massachusetts 02116<br>Telephone:  (617) 880-1800<br>Email:  sgarko@orrick.com |

-and-

Steven J. Routh, Esq. (admitted *pro hac vice*)
T. Vann Pearce, Esq. (admitted *pro hac vice*)
Diana M. Fassbender (admitted *pro hac vice*)
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
Columbia Center
1152 15th Street, N.W.
Washington, D.C. 20005-1706
Telephone: (202) 339-8400
Email: srouth@orrick.com; vpearce@orrick.com; dszego@orrick.com

*Counsel to Carnival Corporation*

10684035.v2