1

```
1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
2

3    IN RE:                      .  Chapter 7
                                 .  Case No. 23-10548 (JKS)
4    DECURTIS HOLDINGS LLC,      .
     et al.,                     .  (Jointly Administered)
5                                .
                                 .
6                                .  Courtroom No. 6
                                 .  824 North Market Street
7                                .  Wilmington, Delaware 19801
                 Debtors.        .
8    . . . . . . . . . . . . . . .  Wednesday, December 27, 2023
                                 .  1:00 p.m.
9
               TRANSCRIPT OF FINAL FEE APPLICATIONS HEARING
10              BEFORE THE HONORABLE J. KATE STICKLES
                   UNITED STATES BANKRUPTCY JUDGE
11

12   APPEARANCES:

13   For the Debtors:           L. Katherine Good, Esquire
                                POTTER ANDERSON & CORROON LLP
14                              1313 N. Market Street
                                6th Floor
15                              Wilmington, Delaware 19801

16                              Evan Lazerowitz, Esquire
                                COOLEY LLP
17                              55 Hudson Yards
                                New York, New York 10001
18

19   (APPERANCES CONTINUED)

20   Audio Operator:           Sean Moran, ECRO

21   Transcription Company:    Reliable
                                The Nemours Building
22                              1007 N. Orange Street, Suite 110
                                Wilmington, Delaware 19801
23                              Telephone: (302)654-8080
                                Email:  gmatthews@reliable-co.com
24

25   Proceedings recorded by electronic sound recording,
     transcript produced by transcription service.
```

APPEARANCES (CONTINUED):

For the Debtors:              Nicholas Groombridge, Esquire
                              GROOMBRIDGE, WU, BAUGHMAN
                                 & STONE, LLP
                              565 Fifth Avenue
                              Suite 2900
                              New York, New York 10017

For Groombridge, Wu,
Baughman & Stone LLP:         Reuben Dizengoff, Esquire
                              SCHULTE ROTH & ZABEL LLP
                              919 Third Avenue
                              New York, New York 10022

For the Chapter 7
Trustee:                      Peter J. Keane, Esquire
                              PACHULSKI STANG ZIEHL & JONES LLP
                              919 North Market Street
                              17th Floor
                              P.O. Box 8705
                              Wilmington, Delaware 19899

For Carnival:                 Richard Beck, Esquire
                              KLEHR HARRISON HARVEY BRANZBURG LLP
                              919 Market Street
                              Suite 1000
                              Wilmington, Delaware 19801

For UnumX:                    Aaron Applebaum, Esquire
                              DLA PIPER LLP (US)
                              1201 North Market Street
                              Suite 2100
                              Wilmington, Delaware 19801

1      (Proceedings commence at 1:01 p.m.)

2           THE COURT:  Good afternoon, counsel.  This is Judge

3  Stickles.  We are on the record in DeCurtis Holdings LLC,

4  Case No. 23-10548.

5           I will hear from counsel for the Trustee.  Mr.

6  Keane, good afternoon.

7           MR. KEANE:  Good afternoon, Your Honor.  Can you

8  hear me okay?

9           THE COURT:  I can.

10          MR. KEANE:  Thank you, Your Honor.  For the record,

11  Peter Keane of Pachulski Stang Ziehl & Jones for the Chapter

12  7 Trustee. Happy holidays, Your Honor.  Its good to see you.

13          THE COURT:  Good to see you too.

14          MR. KEANE:  So, thank you, Your Honor.  We have, I

15  think, what will be a short agenda and I will make some

16  corrections on the agenda as we get toward the pretrial

17  conference.

18          I see that, Your Honor, Items Nos. 1 through 3 you

19  had entered orders this morning.  Those have been disposed

20  of.  So, thank you.

21          Item No. 4, the final fee applications of the

22  Chapter 11 professionals I'm not sure if Your Honor has

23  questions, but I will defer to the professionals on that.

24  The Trustee has no objection to the applications as proposed,

25  but I understand that there may be certain questions and I

1  believe there is an outstanding statement from UnumX on one

2  of the applications as well, Your Honor.

3       THE COURT:  Yes.  I have a couple of questions on

4  the fee apps.  I guess, I see a couple of people online. Is

5  there anybody who wanted to be heard specifically with

6  respect to fee apps or, otherwise, I can jump in with my

7  questions.

8     (No verbal response)

9       THE COURT:  Okay.  Well, I am hoping someone is on

10  the line from Province because I want to inquire regarding

11  the June and July research fees; more specifically, I need a

12  little bit more detail about what these fees are and whether

13  or not these are the fees actually charged by a third-party

14  vendor.  So, if someone from Province could address their

15  June research fees in the amount of $705 and their July

16  research fees in the amount of $651.

17       MS. GOOD:  Good afternoon, Your Honor.  Katie Good

18  from Potter Anderson & Corroon.

19       THE COURT:  Good afternoon.

20       MS. GOOD:  We do have a representative from

21  Province on the line, Mr. Busto, but I do have some

22  information that I can preliminarily give the Court to see if

23  that answers the question.  Those fees are related to flat

24  fee monthly third-party subscription services, such as

25  Capital IQ, that Province subscribes to in order to reduce

1  billable time that would, otherwise, be spent gathering

2  information.  There are no markups to those fees.  The actual

3  fees are allocated across Province clients pro rata based on

4  billable hours each subscription period.

5          So, there is no markup going through on those

6  services.  Those services are used to download information --

7  financial information that would be useful in advising

8  companies, analyzing industry competitors, assessing credit

9  worthiness, and ability to pay, and providing other data to

10 assist Province in serving as financial advisor to the

11 debtors.

12         THE COURT:  Thank you for the explanation. I

13 appreciate that, Ms. Good.

14         Is there anyone from Province who wanted to add

15 anything to her explanation?

16    (No verbal response)

17         THE COURT:  Is someone on the line from Cooley?

18 Oh, I do see someone.  Could you address for me the monthly

19 relativity and monthly data hosting fee.  Explain those

20 expenses to me.

21         MR. LAZEROWITZ:  Absolutely, Your Honor.  Good to

22 see you again.  Evan Lazerowitz, Cooley LLP.

23         So, Your Honor, in this case rather then utilize an

24 outside discovery vendor, Cooley has the ability to,

25 basically, internally host e-discovery data.  So, as Your

1  Honor may recall there was quite a bit of discovery

2  litigation in this case and so these three fees –- I will go

3  through each one, but they are costs and, essentially, they

4  are fees for the hosting, license, and user access to a

5  relative data base.  That is billed at cost.  There is no

6  markup.  Its not shared among clients.  Each instance is

7  different.

8          THE COURT:  Okay.

9          MR. LAZEROWITZ:  Obviously, we use that in the case

10  to make productions and review documents.

11          THE COURT:  Thank you.  Also, the Court had noted

12  some overcharges with respect to two-time entries of Cooley.

13  Could you address those.

14          MR. LAZEROWITZ:  We will waive those, Your Honor,

15  in our final application.

16          THE COURT:  Okay.  All right.  Thank you very much.

17          MR. LAZEROWITZ:  Thank you, Your Honor.

18          THE COURT:  The other comments the Court had was

19  with respect to Groombridge.  Despite the resolution of the

20  Carnival objection, the Court has a duty to independently

21  review the professional fee applications.  The first issue

22  the Court has deals with the reasonableness and necessity and

23  the benefit to the estate of the Schulte fees and expenses.

24  So, I would like to either hear from Groombridge or

25  Groombridge can file a supplemental statement, but it's

1  unclear why Groombridge would require the services of Schulte

2  to advise with respect to retention when DeCurtis has

3  bankruptcy counsel in the case.  That is my first issue.

4        My second issue is that the application, as best I

5  can tell, I didn't see any information compliant with Local

6  Rule 2016(2)(f), which is addresses reimbursement of payments

7  made to other professionals.  That rule requires an entity

8  seeking reimbursement for the payment it made to another

9  professional to provide information required by Subsections

10 (c), (d), and (e) of the rule; essentially, an explanation

11 for the fees and expenses.  The application did not satisfy

12 this. I don't see anywhere in the application where Schulte's

13 invoice is attached or there is any other explanation with

14 respect to Schulte's fees and expenses.

15       So, absent a supplement to this application I am

16 not going to grant reimbursement of Schulte's fees and

17 expenses.

18       MR. DIZENGOFF:  Good afternoon, Your Honor.  May I

19 be heard?

20       THE COURT:  Yes.

21       MR. DIZENGOFF:  For the record, Reuben Dizengoff,

22 Schulte Roth & Zabel, counsel to Groombridge on these fee

23 issues.

24       So, I just wanted to take -- I will take Your

25 issues in order. So, the first issue regarding why DeCurtis

1  utilized Schulte in connection with their 327(e) retention,

2  if you recall, Your Honor, Groombridge's retention at the

3  time was contested and as you well know Groombridge is a

4  specialty intellectual property firm.  They do not have

5  anybody at that firm who specializes in bankruptcy matters.

6  So, they sought our counsel with respect to their engagement

7  and their retention in the case, and the contested retention.

8         I think, Your Honor, the issue there is when

9  Groombridge runs into some issues related to their 327(e)

10  retention they can look to other counsel in the case who have

11  bankruptcy expertise to help them wade their way through and

12  ultimately get retained.  Those are other debtor

13  professionals, so the net result, hypothetically, if they

14  were to look to, let's say, Cooley or Potter Anderson for

15  that help, the other firms who were retained by the debtors

16  in the case, the payment or the work that would be done to

17  assist to Groombridge with that retention, the payments or

18  the fees there incurred in connection with that would go to

19  one of those firms in that hypothetical situation.

20         So, here the money that is going out the door from

21  the debtors' estates to pay a professional to assist

22  Groombridge in their retention and in the bankruptcy work

23  that they don't have a specialized expertise or knowledge in,

24  at the end of the day, goes to a different retained

25  professional and that's just Groombridge in connection with

1  the expenses that they incurred.  So, the net result, I

2  think, ends up being the same and I don't necessarily think

3  that that is particularly problematic, but that does segway

4  into Your second question.

5       We are happy to work with Groombridge to put

6  together the necessary supplements and the fee detail, and

7  file that with the Court promptly so that the Court can see

8  the time detail from the Schulte attorneys in connection with

9  assisting Groombridge in their 327(e) role.

10      THE COURT:  Yes, because I have no basis to

11  determine whether there was a benefit to the state, whether

12  $100,000 to Schulte was reasonable or necessary under the

13  circumstances.  Essentially, it's just not compliant with 26-

14  2(c), (d), or (e).  So, I am allowing you the opportunity to

15  supplement for the Court to look at that portion of the fees.

16      MR. DIZENGOFF:  We will do that, Your Honor,

17  expeditiously.  We will get that to you and the Court.

18      THE COURT:  Okay.  Let me -- I would like to talk

19  to Schulte about a couple of overcharges on their

20  application.  If you bear with me a second, I will pull up

21  the notes that I have.

22      So, I am looking first at Document No. 315-2. I am

23  looking at a 5/11 charge of Daniel Klein.  This has an

24  overcharge -- the actual narrative reflects point six, but

25  its billed at point seven.  It shows $135 overcharge.  On

1  5/17, the same application, Jennifer Wu overcharge three

2  hours.  She billed point three in the narrative, but actually

3  billed point six.  So, that is a $1,215 overcharge.

4       In application No. 437-2, I am looking at 6/1/23,

5  Jennifer Wu overcharge point three hours.  It was billed in

6  the narrative point two, but the actual bill reflects point

7  five.  So, that is an overcharge of $607.50.  In the same

8  application I am looking at June 9th, Jennifer Wu overcharge

9  7.2 hours.  The narrative reflects point eight, but billed

10  was 8.0.  So, that is a $14,580 overcharge.

11       So, absent further explanation the total reduction

12  for the overcharges is $15,930.  So, I don't know if anybody

13  wants to be heard on this.

14       MR. DIZENGOFF:  Your Honor, we can go back and look

15  at those specific line items.  I was wondering whether the

16  Court would be willing to, today, approve the fees and

17  expenses of Groombridge and then net the Schulte expenses and

18  specific overcharges that you flagged.  We can resolve those

19  with the supplement that we are going to file expeditiously.

20       THE COURT:  Okay.  Well, I have some more

21  questions.  Let's get through them and then I want to talk

22  about what was filed last evening.

23       MR. DIZENGOFF:  Okay.

24       THE COURT:  There is a 7/19/23 launder expense.

25  This Court will not compensate for launder expenses.  So,

1  that is a $16.45 reduction.  That is on Docket No. 437-3,

2  page 202.

3         Let me ask, is counsel in a position to advise or

4  confirm whether all of the travel expenses in this case were

5  not first-class travel?

6         MR. DIZENGOFF:  I don't have that information in

7  front of me.  I am -- Mr. Groombridge is on the line, but I

8  am not sure.  I can't speak to whether or not he will have

9  that information available.  If that is something that the

10 Court needs we can get that information for the Court.

11        THE COURT:  All right.  I just would like

12 confirmation because there is a lot of train, but there are

13 multiple people on one invoice, which is understandable when

14 a firm sets it up, but I just want to confirm that there is

15 no first class travel.

16        So, yesterday UnumX filed a statement stating

17 Invictus Global Management granted Groombridge an 8.7 percent

18 ownership interest in UnumX in furtherance of a prepetition

19 agreement.  To be clear, if its not clear, the Court did not,

20 has not approved Groombridge's fees and expenses, nor any

21 arrangement for the payment of Groombridge's fees, nor did

22 the Court authorize assumption of any prepetition agreement

23 regarding Groombridge's fees.

24        So, first of all, Mr. Applebaum, do you want to be

25 heard with respect to this statement?  Is this statement an

1    objection?  What is Your position?

2            MR. APPLEBAUM:  Can you hear me okay?

3            THE COURT:  Yes.

4            MR. APPLEBAUM:  Happy holidays as well.  Aaron

5    Applebaum from DLA Piper on behalf of UnumX.

6            Your Honor, we did file this statement yesterday.

7    We are not taking a position with respect to the fee

8    application.  We are not objecting to it.

9            As the Court may recall, we were in front of Your

10   Honor in October with respect to a TRO application that we

11   had filed and this issue had come up.  Our recollection was

12   that the Court had asked for more information about that.

13   When we -- a lot of this information has crystallized over

14   the last few weeks including at a deposition just last week

15   on Thursday.  We did look back and just confirm that there

16   hadn't been any additional filings.

17           So, just in order to ensure that we were disclosing

18   what the Court needed us to disclose we just felt that it was

19   appropriate to put that statement on the record so that there

20   wasn't any confusion as to the facts and what was being

21   disclosed.  How the Court deals with that in the context of

22   the fee application we don't take a position, but we just

23   wanted to make sure that the record was clear with respect to

24   that equity interest because it appears to us that the

25   parties believe that that equity interest was granted to

1    Groombridge in connection with or following the foreclosure.

2         THE COURT:  Okay.  Well, let me hear from

3    Groombridge or Invictus.  Did it grant Groombridge an equity

4    interest or an 8.7 percent interest in UnumX, and was it in

5    satisfaction of professional fees?

6         MR. DIZENGOFF:  For the record, again, Your Honor,

7    Reuben Dizengoff from Schulte. I am going to cede the podium

8    to Mr. Groombridge on that one so that he can explain to the

9    Court the situation.

10         THE COURT:  Thank you.

11         MR. GROOMBRIDGE:  Good afternoon, Your Honor.

12         THE COURT:  Good afternoon, Mr. Groombridge.

13         MR. GROOMBRIDGE:  Nice to see you again.  So, the

14    situation here, Your Honor, is that we do not at present have

15    the documentation transferring to us any equity interest in

16    UnumX.  We believe that we have a contractual right to obtain

17    that equity interest of approximately 8.7 percent; although

18    that, I believe, is or may be contested.  It also may depend

19    upon Your Honor's rulings on whether the partial foreclosure

20    was or was not effective, which presumably are rulings that

21    will be made in weeks to come.

22         The -- we do not consider that equity trust to be

23    for any professional services rendered in connection with the

24    bankruptcy.  And the background to this, Your Honor, was that

25    prior to the Chapter 11 filing we had been representing

1    DeCurtis for several months in the Florida litigation. They

2    owed the Groombridge Wu Law Firm over $4 million. There were

3    numerous upcoming filings in the Florida case. We voiced

4    concern, particularly, when we heard the idea that there

5    would be a bankruptcy filing. The law firm could not

6    continue to represent them because we had no assurance that

7    we would ever be paid for our work in the Florida case.

8         There were upcoming, at that point, various post-

9    trial briefs and then the possibility of an appeal to the

10   Federal Circuit. What we were concerned about is that we

11   would do that work and it would simply be added to the amount

12   we were owed as an unsecured creditor and we would never be

13   compensated for it. We voiced that concern to DeCurtis who

14   then involved Invictus. The result of that was this

15   agreement whereby we would receive, a kind of, contingent fee

16   payment if Invictus emerged from any bankruptcy proceeding

17   that were filed with either ownership of DeCurtis or

18   DeCurtis's assets then they would provide this equity to us.

19   In return for that we would continue to work on the Florida

20   case.

21         As part of that agreement we were -- our view was,

22   and I think this agreed certainly with DeCurtis and Invictus

23   that any work from the bankruptcy would be compensated

24   separately on the basis of normal hourly billing. It was on

25   that basis that we submitted the application or DeCurtis

1  submitted the application to retain Groombridge Wu.  And as

2  Your Honor may recall, this arrangement was disclosed in that

3  Docket Item 93, and addressed that. I don't believe anyone

4  raised any questions about it at the time, but that is the

5  backdrop to it.

6          So, in our view it was -- this was to assure that

7  there would be -- that we would have, at least, some pathway

8  to receiving payment for work that we did that was not part

9  of the bankruptcy, but was part of the Florida proceedings.

10          I will pause there and see whether Your Honor has

11  questions.

12          THE COURT:  So, Mr. Groombridge, do I understand

13  correctly that no equity interest has been transferred to the

14  Groombridge firm.

15          MR. GROOMBRIDGE:  That is correct, Your Honor.

16          THE COURT:  And so that you've gotten no

17  renumeration for the bankruptcy services provided or the

18  legal services provided in the bankruptcy case.

19          MR. GROOMBRIDGE:  We have -- we made a total of

20  four fee applications, Your Honor.  We received reimbursement

21  on the first one.

22          THE COURT:  The 80 percent.

23          MR. GROOMBRIDGE:  Yeah, it's around -- we received

24  80 percent of that fee application in accordance with the

25  normal procedures.  My recollection is that was around

1  $85,000.  That is the only remuneration that we have received

2  to date for our work in the bankruptcy proceedings.

3         THE COURT:  Okay. Mr. Groombridge is it Your

4  understanding that notwithstanding what was set forth in the

5  application, the Groombridge retention application, that the

6  Court did not approve payment of any prepetition amounts owed

7  to Groombridge or the assumption of that prepetition

8  agreement.

9         MR. GROOMBRIDGE:  That is absolutely our

10  understanding, Your Honor.  The Court was never asked to

11  approve those and, thus, had no occasion to.  This is also --

12  in our view, this is an agreement -- it's not an agreement

13  with the debtor, it's an agreement with Invictus Global

14  Management.

15         THE COURT:  Mr. Applebaum, did you want to be

16  heard?

17         MR. APPLEBAUM:  No, Your Honor. I don't have

18  anything further to add.  Its certainly a different element

19  for us that Mr. Groombridge is taking that they do not have

20  an equity interest in UnumX.  That was certainly different

21  then the position he took in correspondence to us, which we

22  attached to our statement.  But if their position is that

23  they do not have an equity position then we we're happy to

24  rest on that.

25         THE COURT:  Okay.  Could you bear with me just a

1  second.  Mr. Groombridge, did you want to be heard?

2      MR. GROOMBRIDGE:  Yes.  I just want to be very

3  clear, Your Honor, we believe that we have a contractual

4  right to obtain that equity interest, but we do not currently

5  hold that equity interest.  There may be some fine points

6  here, but we believe we have tried to engage with UnumX on

7  this with, I want to say, some limited success, but that is

8  something presumably that can be -- that will be the subject

9  of further discussion.

10      THE COURT:  Is it Your understanding that your

11  contractual right to be paid is based on prepetition

12  services, not post-petition services?

13      MR. GROOMBRIDGE:  I think some of it is prepetition

14  and some of it is post-petition because those services

15  continued in connection with the District Court after the

16  petition was filed; although, I'm not sure how long but it

17  did continue after.

18      THE COURT:  Are any of those services related to

19  services performed in the bankruptcy case?

20      MR. GROOMBRIDGE:  No.  They are not, Your Honor.

21  If I may, sort of, elaborate on that there were a number of

22  filings that were scheduled to be made in the Florida case;

23  most of which were not actually made because the Chapter 11

24  proceedings began.  We were also concerned that Carnival

25  would seek relief, as it, in fact, did, from the automatic

1  stay that the proceedings in the Florida Court might go on in

2  parallel with the bankruptcy.  So, we were doing work on

3  things related to the Florida Court, but not related to the

4  bankruptcy.  That is (indiscernible).

5       THE COURT:  Okay. Let me ask, does anyone else wish

6  to be heard?  The United States Trustee?  Anyone else?

7       (No verbal response)

8       THE COURT:  Okay.  I need to take a five-minute

9  recess.  I will reconvene at 1:30 p.m.

10      (Recess taken at 1:25 p.m.)

11      (Proceedings resumed at 1:32 p.m.)

12      THE COURT:  We're back on the record in DeCurtis

13  Holdings.

14      Okay.  I will entertain a revised fee order with

15  the agreed reduction for Cooley.

16      With respect to Groombridge, I will approve the

17  fees except for reduction with respect to Schulte's fees and

18  expenses for which there has not been a record established.

19  But I will entertain a supplement. Also, a reduction for the

20  overcharges in the amount of $15,930 and the launder expense

21  in the amount of $16.45.

22      So, I want to be clear here, any post-petition

23  services, whether provided in the Delaware bankruptcy case,

24  or in the Florida case, or in Kalamazoo must be approved by

25  this bankruptcy Court.  So, these fees that I am approving

1  need to be paid in this estate pro rata with other

2  professionals.  I am not approving any prepetition

3  arrangement. I am not approving any assumption of a

4  prepetition arrangement.  For all intents and purpose, the

5  retention order stands.  Okay.

6          So, that leads me to my next question, and that is

7  with respect to fees.  Obviously, there was a carve-out in

8  the DIP order.  So, what I want to know is are all the

9  professional fees, for which approval is being sought today,

10  covered by the carve-out in the final DIP order?

11          MR. BUSTO:  Your Honor, this is Raul with Province.

12  They are not.  There will be a haircut.

13          THE COURT:  I'm sorry, I couldn't hear the last

14  part of what you said.

15          MR. BUSTO:  The (indiscernible) haircut.  The

16  (indiscernible) number I don't have off the top of my head.

17          THE COURT:  So, to the extent that Paragraphs 3 and

18  4 of the proposed order state the debtor and the Chapter 7

19  Trustee are authorized and directed and the power to take

20  action, who or what entities are holding the funds that were

21  set aside in the carve-out?

22          MS. GOOD:  Good afternoon, Your Honor.  Katie Good

23  of Potter Anderson & Corroon.

24          Your Honor, there was a carve-out in the final DIP

25  order for certain budgeted amounts to be paid into an escrow

1 | each week.  I believe that escrow is being held by Potter
2 | Anderson.
3 |         THE COURT:  Okay.  But it doesn't cover all the
4 | fees, is that correct?
5 |         MS. GOOD:  Correct.  It does not cover all the
6 | fees.
7 |         THE COURT:  Okay.  Do any of the professionals, are
8 | any of them holding retainers?
9 |         MS. GOOD:  I do believe some professionals may be
10 | holding small retainers.  I think Potter may have a small
11 | retainer.  I would have to go back and check.  Even with the
12 | application of that retainer there is not a sufficient
13 | amount.
14 |         I saw Mr. Lazerowitz shake his head and he is on
15 | screen.  So, he can confirm if that is different for Cooley.
16 |         MR. LAZEROWITZ:  I think Cooley is no longer
17 | holding a retainer.
18 |         MR. GROOMBRIDGE:  Your Honor, my firm is holding a
19 | retainer of $500,000.  So, that is a significant amount.
20 |         THE COURT:  So, I guess the reason I raise this is
21 | because -- and I don't want to -- the Trustee is being
22 | directed to pay these sums.  So, I don't even know that the
23 | Trustee has these funds. I noticed for an admin order that
24 | had been submitted the Trustee carved out language.  So, it
25 | seemed to me this order requires some kind of modification to

1  say, you know, that first these professionals, and their fees

2  and expenses are going to be paid for retainers.  Then they,

3  you know, second, from this fee account, whoever is holding

4  onto it, I guess Ms. Good is, and then, you know, thereafter

5  are these coming from the Chapter 7 estate.  Are these, you

6  know, allowed 11 expenses, admin expenses.

7          Mr. Keane, I am looking at you because I think

8  there needs to be some language here to protect the Chapter 7

9  Trustee.

10          MR. KEANE:  I understand, Your Honor.  Other cases

11  that we have encountered similar situations, usually the

12  order -- we have tried to be very precise with the amount of

13  time that we spend in this case because --

14          THE COURT:  I understand.

15          MR. KEANE:  -- from where I'm sitting, Your Honor,

16  it appears to be a no asset case.  I mean, we are on the

17  sidelines watching this other litigation play out.  So, we

18  will see how that goes.  Its, effectively, as of right now, a

19  no asset case.

20          To get back to Your point, Your Honor, in the final

21  fee orders and Chapter 11 get converted to a Chapter 7.

22  Typically what happens is some professionals are holding

23  retainers, they can apply.  There is a delta where the

24  professional doesn't get paid a certain amount, everyone

25  takes a haircut and usually what it ends up being is they get

1  an allowed Chapter 11 admin claim for whatever amount is

2  leftover.  That gets paid, you know, as and when other

3  Chapter 11 cases get paid, if any.

4        So, we can work to revise the order language. If

5  Your Honor wants detail about what is still unpaid from each

6  of the professionals that's fine.  In other cases, what I

7  have said is just the professionals can email us the

8  information about if they apply a retainer, what is left

9  over, and then at least the Trustee has that information

10 going forward so he knows.

11        THE COURT:  It should be applied pro rata.

12        MR. KEANE:  Yes.  Understood, Your Honor.

13        THE COURT:  Including retainers, correct?

14        MR. KEANE:  Right, Your Honor.  Yes.

15        THE COURT:  So, I think you need a waterfall

16 retainer, the professional account.  I guess there is a

17 carve-out here -- there was a $100,000 carve-out the business

18 day following the trigger notice.  I don't even know if there

19 was a separate fund for that.

20        I think -- well, we need to submit a revised order

21 with different amounts, but also, I think there needs a

22 mechanism in here to say how this is really being paid and to

23 protect the Chapter 7 Trustee who is being directed to make

24 payment in an estate that you believe is insolvent.

25        MR. KEANE:  Understood, Your Honor.  We can work

1  with the professionals to have that done.

2          THE COURT:  All right.  As soon as Groombridge

3  submits the supplemental information the Court will look at

4  that as well.  I see no reason to hold up the order for the

5  rest of the professionals pending receipt and review of the

6  Groombridge information.

7          MR. KEANE:  Understood.  Thank you, Your Honor.

8          THE COURT:  Any questions about that?

9      (No verbal response)

10         THE COURT:  So, we had the pretrial on for three

11 o'clock. I have no issue with it being on right now, but I

12 don't know if all the parties are on the line or if the

13 parties agreed to move it that's fine. I just want to make

14 sure everyone is here who needs to be here.

15         MR. KEANE:  Your Honor, I will jump in and say that

16 was my mistake in preparing the agenda.  Your Honor, I guess,

17 I conflated the two.

18         THE COURT:  No problem.

19         MR. KEANE:  I do not know if everyone that needs to

20 be one, I know there is a lot of litigation and separate

21 counsel handling different aspects of the litigation that may

22 need to be on.

23         I know Mr. Beck had reached out to Chambers just to

24 confirm the clarification on when the pretrial was set, which

25 was 3 p.m., and this omnibus was set for 1 p.m.  I think

1  there is actually a different Zoom link that is set for the 3

2  p.m. pretrial.  So, I don't want to be creating more

3  logistical issues then there needs to be, Your Honor.  So, I

4  think everyone will probably be happy to jump back on at

5  three using that separate Zoom link, but I will defer to the

6  other parties that are involved in litigation.  And I see Mr.

7  Beck has turned his camera on.

8          MR. BECK:  Your Honor, Richard Beck for Carnival.

9          There was some confusion on the timing based the

10  agenda, but everybody -- not everybody is on this hearing,

11  not on this link.  So, I believe the parties are intending to

12  Zoom in at three o'clock.

13          THE COURT:  All right.  Then we will get back on at

14  three.  Thank you, Mr. Beck, for clarifying and, Mr. Keane.

15          With that, is there anything further for today?

16      (No verbal response)

17          THE COURT:  Okay.  I appreciate everyone getting on

18  the line this afternoon with the fees. I hope you all have a

19  good holiday.  We stand adjourned.  Thank you.

20          (Proceedings concluded at 1:41 p.m.)

21

22

23

24

25

1                        CERTIFICATION

2            I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of my

5    knowledge and ability.

6

7    /s/ Tracey J. Williams                    January 2, 2024

8    Tracey J. Williams, CET-914

9    Certified Court Transcriptionist

10   For Reliable